1           IN THE UNITED STATES DISTRICT COURT FOR THE

2                 WESTERN DISTRICT OF OKLAHOMA

3

4    EDWARD C. HUGLER, ACTING
     SECRETARY OF LABOR, UNITED STATES
5    DEPARTMENT OF LABOR,

6         Plaintiff,

7    vs.                              No.  CIV-15-1378

8    MARGARET MARANTO, Individually, and
     MEERS STORE & RESTAURANT, INC., a
9    Corporation

10        Defendants.

11

12            DEPOSITION OF RANDALL G. O'NEAL
              TAKEN ON BEHALF OF THE PLAINTIFF
13      ON APRIL 20TH, 2017, BEGINNING AT 9:19 A.M.
                    IN TULSA, OKLAHOMA

14

15         APPEARANCES:
16
     On behalf of the PLAINTIFF:
17
          Tyler P. McLeod
18        UNITED STATES DEPARTMENT OF LABOR
          Office of the Solicitor
19        Cesar E. Chavez Memorial Building
          1244 Speer Boulevard, Suite 515
20        Denver, Colorado 80204

21

22

23   (Appearances continued on next page.)

24   REPORTED BY:  Lindsey N. Goodenow, CSR

25

**H+G**

**Hunter+Geist, Inc.**

**303.832.5966**   1900 Grant Street, Suite 1025   ■ www.huntergeist.com
**800.525.8490**   Denver, CO 80203   ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**RANDALL G. O'NEAL - 4/20/2017**
**Edward C. Hugler, et al.  v. Margaret Maranto, et al.**

**1**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

EDWARD C. HUGLER, ACTING
SECRETARY OF LABOR, UNITED STATES
DEPARTMENT OF LABOR,
    Plaintiff,
vs.                              No.  CIV-15-1378
MARGARET MARANTO, Individually, and
MEERS STORE & RESTAURANT, INC., a
Corporation
    Defendants.


DEPOSITION OF RANDALL G. O'NEAL
TAKEN ON BEHALF OF THE PLAINTIFF
ON APRIL 20TH, 2017, BEGINNING AT 9:19 A.M.
IN TULSA, OKLAHOMA


APPEARANCES:

On behalf of the PLAINTIFF:

    Tyler P. McLeod
    UNITED STATES DEPARTMENT OF LABOR
    Office of the Solicitor
    Cesar E. Chavez Memorial Building
    1244 Speer Boulevard, Suite 515
    Denver, Colorado 80204


(Appearances continued on next page.)
REPORTED BY:  Lindsey N. Goodenow, CSR

**2**

On behalf of the DEFENDANTS:
    Bill V. Wilkinson
    WILKINSON LAW FIRM
    Valley National Bank Building
    4812 E. 81st Street, Suite 302
    Tulsa, Oklahoma 74137


ALSO PRESENT:

Michael Speer

Nancy McClung

**3**

INDEX

|  |  | Page |
|---|---|---|
| DIRECT EXAMINATION BY MR. McLEOD | | 6 |
| CROSS-EXAMINATION BY MR. WILKINSON | | 207 |
| REDIRECT EXAMINATION BY MR. McLEOD | | 211 |

PLAINTIFF'S EXHIBITS

| Exhibit | | Page |
|---|---|---|
| A | Letter Dated 11/20/2014 | 176 |
| C | Letter Dated 1/23/2015 | 164 |
| F1 | Time Cards | 112 |
| L | Expert Witness Disclosure | 9 |
| M | Expert Witness Report | 29 |
| N | Letter Dated 7/5/2016 | 30 |
| O | Supplemental Expert Witness Report | 34 |
| P | Summary of Employee Interviews | 40 |
| Q | Report of Interviews | 43 |
| R | FLSA Narrative Report | 70 |
| S | Complain | 72 |
| T | Deidra Wash Sample of Rounding Errors | 84 |
| U | Fact Sheet #22 | 101 |
| V | Fact Sheet #15 | 127 |
| W | Field Operations Handbook Excerpt | 128 |
| X | Margaret Maranto Deposition Excerpt | 151 |
| Y | Dallas Regional Wage Hour Memorandum No. 07-07 | 165 |

**4**

PLAINTIFF'S EXHIBITS (Continued)

| Exhibit | | Page |
|---|---|---|
| Z | Margaret Maranto Deposition Excerpt | 196 |

DEFENDANT'S EXHIBITS

| 1A | Off the Clock Hours to be Added | 139 |
| 1B | Slow Season Spreadsheet | 139 |

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

---

**5**

                    STIPULATIONS

          It is stipulated and agreed by and between
the parties hereto, through their respective attorneys,
that the deposition of RANDALL G. O'NEAL may be taken
pursuant to the subpoena and in accordance with the
Federal Rules of Civil Procedure on April 20th, 2017,
before Lindsey Goodenow, Certified Shorthand Reporter.

---

**6**

1           RANDALL G. O'NEAL,
2      having been first duly sworn, testifies as follows:
3           MR. WILKINSON:  We'll use the same
4      stipulation that we've had, in that we will reserve
5      objections except as to form until the time of trial.
6           MR. McLEOD:  That's agreed.
7           DIRECT EXAMINATION
8      BY MR. McLEOD:
9           Q    Could you please state your name?
10          A    Randal G. O'Neal.
11          Q    And could you spell your last name for the
12     court reporter?
13          A    O-N-e-a-l.  I did give her a card so she has
14     it.
15          Q    Okay.  Thank you.  And have you been deposed
16     before?
17          A    I have.
18          Q    And when have you been deposed before?
19          A    I have been deposed most recently in a Merit
20     Systems Personnel Board case, I think, in 2014.  Prior
21     to that, I've been deposed in another personnel matter
22     and in regard to investigations made by the Wage and
23     Hour Division.
24          Q    Okay.  Approximately how many times?
25          A    Approximately six.  I would say six to eight

---

**7**

1      times.
2           Q    And in what capacity were you in when you
3      were deposed?
4           A    First time, I would have been a Wage Hour
5      investigator.  After that, I was the director of
6      government contract enforcement maybe for one
7      deposition -- one or two depositions.  And then the
8      others were as director of enforcement for Wage and
9      Hour.
10          Q    Okay.  Do you know how many times you were
11     deposed as director of enforcement?
12          A    I would say about three -- about three or
13     four.
14          Q    Okay.  So I'm going to go over some
15     preliminary things that you probably are aware of
16     having been deposed before.  First of all, are you
17     taking any medications or any substances that would
18     affect your ability to truthfully answer questions
19     today?
20          A    No.
21          Q    Is there any other reason you cannot provide
22     truthful answers to questions today?
23          A    No.
24          Q    What did you do to prepare for this
25     deposition?

---

**8**

1           A    I went through my notes that I had made with
2      regard to examination of documents that were supplied
3      by Mr. Wilkinson.  I reviewed my notes I made with
4      regard to depositions taken in Meers and depositions
5      taken in Oklahoma City.  I re-read the complaint and I
6      had discussions yesterday afternoon with Mr. Wilkinson.
7           Q    Okay.  Anything else?
8           A    I think that's everything.
9           Q    Okay.  And how long did you spend preparing
10     for the deposition?
11          A    Probably six to eight hours.
12          Q    And that's reviewing notes, the complaint,
13     and meeting with Mr. Wilkinson?
14          A    Yes.
15          Q    Okay.  Well, I'm going to ask you a series of
16     questions today, and if I ask you something you don't
17     understand, will you let me know so I can rephrase it?
18          A    Yes.
19          Q    And if you need to take a break, let me know.
20     But if there's a question that's before you, you need
21     to answer before you take a break.  Do you agree on
22     that?
23          A    Agree.
24          Q    And the court reporter here is taking down
25     our conversation on the record so it's important that

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

---

9

1  we don't talk over one another, and I've definitely
2  been guilty of that before, but we just need to be
3  mindful of that as we go along.  Can we agree on that?
4     A   Yes.
5     Q   Also, any yes or no responses need to be
6  verbalized as yes or no.  Okay?
7     A   Okay.
8     Q   So what is your current occupation?
9     A   I am a semi-retired federal employee doing
10  some Wage and Hour consulting work.
11     Q   Okay.  Anything else other than the
12  consulting work?
13     A   Volunteer work in the area -- in the Dallas
14  area.
15        (Exhibit L is marked for identification.)
16     Q   All right.  Randy, I'm handing you what's
17  been marked as Exhibit L.  Could you please identify
18  this document?
19     A   This is an expert witness disclosure form
20  that I filled out, I believe, in January of this year.
21     Q   You prepared this?
22     A   I did.
23     Q   And is that your correct address at the top?
24     A   Yes.
25     Q   And how long have you lived in Garland?

---

10

1     A   How long have I lived in Garland?
2     Q   Yeah.
3     A   Since October of 1990.
4     Q   And specifically, how long have you been
5  engaged as a Wage and Hour consultant?
6     A   I retired from the Department of Labor on
7  January 3rd, 2015.  I represented myself as being
8  available to do consulting, I think, later that month
9  or in February 2015.
10     Q   Okay.  So you have listed a description on
11  the first paragraph of Exhibit L of essentially the job
12  functions of a Wage Hour consultant; is that accurate?
13     A   Yes.  And --
14        MR. WILKINSON:  I'm sorry.  Which paragraph
15  are you asking about?  Which paragraph?
16        MR. McLEOD:  The first paragraph under Wage
17  Hour consultant.
18     A   Yes.  As I have -- as I have visualized the
19  work that I would like to do.  By that, I mean, other
20  Wage Hour consultants may do things that I'm not really
21  interested in doing.  I don't know if you would call
22  that limiting my practice or focusing my activity, but
23  I try to list there the type of things I had either
24  done or was interested in doing in my consulting work.
25     Q   (By Mr. McLeod)  Okay.  So is there anything

---

11

1  that you do as a Wage Hour consultant that is not
2  listed under the description?
3     A   No.
4     Q   Okay.  And who do you provide services to?
5     A   Primarily law firms.  I have provided
6  services to church ministries, to a program management
7  company, to an engineering company.  I think that's
8  all.
9     Q   And how many clients have you had since you
10  started?
11     A   About eight, eight to ten.
12     Q   Okay.  Other than law firms, church
13  ministries, and I think you said program management?
14     A   Yes.  Program management company.
15     Q   Any other businesses that you provided
16  services to?
17     A   I think I mentioned an engineering company.
18     Q   Okay.  Any others?
19     A   I believe that's all.
20     Q   Okay.  In the description here, are these
21  services that you have, in fact, done or that you are
22  offering to potential clients?
23     A   A mix.
24     Q   Okay.
25     A   Most of them I have done.  When I wrote this,

---

12

1  "Assist plaintiff and defense attorneys with respect to
2  opinions and expert testimony," when I wrote this, I
3  had not functioned as an expert as far as giving expert
4  testimony.  I anticipated doing that.  I was willing to
5  do that, but I think at the point this was written I
6  had not done that yet.  Everything else I had done or
7  was work I had performed when this was written.
8     Q   Okay.  So what kind of work are you doing for
9  law firms?
10     A   One type is to conduct audits -- they prefer
11  to call them audits rather than investigations --
12  audits of their clients' compliance with regard to the
13  Fair Labor Standards Act, particularly with respect to
14  exempt versus nonexempt employees.  I've answered
15  questions about the Department of Labor's -- or the
16  Wage and Hour Division's position with regard to
17  certain technical issues regarding laws enforced by the
18  Wage and Hour Division.  I have, in this matter,
19  assisted Mr. Wilkinson in his defense of the Meers
20  Restaurant client.
21     Q   Okay.  And have you -- other than with the
22  Wilkinson Law Firm, have you assisted with defense to
23  any sort of investigation or lawsuit?
24     A   As of today?
25     Q   Yeah.

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 5 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v.  Margaret Maranto, et al.

13

A   Yes.
Q   Okay.  Can you identify who that was for?
A   For Crowe and Dunlevy Law Firm based in Oklahoma City with regard to a private suit under the FLSA, what you and I might call a 16(b) suit.
Q   Okay.  And what kind of services did you provide in connection with that private suit?
A   An analysis of the complaint, an analysis of the deposition testimony, an opinion with regard to the merits of the complaint, next steps to defend the client, that sort of thing.
Q   Is that an ongoing lawsuit?
A   Yes.
Q   And when were you retained on that?
A   Formally, Tyler, I think in February of this year.  I say that, there were some discussions in January, but no agreement between the firm and I until February.
Q   And have you prepared a formal expert report in that case?
A   No.
Q   And do you know, have you been designated as an expert in that case?
A   Yes.
Q   Do you know what court that case is in?

14

A   Northern District of Texas, Dallas Division.
Q   Okay.  Does the law firm you're working with represent the employer or employees?
A   Employer.
Q   All right.  So other than that case, have you provided any services in connection with the defense to an investigation or a lawsuit?
A   Yes.
Q   Okay.  What else?
A   Cowles Thompson Law Firm in Dallas called me -- an attorney called me and asked questions about a lawsuit that had been filed against his client in the Southern District of Texas.  The client is a -- it's either a chain of nursing homes or group homes or something like that and he just wanted to have a conversation.  He wanted to explain his understanding of the complaint.  He wanted my thoughts on that.
I shared those verbally telephonically.  He asked me if I would be willing to be an expert in the case or assisting with the case.  I indicated that I would and that was pretty much the end of it.  I don't remember if it's litigation brought by the Department of Labor or by private party.
Q   Okay.  Is it actively in litigation, do you know?

15

A   My understanding is his client has been sued.
Q   Do you know the name of that case?
A   I do not.
Q   Do you know what court it's in?
A   Southern District of Texas.  It's in the Houston area.
Q   What was the name of the case that was in the Northern District of Texas?
A   I'm going to decline to answer that simply because I've signed a confidentiality agreement with the law firm that I would not disclose the name of that company and I'm going to abide by that today.  If ordered -- obviously, if the Court orders me to answer the question, I'm going to answer the question.  But it's a drilling company.  It's an oil and gas drilling company.  I'm going to fall short of giving you the name of it today.
Q   Okay.  But as I understand it, you're saying that's an active lawsuit in the Northern District of Texas?
A   Yes, it is.
Q   All right.  So other than those two you identified, are there any other defense matters whether it's a Wage Hour investigation or lawsuit that you are involved in or have been involved in?

16

MR. WILKINSON:  Object to form.
A   I think those are the only ones.
Q   Okay.  So can you just briefly describe what sort of services have you, then, provided for non-law firm clients such as the church ministries, the program management company, and the engineering firm?
A   Yes.  Program management company hired me to provide Davis-Bacon -- and related -- Act training to compliance monitors, I would call them, employed by the program management company.  I did not sign an agreement with them.  They were hired to contour a series of Davis-Bacon covered construction projects in the Dallas area.  They wanted their monitors to be trained in how to examine certified payrolls, how to conduct employee interviews, and I delivered that training to them.  Two days worth.
Q   All right.
A   Both churches, the work centered on anticipation of the previous administration changing the salary level of the 541 exemptions under Section 13(a)(1).  They wanted -- these are large ministries.  They wanted an analysis of their job descriptions.  They wanted discussion and guidance on properly classifying exempt and nonexempt employees should that salary increase take effect December 1st.

4 (Pages 13 to 16)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 6 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

17

Q   Okay.  How about for the engineering firm?

A   The engineering firm is actually a client -- turned out to be a client of the program management company.  So that really was -- that was really a combined effort.  The engineering company retained the program management company which retained me.

Q   Okay.  Have you described all the services that you've provided since you started consulting in approximately January or February 2015?

MR. WILKINSON:  You mean, except in this case?  You haven't actually made any inquiries yet about this case.  I just want to be sure.

A   Yes, I have.

Q   Okay.  And what else?

A   That's all.  These are the only ones.

Q   I see.  Okay.  Thank you.

MR. WILKINSON:  But I think he's including in his answer the fact that he's done work in this case.  You're already aware of that, but your question was a little tricky I thought.

MR. McLEOD:  Well, Bill, to the extent you think I'm trapping him, I think we all know that he's provided services in this case.  I'm just trying to understand what he's done other than this case.  I'm aware he's here as an expert in this case.

18

MR. WILKINSON:  Okay.

Q   (By Mr. McLeod)  So regarding director of enforcement position with Wage Hour, I understand you did that 11 years?

A   I did that in that -- with that particular title for about 11 years.

Q   And why do you say with that particular title?

A   I did the same duties for the last 20 years that I was with the Wage and Hour Division, but for a period of time before the director of enforcement position was created in 2004, I performed the same duties, had the title of director of regional operations.

Q   Okay.  And could you please explain your involvement in that capacity as director of enforcement with specific investigations taking place throughout the region?  How would you describe that?

A   I would describe it largely in two ways:  The great majority of cases that were active in the region -- in the 11-state region, I had no personal direct involvement in them.  I "participated," in quotes, or influenced those investigations by delivering guidance and training with regard to policy and procedure as to how those investigations should be made, what positions

19

should be taken with regard to the application and interpretation of the regulations, how those cases should be handled in the district office.  And absence of any personal hands-on involvement, I attempted to influence those cases by delivering training and guidance and accountability reviews to those offices with regard to those cases.

There was a smaller, much smaller number of cases that, because of their sensitivity or their complexity or their size, size with regard to the number of employees or potential back wage figures, the potential for litigation, the potential for criminal enforcement, I took a more hands-on approach with those cases and monitored them in some form or fashion either through written reports, telephone conversations, visits to the office and, I guess, conversations where I would either ask questions and have those questions answered about the cases or I would be contacted and the district office manager would want to bring the case to my attention.

Q   Okay.  So to what degree were you aware of cases that were ongoing or investigations that were ongoing throughout the region?

A   It varied.  On one end of the spectrum was the case that was -- I would call it the

20

run-of-the-mill case.  I got a complaint about a nonpayment of overtime.  The district office would set the case up, assign it to an investigator.  They would conduct the investigation.  If they found no violations, they would close it.  If they found violations, they would get the employer in compliance.  They would request the payment of back wages.  Voluntarily, that was often done.  The case would close maybe ten, 15,000, $20,000 in back wages due and paid.  The case would be closed.

I might literally know nothing about that case other than if I pulled it in an accountability review or an audit and happen -- randomly to happen to take a look at it, or if I pulled the case for another reason, maybe a subsequent congressional or an internal investigation that would cause me to pull the case.  Those -- so in one end of the spectrum were the cases that, for all practical purposes, are created, flowed through the process, and are concluded, and I never knew anything specifically about that case.

Q   How about the identity of cases?

A   It was always available to me through the database but I --

Q   Can I ask you, was there a list of some kind that had all active cases in the region or

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 7 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

21

1  investigations in the region?
2      A   Yes.  If the list didn't exist, it could be
3  easily created.
4      Q   Is that through WHISARD?
5      A   Yes.
6      Q   And how do you spell WHISARD?
7      A   W-H-I-S-A-R-D.
8      Q   That was for the court reporter.
9      A   Yeah.  Do you want to know what it stands
10  for?
11     Q   Sure.
12     A   Wage hour information system and reporting
13  database.
14     Q   And what is that?
15     A   It's the -- it is just what it says.  It is
16  the software that -- national software that records all
17  compliance actions in the Wage Hour Division and
18  creates a historical database of those on a fiscal year
19  basis.
20     Q   When you were director of enforcement --
21  regional director of enforcement, who did you report to
22  directly?
23     A   The deputy regional administrator.
24     Q   And who was that during -- just to add a time
25  frame, during your actual title of director of regional

22

1  enforcement in 2004 to 2015?
2      A   Okay.  2004 -- 2004 would be Cynthia Watson.
3  She was the deputy regional administrator.  She was
4  replaced by Betty Campbell as deputy regional
5  administrator.  So during the period that that was
6  technically the title, those were the two supervisors I
7  had, direct supervisors.
8      Q   Okay.  And who did they report to?
9      A   Cynthia reported to Joe Villareal.
10     Q   What was his title?
11     A   Regional administrator.  Betty reported to
12  Cynthia Watson who had been promoted to regional
13  administrator.
14     Q   Okay.  So you reported to the deputy regional
15  administrator; right?
16     A   I did.
17     Q   And the deputy regional administrator
18  reported to the regional administrator?
19     A   Correct.
20     Q   And who were your direct reports?
21     A   Mr. Speer, who's with us today, was
22  previously --
23     Q   And if you could use titles too?  Actually,
24  let me --
25     A   Yeah.  You just want titles?

23

1      Q   Yeah.  I'm not asking for names actually.
2  What positions were your direct reports?
3      A   When I was director of enforcement?
4      Q   Yes.
5      A   I had somewhere between three and six
6  targeted enforcement coordinators that had areas of the
7  program they were responsible for.  For example, one
8  was responsible for FLSA.  One was responsible for
9  agriculture.  One was responsible for government
10  contract enforcement.  All of them were enforcement,
11  but we carved out areas of -- specialty areas.
12  Sometimes they had -- I don't know if any of them had
13  only one.  So three to six targeted enforcement
14  coordinators.
15     Q   Okay.
16     A   I supervised about six senior investigator
17  advisors.  All of these positions are at the GS-13
18  level.  I supervised the Freedom of Information Act
19  disclosure officer.  Sometimes there were -- there was
20  one person in that position, sometimes there were two.
21  I supervised the regional immigration coordinator.  I
22  believe that's all.
23     Q   Okay.
24     A   Probably I think when I retired, I
25  supervised, I believe, 13 people total.

24

1      Q   Okay.  And those positions are in the
2  regional office in Dallas; is that right?
3      A   Most are.
4      Q   Okay.  Which ones would not be?
5      A   There was a targeted enforcement coordinator
6  housed in the Houston office.  Immigration coordinator
7  for a period was located in the San Antonio district
8  office.  The senior investigator advisors, SIA's, were
9  located in various district offices.  There was one in
10  Denver.  There was one in New Orleans.  Those
11  individuals stayed in place.  When I selected them and
12  promoted them to those positions, it was not with the
13  requirement that they move to the regional office
14  physically.  They could stay where they were.
15     Q   But they reported to the regional office;
16  right?
17     A   They reported to me.
18     Q   And you're in the regional office?
19     A   Right.  And I was in the regional office.
20     Q   And just to kind of set some background here,
21  can you just briefly explain how -- well, how many
22  district offices there were during your tenure as
23  director of enforcement?
24     A   Anywhere from eight to either ten or 11.
25     Q   And what is the general make-up of positions

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

25

1  in a district office?
2      A   Top to bottom, a district office has one
3  district director, one or more -- one to four assistant
4  district directors.  They might house a senior
5  investigator advisor.  They would not report to anyone
6  physically in the district office.  The largest
7  component would be investigators and then
8  administrative, clerical staff.
9      Q   Okay.  And in terms of chain of command, who
10 did the investigators report to?  Who were their direct
11 reports?
12     A   The investigators report to an assistant
13 district director.
14     Q   And then who did the assistant district
15 directors directly report to?
16     A   They report directly to the district
17 director.
18     Q   And who does the district director report to?
19     A   The district director reports to the deputy
20 regional administrator.
21     Q   The same person you would have reported to;
22 right?
23     A   Yes.
24     Q   And so in your role, were you involved in any
25 personnel performance or conduct matters?

26

1      A   Yes.
2      Q   And other than the people you supervised,
3  were you ever involved in those matters?
4      A   Yes.
5      Q   Can you explain how that would come about?
6      A   On the low end of the spectrum, the simple
7  provision of guidance and mentoring, I was always
8  assigned one or more mentees who were district office
9  managers.  Sometimes it was a district director,
10 sometimes it was an assistant district director.  I was
11 expected to have at least monthly interaction with them
12 just to talk with them and answer their questions about
13 how do you deal with poor performance, how do you deal
14 with time and attendance, how do you deal with training
15 issues, to how do you interact with HR, how do you
16 interact with the solicitor's office, state agencies.
17 I would just share my experiences and my knowledge with
18 them in a formal mentor/mentee relationship.
19     Besides that, any manager in the district
20 office could call me.  I hope this is true, they felt
21 the freedom to call me to talk about disciplinary
22 issues.  They knew, by and large, that I handled the
23 region's internal investigations, investigations of our
24 own people.  I would often get a call that said or that
25 posed a question, here's what I think is happening,

27

1  what should I do, should I handle it through a
2  conversation with them, is this something, Randy, that
3  you need to investigate, where does this fall on the
4  spectrum of disciplinary issues, is this something that
5  rises to the level of contacting the IG.
6      So I would be involved largely aware of what
7  the issues were, disciplinary type issues, conduct
8  issues in the region, although that was truly the
9  territory of the regional administrator and the deputy
10 regional administrator.  So I would not represent
11 myself to you today, Tyler, as knowing about all of
12 them.  They would know about them.
13     But the district office managers would
14 sometimes informally or formally make me aware of them.
15 Other times, the regional administrator or deputy
16 regional administrator would make me aware of them so I
17 would know.  I needed to know from an enforcement
18 perspective because if we were having disciplinary
19 problems with an investigator, it would color my view
20 on whether that investigator's case work was suitable
21 for further action or not.
22     Q   Just shifting gears here still with respect
23 to your resume, Exhibit L, when you were an
24 investigator, it looks like you moved from Dallas to
25 Tulsa?

28

1      A   I did.
2      Q   And why did that happen?
3      A   I was a native of Oklahoma.  I had been
4  interviewed for the job by two managers in Tulsa, and
5  they -- after I spent two years in Dallas, they reached
6  out and asked me if I would be interested in coming
7  back to Oklahoma, specifically to Tulsa, and I was.  So
8  I requested a transfer at my own expense.
9      Q   Okay.  And you got a bachelor of science
10 degree from Oklahoma State?
11     A   Yes.
12     Q   Any other formal education?
13     A   No.
14     MR. WILKINSON:  In here, we talk about a
15 person who attended Oklahoma State University, that's
16 not also not referred to as formal education.
17     MR. McLEOD:  Okay.  That's a fair
18 interjection.  I won't comment because I'm not from
19 here.
20     THE WITNESS:  Appreciate it.
21     MR. McLEOD:  And I'm actually from Nebraska,
22 so I'm not taken kindly in these parts typically.
23     Q   (By Mr. McLeod)  Have you authored any
24 articles or publications?
25     A   I have not.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 9 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

29

(Exhibit M is marked for identification.)

Q   Okay.  I'm handing you what's been marked Exhibit M.  Could you identify this document?

A   This document is an expert witness report that I prepared on January 20th of this year.

Q   Anyone assist you in preparing that document?

A   Yes.

Q   And who is that?

A   A person who worked for Mr. Wilkinson sent me a couple of pages out of the civil rules -- Federal Rules of Civil Procedure having to do with an expert witness report to give me, kind of, guidance about what the report was to entail.

Q   Okay.  Is this the first time you wrote an expert witness report?

A   Yes, it is.

Q   And when were you retained -- well, let me ask you, who retained you in this matter -- with respect to this matter?  Was it the named defendants or the Wilkinson Law Firm?

A   Short answer is both.  The named defendants initially.  Because of the way the matter rolled out, subsequently Mr. Wilkinson either agreed to that or acquiesced to that or endorsed that.

Q   Okay.  And when were you retained by --

30

retained to be involved in this matter?

A   I believe it was August of this year.

MR. WILKINSON:  I believe he means August of last year.

Q   Yeah.  2016; right?

A   I'm sorry, 2016.

(Exhibit N is marked for identification.)

Q   Yeah.  August 2016.  I'm handing you what's been marked Exhibit N.  Do you recognize Exhibit N?

A   I do.

Q   What is that?

A   It is a letter I wrote to Joe Maranto on July 5th, 2016.  I would call it an introductory letter, offer of assistance.

Q   All right.  Is this your first contact with Meers or anyone with Meers?

A   Yes.  Other than to eat there in years past.

Q   In connection with this lawsuit?

A   Yes.

Q   At that point in time, what did you know about the litigation between the Secretary of Labor and the defendants?

A   In January of 2016, I was at my mother's house in Altus, Oklahoma, for a visit and she showed me a copy -- she showed me an article she had cut out of

31

the Lawton Constitution newspaper.  It was a news article about the lawsuit by the Department of Labor against the Meers Store and Restaurant.  She found it interesting.  She knew I was retired.  She knew I was consulting.  She showed me the article and she said is this what you do, could you help these people because she had eaten there several times with church groups -- can't make this stuff up.  She had eaten there several times, she was familiar with the place, and so she gave it to me and I read it.

And I don't know exactly what I said to her, but I read the article a couple of times and something didn't add up to me because I had been there.  I knew it was a small place.  And when I read in the article that the government was seeking -- or DOL was seeking $360,000, that didn't compute.  The size of the establishment often gives rise to a Wage Hour person's ability to guess how many or estimate how many employees might work there and if they were not paid correctly, what that might translate into potential back wages.  And I could not understand how a little bitty restaurant like that could owe $360,000.

So I told my mother, I said, well, possibly I could.  The article had the names of two attorneys.  I told her I don't know these attorneys, I never heard of

32

them.  That's a little -- that was of some concern to me because after 40 years, 13-and-a-half of it working in Oklahoma, I was fairly familiar with the labor and employment attorneys that handled -- that had the expertise to handle Wage Hour cases.

Q   Were these names other than Mr. Wilkinson?

A   They were.  Robert Lafferrandre, something like that, was one name and the other gentleman's name, I don't remember.

Q   Okay.

A   So the next day as I was leaving, my mother asked me about it again.  I said I've got the article, I may contact the attorneys and offer assistance and went on my way.

Q   What other facts did you know, though, about other than the newspaper article about the lawsuit?

A   That's all I knew.

Q   At the time you sent this letter?

A   At the time I sent the letter.  And I proceeded to lose that article.  But in July, I was doing some work and I remembered it.  I couldn't find the article.  I didn't know the names of the attorneys, but I knew Joe Maranto's name and the Meers, I Googled that.  I got his name and address and I sent this letter.

33

1    Q   Okay.  And in the last paragraph of the
2  letter, it says, "I'm not an attorney but would
3  certainly be able to assist you in your encounter with
4  the DOL."  Do you see that?
5    A   Yes.
6    Q   Did I read that right?
7    A   Yes.
8    Q   So at the time, what is it you thought you
9  could assist them with?
10    A   I thought he had one or two attorneys who
11  might not be familiar with the Wage Hour Division or
12  the solicitor's office and that I could assist them in
13  their representation of him.
14    Q   Did you have any factual reason other than
15  what you've explained to know what, if any, defense to
16  the allegations the defendants may have had at that
17  time?
18    A   Yes.
19    Q   What?
20    A   I had a concern that because of the location
21  of Meers near Lawton, Oklahoma, my concern was that the
22  investigation had been conducted by Cheryl Masters.  I
23  had a long-existing and somewhat long-standing concern
24  about Investigator Masters' adherence to the policies
25  and procedures of the Wage and Hour Division.

34

1    Q   Anything else?
2    A   No.
3    Q   And part of that sentence I just read says
4  "I'm not an attorney."  You're not an attorney;
5  correct?
6    A   I'm not an attorney.
7        (Exhibit O is marked for identification.)
8    Q   Okay.  I'm handing you what's been marked
9  Exhibit O.  Could you please identify that?
10    A   Okay.  Supplemental -- this is a supplemental
11  expert witness report prepared on April 17th, 2017.
12    Q   You prepared that?
13    A   I did.
14    Q   And did you have any assistance in preparing
15  that?
16    A   I did not.
17    Q   And that's just this past Monday, April 17th
18  that you completed that?
19    A   Yes.
20    Q   And why did you prepare this supplemental
21  report?
22    A   I prepared this at the request of
23  Mr. Wilkinson.
24    Q   Okay.  And why did he request you to prepare
25  that report?

35

1    A   I prepared this to clarify the expert witness
2  report I had done in January of this year.  And
3  specifically, I prepared this supplemental because the
4  January report was prepared and submitted before the
5  March depositions of Mr. Speer, Mr. Lonesky,
6  Investigator Masters, and Investigator Arnold.  I
7  wanted to clarify what I had said in the expert witness
8  report with respect to their deposition testimony.
9    Q   Okay.  Any other reason?
10    A   No.
11    Q   I've read these reports and would you agree
12  it's fair to say that you've expressed some opinions in
13  these reports?
14    A   Yes.
15    Q   And do these two reports concerning the Wage
16  and Hours' investigation of Meers Store and Restaurant
17  and Margaret Maranto and the present litigation, do
18  these reports conclude your -- include all of your
19  opinions regarding these matters?
20    A   Yes.
21    Q   So I would like to start by just -- I want to
22  walk through some things in this report and talk to you
23  about that.  But before I do that, I want to make sure
24  I understand all of the material you have considered in
25  preparing these reports.  Okay?

36

1    A   Okay.
2        MR. WILKINSON:  When you get to a convenient
3  stopping place, I suggest it would be a good time for a
4  brief recess.
5        MR. McLEOD:  We can do that now.
6        (Off the record at 10:15 a.m. and returning
7  at 10:21 a.m.)
8    Q   (By Mr. McLeod)  Randy, one thing I wanted to
9  ask you, it's my understanding your rate in this matter
10  for expert services or consulting services you're
11  providing is $150 an hour; correct?
12    A   Correct.
13    Q   And I think where we left off was I had asked
14  you if all of your opinions concerning the Wage and
15  Hours' investigation in this matter and concerning the
16  lawsuit are included in these reports and you confirmed
17  that; correct?
18    A   Yes.
19    Q   And so I want to understand everything that
20  you reviewed in preparing these reports.  So to start
21  off, can you just describe what documents you reviewed?
22    A   Yes.  I read the complaint.  Then I reviewed
23  copies of documents, I refer to them as flaps or what
24  looked like a flap of an envelope.  There were some
25  envelopes that had numbers on them.  There were some

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 11 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

37

1 time cards.  I reviewed redacted -- I reviewed numerous
2 documents from the investigation case file that had
3 been redacted, the case diary sheet, the narrative
4 report.  I had reviewed some correspondence that had
5 been issued from the district office about the case.  I
6 reviewed a 72-hour letter, I believe an appointment
7 letter.  I reviewed back wage computations.  I reviewed
8 a summary of employees alleged to be due back wages.
9 And I believe that -- I believe that's all.
10    Q   Okay.  And these items you're referencing,
11 they're listed on Page 1 of each of your reports; is
12 that correct?
13    A   Yes.
14    Q   And these are items that -- well, are you
15 aware of whether these are items that the plaintiff,
16 Secretary of Labor, produced in this litigation to the
17 defendants?
18    A   That's my understanding.
19    Q   Okay.  And have you had an opportunity to
20 review all documents that the plaintiff has produced in
21 this litigation to your knowledge?
22    A   I've reviewed the documents that the
23 Wilkinson Law Firm has provided to me for review.
24    Q   Okay.  Have you been provided any index of
25 documents prepared by the plaintiff?

38

1    A   Yes.
2    Q   And, you know, I'll represent to you that
3 plaintiff has produced documents Bates stamped 1
4 through 941 that were identified on indexes.  Would you
5 have reviewed those?
6    A   I reviewed the summary of what I would call,
7 Tyler, the summary of indexes that had the Bates number
8 and so forth.  I did it on the computer.  I had
9 problems when I tried to print it out, so all of it was
10 done on the computer, on the screen.  To the extent
11 that -- to the extent that every document listed in
12 that summary was provided to me, I reviewed it, if that
13 makes sense.
14    Q   Yeah.  And have you -- from reviewing the
15 indexes provided by the plaintiff, have you reviewed
16 all the material you felt you needed to, to provide
17 these opinions?
18    A   No.
19    Q   Can you explain that?
20    A   I would love to review the precise language
21 in FOH Chapter 51.
22    Q   Well, I guess I'm asking specifically what we
23 have produced and what has been identified on the
24 index.  You know, have you reviewed what has been
25 produced -- identified as produced on the indexes that

39

1 you've needed to?
2    MR. WILKINSON:  Now, we object to form,
3 counsel.  He was in the process of providing an answer
4 to that question.  So I always get nervous when the
5 adverse party propounds questions and the witness is
6 answering the question, but then is cut off and stopped
7 because, obviously, his answer to that last question is
8 now incomplete because you stopped it.  And so I
9 respectfully request you allow him to answer it.
10    MR. McLEOD:  Did you understand my last
11 question?
12    THE WITNESS:  Could you repeat it, please?
13    MR. McLEOD:  Can you read that back, please?
14    (The previous question was read back.)
15    MR. WILKINSON:  The question we're referring
16 to was the previous question to that, of course.
17    MR. McLEOD:  Yeah.  I understand your
18 objection, but I have a question on the table.
19    A   My interpretation of your question is have I
20 looked at everything I would need to look at to form a
21 complete opinion.  My answer to that question is no
22 because there are documents, including the interview
23 statements, that I would like to look at to fully form
24 my opinion.  I understand the Department of Labor
25 withholding those and I understand most of the

40

1 redactions.  I don't agree with all of them.  But I
2 have reviewed, to the best of my knowledge, the
3 documents that are listed on the index that have been
4 provided to me.  And I have formed my opinion based on
5 those documents.
6    Q   Okay.  Thank you.  And other than documents
7 produced by the plaintiff, are there any other
8 documents that you have reviewed, for example,
9 documents that may have been provided to you by
10 defendants or Mr. Wilkinson?
11    A   No.
12    Q   And regarding individuals or witnesses that
13 you have spoken to regarding this matter, can you
14 please identify how many you have spoken to?
15    A   Yes.  Well, I have spoken to Mr. and
16 Mrs. Maranto.  I have spoken -- briefly to Roland
17 Cunningham, to April Taylor, to Brian Hausheer,
18 something like that, and to Justin Grohn, and I believe
19 that's all.  I beg your pardon, I spoke to Lisa
20 Wiederman, and I believe that's all.
21    (Exhibit P is marked for identification.)
22    Q   Yeah.  And I'm handing you what's been marked
23 Exhibit P.  Do you recognize that?
24    A   I do.
25    Q   It's entitled summary of employee interviews?

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 12 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

41

1    A   Yes.
2    Q   And I believe there's five of them listed
3  right on Pages 1 and 2 of the exhibit that are
4  numbered?
5    A   Yes.
6    Q   So that's Roland Cunningham, Justin Grohn,
7  Brian Hausheer, April Taylor, Lisa Wiederman?
8    A   Yes.
9    Q   That's who you just listed; right?
10   A   Yes.  I spoke to those five people and --
11       MR. WILKINSON:  Counsel, you said five, but
12  it's actually six.
13       MR. McLEOD:  I'll address that.  I said the
14  five numbered here.
15       MR. WILKINSON:  I'm sorry.  I thought it was
16  an oversight.  I apologize.
17   Q   (By Mr. McLeod)  And there is a -- below a
18  No. 5 on page two, there's an M/M Maranto.  What does
19  that refer to?
20   A   Mr. and Mrs. Maranto.
21   Q   Okay.  So it's both?
22   A   Yes.
23   Q   Okay.  So other -- then on Page 3 of the
24  exhibit through Page 6, do you recognize those pages?
25   A   Yes.

42

1    Q   Okay.  What is that?
2    A   It's a list that I requested that ranks the
3  employees from the Wage Hour 56 Form, takes the same
4  employees and it ranks them by the amount of money they
5  are alleged due in back wages.  So Roland Cunningham is
6  on top.  He is alleged to be due the most.  Chris
7  Jakubiszyn is the end, he's alleged to be due the
8  least.
9    Q   And on Page 3 of the exhibit, there are
10  checkmarks on the left-hand column.  Those are the
11  individuals you spoke to?
12   A   Yes.
13   Q   Okay.  So other than who's identified on
14  Pages 1 and 2 and then the checkmarks, obviously, on
15  Page 3, did you speak with anyone else in connection
16  with this?
17   A   No.
18   Q   Okay.
19   A   Yes.  I beg your pardon.
20   Q   Okay.
21   A   I spoke with Joy Enos, E-n-o-s, at the CPA
22  firm.  I'm sorry.  I can't remember the CPA's name but
23  I spoke --
24   Q   Don Smith?
25   A   Yes.  Thank you.  I spoke to her at the firm

43

1  to request some address information with regard to the
2  people on this list.  And there was a lady,
3  receptionist-type position, who I also spoke with who
4  actually provided the addresses to me.
5    Q   Okay.  Anything else you spoke to Ms. Enos or
6  her co-worker about?
7    A   No.
8    Q   And then I want to just clarify something
9  regarding your notes.  And as I understand Exhibit P,
10  it's a summary of your interviews of each of these
11  individuals; is that fair?
12   A   Yes.
13   Q   And you separately took notes with respect to
14  these interviews?
15   A   Yes.
16       (Exhibit Q is marked for identification.)
17   Q   I'm handing you what's been marked Exhibit Q.
18  Can you please identify this, Pages 1 through 15?
19   A   These are what I termed ROI's, report of
20  interview.  It is my report or summation of the
21  interview that I had with the individuals listed on
22  these sheets starting with Roland Cunningham.
23   Q   Okay.  So fair to say these are your notes of
24  your interviews?
25   A   Yes.

44

1    Q   And were your interviews with these
2  individuals recorded in any other way?
3    A   No.
4    Q   And I had just a question about Pages 1
5  through 4 regarding Roland.  Is there a distinction
6  between Pages 1 and 2 and then separately 3 and 4?
7    A   Yes.  I -- Roland was the first employee I
8  spoke with on that particular day in November.  And the
9  conversation -- so we began the conversation and Page 3
10  and Page 4 were my initial notes.  Page 1 and 2, I
11  tried to put the notes in neater, more organized form.
12   Q   Okay.  So they are your notes and record of
13  the same conversation?
14   A   Of a single conversation.
15   Q   Okay.  And again, the last page, Page 15, are
16  these your notes with respect to a discussion with
17  Mr. and Mrs. Maranto?
18   A   Yes.
19   Q   Okay.  Any other notes with respect to your
20  conversations with them?
21   A   No.
22   Q   And any other notes with respect to any of
23  the other individuals that you spoke with?
24   A   There was a note I had for a period of time
25  that had a name and a phone number on it only and it

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

---

45

1  regarded Twilla Nieto.  It had her name and a phone
2  number.  I never spoke with her, so I'm not sure I
3  retained that particular note.  I think I just
4  transcribed her phone number on another piece of paper
5  that I did preserve.
6     Q   Okay.  Any other notes?
7     A   No.
8     Q   So regarding the five individuals other than
9  Mr. and Mrs. Maranto that you spoke with, I think you
10  touched on one of them, but how were these individuals
11  selected?  Why did you speak with them in particular?
12     A   They were the employees who could be
13  contacted and available to come to the restaurant.
14  That particular day, the restaurant was closed.  They
15  were available to come in and speak with me.  My goal
16  was to speak to everyone I could, but I was somewhat
17  limited to that one day.  I prevailed on the Marantos
18  to contact as many people as possible and asked them to
19  come in to speak with me.
20     Q   Okay.  Were they working at the time?
21     A   No.  The restaurant was closed that
22  particular day.
23     Q   Okay.  And I have to ask you a Wage Hour
24  question.  Were they paid for their time talking to
25  you?

---

46

1     A   I do not know.
2     Q   Did you do anything to find that out?
3     A   Only -- I told the Marantos that it should be
4  a voluntary situation, that the employees should be
5  told the purpose of -- the purpose -- my purpose was to
6  ask them about the Wage Hour investigation and if they
7  would be willing to come in and speak to me.
8     Q   Okay.  So as I understand it, you didn't
9  specifically select the individuals to speak to?
10     A   I did not.
11     Q   Do you know who did?
12     A   The contacts to the individuals was made by
13  Mr. and Mrs. Maranto.  Again, the -- my request to them
14  was I wanted to talk to as many employees as they could
15  -- on the summary of unpaid wages that they could
16  contact and that would be willing to come in under
17  those circumstances and speak with me.
18     Q   Okay.  So you don't know specifically who
19  selected them?  Is that what I'm understanding?
20     A   I'm not sure, Tyler, there was any selection
21  to it.  If there was, it was on the part of the
22  Marantos and I don't know what basis it would have been
23  on because the only basis I gave them was employees --
24  the universe consisted of the employees who were
25  alleged to be due back wages.

---

47

1     Q   Okay.  And when did you speak with Margaret
2  Maranto and Joe Maranto?
3     A   March -- I'm sorry, to explain the parameters
4  of the interviews or for the purpose of my note?
5     Q   Okay.  With respect to your notes?
6     A   November 15th, 2016.
7     Q   Okay.  And where did you meet them or where
8  were they and where were you when you had the
9  conversation?
10     A   We met at the restaurant.
11     Q   And have you had conversations with Margaret
12  Maranto or Joe Maranto regarding the substance of this
13  litigation?
14     A   I spoke with them the day that their
15  deposition was taken.  Karen took their deposition, I
16  believe, in January of this year.  I attended and spoke
17  with them briefly, I guess you would say, about the
18  investigation.
19     Q   Okay.  Would you have taken notes with
20  respect to that discussion?
21     A   No.
22     Q   So you don't have notes of any other
23  conversations with the Marantos?
24     A   No, sir.
25     Q   And you were present at the depositions of

---

48

1  Margaret Maranto and Joe Maranto?
2     A   Yes.
3     Q   And the exhibits presented at those
4  depositions, did you have an opportunity to read those?
5     A   Yes.
6     Q   And you were present at the depositions of
7  Cheryl Masters?
8     A   Yes.
9     Q   And Lindsay Arnold?
10     A   Yes.
11     Q   And Michael Speer?
12     A   Yes.
13     Q   And Mike Lonesky?
14     A   Yes.
15     Q   And did you have an opportunity to review the
16  exhibits that were presented at those depositions?
17     A   Yes.
18     Q   So are there any other people that you
19  interviewed, spoke with, or any other documents that
20  you reviewed that we haven't touched on in forming your
21  opinions that are included in these reports?
22     A   No.
23     Q   All right.  So I would like to talk to you
24  about your report.  And I think unless I say otherwise,
25  I'm primarily going to refer you to your most recent

---

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 14 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

49

1    one.
2        A    Exhibit O?
3        Q    Yes, the April 17th report.  And by the way,
4    you mentioned and I think you wrote here the Merit
5    System Personnel Board, is that the same as the Merit
6    System Protection Board, MSPD?
7        A    Yes.  Sorry.
8        Q    Just some questions I'm going to ask you here
9    on some technical things.  Another one is the
10   Enforcement Policy Advisory Committee, that's
11   referenced in the first paragraph of Page 1; correct?
12       A    Yes.
13       Q    All right.  What is that?
14       A    It was a committee made up of the five
15   directors of enforcement and about the same number of
16   people in the national office.  Basically, national
17   office enforcement related people but sometimes
18   political appointees would sit in on the meetings.  But
19   the committee itself was comprised of, formal
20   membership I guess, the five directors of enforcement
21   in the field and about that many people who were
22   involved in enforcement either policy and procedure or
23   strategy and support in the national office.
24       Q    Okay.  And what exactly did this committee
25   do?

50

1        A    The committee -- the purpose of the committee
2    was literally to establish enforcement policy for the
3    agency.  It rolled out in various ways.  The phone
4    calls were monthly.  The meetings were less frequent
5    face-to-face meetings.  But an example would be if an
6    administrator of the Wage Hour Division wanted to begin
7    to assess liquidated damages on cases, if she wanted to
8    take a certain enforcement position new or different
9    going forward, the committee would meet and vet that.
10       Because, typically, the Wage Hour
11   administrator serves an average of 22 months.  They
12   come in and they don't have the institutional knowledge
13   to inform them about the pitfalls of what they might
14   want to begin to do or stop doing.  Maybe the
15   administrator says I want to stop issuing opinion
16   letters.  That would go into the Enforcement Policy
17   Advisory Committee, and we would say, well, have you
18   thought about this, have you thought about that, have
19   you thought about the Portal-To-Portal Act saying that,
20   you know, you're going to issue those, are you just not
21   going to issue anything at all.  And the matter would
22   be vetted.  A policy -- certainly, she, the
23   administrator, was in a position to make the final
24   decision, but she wanted to hear about that.
25       Enforcement position, what's a violation of

51

1    the regulation, what's not, what are we going to take a
2    position on, and what's that position going to be, is
3    it different in the Southeast than in California, if it
4    is, why it is, let's talk about that.  Because there
5    was a need for uniformity and consistency since it was
6    a national agency.
7        So we talked monthly.  If I had a concern, I
8    could bring it -- I put it on the agenda, bring it into
9    the committee.  We would talk about it.  Periodically,
10   we would meet face-to-face to talk about them,
11   particularly if they wanted us to come in and meet with
12   a representative from the national solicitor's office
13   who had to approve anything that was going to go into
14   the handbook or into an administrator's interpretation
15   or an opinion letter or that sort of thing.
16       Q    Okay.  That's a pretty thorough explanation.
17       A    I try.
18       Q    So you state that -- on this first page, I'm
19   still focusing on that.
20       A    Okay.
21       Q    It's the second paragraph.
22       A    Okay.
23       Q    That you were replaced as director of
24   enforcement in late 2014?
25       A    Yes.

52

1        Q    So when in 2014 would that have been?
2        A    I believe it was in October or it could have
3    been early in November.  Once I informed the regional
4    administrator and her deputy of my intention to retire,
5    they wanted me to spend time with my successor.  So
6    they moved quickly to announce the position, back fill
7    it even while I was still there.  It's somewhat like
8    attending your own funeral.  But that happened quickly.
9    So she was in place and she and I were talking and I
10   was trying to impart information to her the last -- I
11   would say last couple of months that I was working.
12       Q    When you say she, who are you referring to?
13       A    Naixa, N-a-i-x-a, last name Franquiz
14   F-r-a-n-q-u-i-z.
15       Q    I was going to save you the trouble of having
16   to spell that.  I was going to say first name is okay.
17       A    Okay.
18       Q    Okay.  So during that interim period, then,
19   your last day was January 3rd, as I'm understanding it,
20   2015?
21       A    Yes.
22       Q    Is it fair to say you were still involved in
23   that role just training Naixa?
24       A    I stepped away immediately from anything that
25   I was not already involved in because I had some

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

---

53

1  internal investigations underway.  There was some
2  litigation I was already involved in.  So Cynthia and
3  Betty and I agreed that from that day in October
4  forward, I would delegate to the targeted enforcement
5  coordinators and I would stop, basically for all
6  practical purposes, stop working on anything, talking
7  about anything, participating in anything that I was
8  not already involved in and that I would focus on two
9  things:  Tying up loose ends, so to speak, bringing
10 things to closure or put them in a position to be
11 handed them off to someone else; and then to sit with
12 Naixa and share information, experiences with her.
13     Q   Okay.  And when you referenced Betty and
14 Cynthia, you're referring to Betty Campbell and Cynthia
15 Watson; right?
16     A   Cynthia Watson, the regional administrator;
17 Betty Campbell, the deputy.
18     Q   Okay.  And you mentioned that you were
19 involved in litigation at that time.  What are you
20 referring to?
21     A   Repeat the question, please?
22     Q   I believe in your explanation of what you
23 were doing during this, sort of, interim period is, I
24 believe you said you had some litigation you were
25 involved in?

---

54

1     A   Yes.
2     Q   And I'm what that was in reference to?
3     A   There was a case here in Tulsa that I was
4  participating in depositions on, trying to see if we
5  could resolve that matter.  There were other cases --
6  there were other cases in the region that once I --
7  once word of my impending requirement got out, I had
8  several -- well, a few trial attorneys call me and say
9  you and I have talked about this, let's see if we can
10 wrap it up, have a settlement conference, have -- you
11 know, let's do something because I don't want you
12 leaving and then -- you know, because I had
13 participated somewhat heavily in those.  So that type
14 of litigation.
15     Q   Okay.
16     A   No new -- to completely answer your question,
17 I stopped reviewing cases that were coming in for
18 potential litigation.  And once I announced my
19 retirement, I didn't do anymore of that.
20     Q   Okay.  So I guess, first of all, the case
21 that you're referring to in Tulsa, is that the El
22 Tequila case?
23     A   Yes.
24     Q   And you mentioned depositions.  Were you
25 deposed in that case?

---

55

1     A   No.  I sat in on depositions of employer and
2  some employees.
3     Q   And Mr. Wilkinson was taking those
4  depositions?
5     A   Matt Sallusti from the solicitor's office was
6  taking those depositions.
7     Q   Okay.  So you were representing the secretary
8  when the solicitor's office was taking depositions?
9     A   Yes.  Sorry.
10    Q   No.  You didn't misspeak.  I'm just trying to
11 clarify.  And you mentioned that when you were leaving
12 and word got out, you were involved in other matters in
13 addition to this Tulsa case.  So in what manner were
14 you involved in these -- like, what did you do with
15 respect to these litigation cases?
16    A   Tyler, I don't remember specifically the
17 cases, but the norm for me was once the trial attorney
18 -- well, I was responsible for referring all the cases
19 that went to the solicitor's office.  I was responsible
20 for that activity, whether I did that personally or
21 whether I did it through a targeted enforcement
22 coordinator.  I looked at every case when it came in
23 before I gave it to a targeted enforcement coordinator.
24 We discussed it.  I was certainly having them draft
25 some of the referral memos as developmental work and

---

56

1  building their own expertise at that.
2         Once it got to the solicitor -- I'm sorry.  I
3  participated with Margaret with Lydia Tzagoloff in
4  Denver in what we call the second level JRC.  The Joint
5  Review Committee call had been made already by the
6  district office, but when the case came in after I took
7  a look at it, there was a second level JRC where I or
8  one of the enforcement coordinators met, typically face
9  to face, sometimes on the phone, but typically face to
10 face with counsel to talk about the merits of the case
11 before we formally referred it.
12        Once we referred it, the trial attorney
13 prepared the legal analysis if it was approved for
14 filing.  Once it was filed, it was typical that some
15 subsequent time the trial attorney and I would have a
16 conversation about the case, the development of the
17 case, the needs of the case, what they perceived as
18 maybe a deficiency in the case.
19    Q   Okay.  And I would like to clarify some of
20 the things you just said for the record here.  So
21 you're referring to litigation cases and you used the
22 term "referred"; right?
23    A   Referred.
24    Q   So can you explain who cases -- where are the
25 cases being referred to?

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

57

1  A    The referral is to the Office of the Regional
2  Solicitor.
3      Q    Okay.  And can you just explain -- well, let
4  me just ask you, so for example, Wage and Hour -- as
5  you testified earlier, you're not an attorney; right?
6      A    Correct.
7      Q    And you were never an attorney for Wage and
8  Hour; right?
9      A    Correct.
10     Q    And Wage and Hour does not have its own
11 lawyers that represent the agency in court?
12     A    Correct.
13     Q    Okay.  And so who does represent the
14 secretary in litigation?
15     A    The Office of the Solicitor of Labor.
16     Q    And the solicitor's office is a separate
17 agency in the Department of Labor; right?
18     A    Very much so.
19     Q    And it represents other agencies other than
20 Wage and Hour; right?
21     A    Yes.
22     Q    Okay.  So, I guess, can you just explain the
23 process how a Wage and Hour case gets referred to the
24 solicitor's office and filed in federal court?
25     A    Yes.  If the investigation made by a district

58

1  office -- if it's a significant case, if it's a
2  potential litigation case, then the district office
3  will be reporting that case in -- typically, in the
4  weekly report -- weekly enforcement report.  It would
5  come to me, other people in the regional office, and it
6  would be rolled up into an abbreviated report for the
7  national office on a weekly basis.
8      So we would know about these cases.  As I
9  mentioned earlier, sometimes the district office
10 manager would be talking to -- with me about the case.
11 We would be developing our position.  They didn't --
12 they were very resource conscious as they have to be.
13 So they did not want to develop a case, compute alleged
14 back wages in the case, only to have me say I'm not
15 going to -- I'm not going to further handle that case,
16 that case is not eligible for further handling, don't
17 send -- don't think you're going to send that case to
18 me and I'm going to do something with it, I'm not.  I
19 would share that information that would help them make
20 a decision whether to invest resources in developing
21 the case or not.
22     But let's assume the case gets developed,
23 it's suitable for litigation.  The district office
24 manager talks to counsel for Wage Hour who is in the
25 solicitor's office.  She would listen to their telling,

59

1  their description of the case, and she would say send
2  it in for review by your regional office or, no, I'm
3  not interested in that.
4      It was a fallacy to believe -- and some
5  managers struggled with this.  Some managers would say,
6  I talked to counsel for Wage Hour, she accepted this
7  case for litigation.  Michael is smiling.  No, she
8  didn't.  She told you to -- she approved the case for
9  forwarding to the regional office.  Big difference.
10     And I point that out, Tyler, because I was
11 the only person in the region, as designated by the
12 regional administrator, who could refer a case to the
13 solicitor's office.  So she could -- she being the
14 counsel for Wage Hour could not bind me, she could not
15 commit me to send that case to her.  So she very wisely
16 would say send it in for review.
17     We would review the case.  We would hold a
18 second level JRC.  If everything was up to snuff,
19 everything appeared to be in order, suitable for
20 litigation, we would make the referral.  We would
21 formally write a memo to refer the case, requesting by
22 the solicitor.  Usually, they accepted it and litigated
23 it.  Sometimes they found deficiencies, they would
24 reject the case.  Even after a formal referral, they
25 would reject it back to us.

60

1      So that was -- if the legal analysis
2  supported litigation and the regional solicitor is the
3  only person in the region that can authorize the filing
4  of a lawsuit, if the regional solicitor authorized the
5  filing and they actually filed the case, then some
6  subsequent point, I would be drawn into the development
7  and the litigation of that case.
8      Sometimes my involvement played out in
9  attending a presettlement conference.  Sometimes the
10 district judge would order the magistrate judge to have
11 a settlement conference.  I would be the agency
12 representative at those.  So I continued to speak for
13 the client agency for the Wage Hour Division with
14 regard to that case even when it was in the possession
15 of the regional solicitor.
16     Q    Okay.  So your role after it was transferred
17 to -- for referral to the solicitor's office, assuming
18 the solicitor's office decided independently to file in
19 Federal Court, you would be there to assist in
20 development of the litigation and process of
21 litigation?
22     A    Yes.
23     Q    Right.  And so there are instances where the
24 solicitor's office may choose not to accept a case for
25 litigation; right?

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 17 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

61

1    A   Yes.
2    Q   And as you mentioned, the solicitor's office
3  does its own independent legal analysis?
4    A   Yes.  They represented the secretary.  They
5  did not represent the Wage Hour Division.
6    Q   And that's why the plaintiff in the lawsuit
7  is the Secretary of Labor; right?
8    A   Yes.
9    Q   And is it your understanding that the
10 solicitor's office, once a lawsuit's filed, is making
11 decisions with respect to the Secretary of Labor as
12 opposed to Wage and Hour?
13   A   Yes.
14   Q   So kind of going back to where we kind of got
15 sidetracked on this was your interim period when you
16 announced your retirement and you were involved -- you
17 were wrapping -- you explained you were wrapping up
18 certain matters, including litigation.  And I guess my
19 question is what, if anything, did you know about Wage
20 Hour's investigation of Meers Restaurant and Store?
21      MR. WILKINSON:  Object to form.
22   A   Absolutely nothing.
23   Q   Okay.  And why is that?
24   A   From this vantage point, Tyler, looking back,
25 I think the investigation began in November -- late

62

1  November 2014.  By that time, I was completely
2  unplugged from anything that was new or being initiated
3  or planned or in the early stages of investigation in
4  the field.  There was nothing -- to my memory, maybe my
5  assumption, at that point, I had quit looking at the
6  weekly reports, but I would have been surprised if
7  there was something in the weekly report, which was the
8  typical vehicle to catch my eye about this particular
9  case.
10   Q   Now, you reviewed the diary sheets, right, on
11 this case?
12   A   Yes.
13   Q   In redacted form?
14   A   Yes.
15   Q   Now, it was registered in August 2014.  Do
16 you recall that?  Do you recall reviewing --
17   A   Do I recall that from the --
18   Q   Yeah.  From the diary sheets?
19   A   Yes, I do.
20   Q   And would you agree that there was
21 significant -- that there was logged investigation
22 activity from September up to November 20th?  September
23 October, November 20th?
24   A   Was there activity showing on the case diary
25 sheet?

63

1    Q   Yeah.
2    A   Yes.
3    Q   So would there have been any reason that you
4  should have known about the existence of this
5  investigation since it had been underway for about two
6  or three months before you were saying you were
7  replaced?
8      MR. WILKINSON:  Object to form.
9    A   Can you repeat that question?
10   Q   Well, in your capacity as regional director
11 of enforcement during August, September, October, and
12 November of 2014, should you have known about the
13 existence of this particular investigation?
14      MR. WILKINSON:  Object to form.
15   A   No.
16   Q   Why?
17   A   Because at any point in time, there are
18 thousands of complaints and -- in the region and early
19 stage investigations in the region.  And I would not
20 have had the time or the ability to -- or the need to
21 know about those.  My focus was on the significant
22 cases, sensitive cases, the large cases, the complex
23 cases.  And that investigation was usually met deep
24 into the investigation process.
25   Q   Okay.  Now, did you ever speak with any Wage

64

1  Hour personnel about the Wage Hour investigation in
2  this matter?
3      MR. WILKINSON:  Object to form.  Might I just
4  suggest that if you're going to ask a question like
5  that, wouldn't it be better for you to include the
6  dates or the time period you're asking about?
7      MR. McLEOD:  I think I'm just asking in
8  general, Bill.  I mean, I appreciate your
9  recommendations.  You can object.
10      MR. WILKINSON:  Well, you're talking about
11 two different completely distinct terms of period of
12 time --
13      MR. McLEOD:  I asked a basic question.
14      MR. WILKINSON:  -- one while he was with the
15 agency and one after he left the agency.  Now, this
16 question --
17      MR. McLEOD:  No.  I'm not splitting that up.
18   Q   (By Mr. McLeod) I'm asking at any time did
19 you ever talk to anybody about this investigation?
20   A   Any Wage Hour personnel?
21   Q   Yeah.  At any point in your life?
22   A   No.
23   Q   Okay.  Thank you.  And you mentioned here on
24 Page 1 --
25      MR. WILKINSON:  This is Exhibit O.  Correct?

16 (Pages 61 to 64)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 18 of 57

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

65

1    Q   -- of Exhibit O, "Since my retirement, I have
2  never had a conversation with any employee of the Wage
3  and Hour Division about this investigation"; right?
4    A   Correct.
5    Q   Okay.  So did you have a conversation or a
6  text exchange with Michael Speer about that -- about
7  the investigation and the lawsuit in June of 2016?
8        MR. WILKINSON:  Object to form.
9    A   In June of 2016, I recall -- I don't recall
10 the date, and it may take some explanation.  I do
11 recall a text to Michael Speer about the Meers
12 Restaurant litigation subsequent to learning about it
13 in January of 2016.
14   Q   Okay.  So that's a communication about the
15 investigation and the lawsuit; right?
16   A   Yes.  Yes or no would be the answer.
17   Q   Okay.  Are there any other communications
18 with Wage and Hour personnel that you've had other than
19 that text with Mr. Speer about this case?
20   A   There was a text in January of this year -- a
21 text exchange between Michael and I about this -- well,
22 I would describe it as about my presence in the state
23 of Oklahoma with regard to this case.
24   Q   Okay.  So I would like to get more
25 specifically into the report and things so --

66

1        MR. WILKINSON:  Into what?  I'm sorry.
2        MR. McLEOD:  Into the report and things
3  you've stated in the report.
4        MR. WILKINSON:  Again, this is Exhibit O now?
5    Q   (By Mr. McLeod)  Exhibit O, and as I
6  mentioned before, unless I say otherwise, I'm referring
7  to the April 17th report which is Exhibit O.  That way,
8  I don't have to say Exhibit O every time.  Agreed?
9    A   Okay.
10   Q   So first of all, are you aware of the
11 violations being pursued by the secretary in this
12 lawsuit?
13   A   Yes.
14   Q   Okay.  How are you aware of them?
15   A   I read the complaint.
16   Q   Okay.  Anything else?
17   A   I read the narrative -- their redacted
18 narrative report, I read the newspaper article, and
19 I've listened to the deposition testimony.
20   Q   So what are the violations that we're talking
21 about as you understand them?
22   A   There's alleged minimum wage violations,
23 overtime violations, child labor violations, and
24 record-keeping violations broadly stated.
25   Q   Okay.  And are you aware of the specific

67

1  reasons for minimum wage violations?
2    A   Yes.
3    Q   And so how would you become aware of those or
4  how did you become aware of those?
5    A   Primarily through the narrative report.
6    Q   Okay.  And are you aware of the corresponding
7  back wages that are alleged here, the amount?
8    A   Yes.
9    Q   And how did you become aware of that?
10   A   I looked at the back wage computation sheets
11 that the investigator prepared.
12   Q   And the back wage computation sheets you're
13 referring to, those are items that are typically
14 included in the investigation file; right?
15   A   Yes.
16   Q   So can you explain, based on your experience
17 with Wage and Hour, when Wage Hour concludes its
18 investigation, how does it communicate to the employer
19 its findings of violations and any corresponding back
20 wages or liquidated damages or penalties?
21   A   It's communicated initially through a final
22 conference, face-to-face meeting, that the investigator
23 has with the employer or the employer's representative.
24   Q   And that's referred to as a final conference;
25 right?

68

1    A   Final conference.
2    Q   And that's opposed to the -- there's an
3  initial conference too; right?
4    A   Yes.
5    Q   Can you explain what that is just briefly?
6    A   The initial conference is the first meeting
7  with the investigator and the employer or the
8  employer's representative.
9    Q   Okay.  And so at the final conference, it's a
10 verbal exchange explanation by Wage Hour personal as
11 to the violations, the basis of the violations, and any
12 back wages, etcetera; right?
13   A   Yes.
14   Q   And they also field questions that the
15 employer might have at that point; right?
16   A   Yes.
17   Q   Okay.  And was that done in this matter to
18 your knowledge?  Was there a final conference in this
19 instance?
20   A   Yes.  There seemed to be a conference.  I
21 most clearly remember a conference at the attorney's
22 office in Oklahoma City.  I would have to go back.  I
23 would have to look at the narrative report to see if
24 she reported what I would call a traditional final
25 conference with the Marantos and if that was followed

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 19 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

69

1  by the conference with the attorney, or whether the
2  attorney noticed Wage Hour of his representation prior
3  to the final conference and the final conference was
4  held in Oklahoma City with the attorney at that time.
5      Q.  Okay.  So at a final conference, Wage Hour
6  doesn't present any kind of written document of any
7  kind with respect to its findings?
8      A   If the employer has agreed that -- assuming
9  there are violations asserted and then assuming the
10  employer agrees to comply in the future, the employer
11  would be given some written documents in the final
12  conference.
13      Q.  And what would those be?
14      A   Typically, a summary of unpaid wages.
15      Q.  That's the Form WH-56?
16      A   Right.  WH-56 and the WH-55's which were the
17  individual back wage transcription and computation
18  sheets.  If they have not already been afforded
19  applicable publications regarding the regulations,
20  those would be given at that time as well.
21      Q.  Okay.  But there's nothing written with
22  respect to the investigation and the basis of the
23  findings or anything like that, right, that's given to
24  the employer?
25      A   No, there's not.

70

1          (Exhibit R is marked for identification.)
2      Q.  Okay.  And I'm going to hand you a copy of
3  the narrative.  It's marked as Exhibit R.  Have you
4  reviewed that document?
5      A   I have.
6      Q.  And you weren't present during any final
7  conference in this investigation; right?
8      A   No.
9      Q.  And you're aware there was an attorney
10  representing the Meers and the Marantos during the
11  investigation?
12      A   I'm not -- without reviewing this closely,
13  I'm not sure, Tyler, whether he began his
14  representation during the investigation or at the
15  conclusion of the investigation.
16      Q.  So you had mentioned his name before,
17  Robert Lafferrandre.  I don't know if I'm pronouncing
18  that right.
19      A   That's the individual.  I'm not sure the
20  pronunciation myself.
21      Q.  And have you spoken to him?
22      A   No.
23      Q.  Or any other attorney that may have been
24  working with him in representation of defendants in
25  this matter?

71

1      A   No.
2      Q.  And you don't know when his representation of
3  the Marantos and Meers began?
4      A   I think I have the information available to
5  me that would tell me.  I'm not -- off the top of my
6  head, I don't know.
7      Q.  Okay.  And a narrative is -- who prepares the
8  narrative?
9      A   The Wage Hour investigator.
10      Q.  Okay.  And what's the general purpose of
11  preparing a narrative?
12      A   It is -- I guess simply put, it's to
13  summarize the investigation, the conduct and the
14  findings and the disposition of the investigation.
15      Q.  Okay.  And that's for what purpose?
16      A   For -- well, I guess, initially, it is for
17  the purpose of review by the investigator's first line
18  supervisor, the assistant district director.  But then
19  depending on the nature of the case, it could have
20  following purposes.  The district director might want
21  to review it.  It becomes a part of the file that is
22  reviewable by people in the regional office, the
23  solicitor's office, and so forth.
24      Q.  Okay.  So it's an internal document for Wage
25  Hour personnel to review what happened in the case;

72

1  right?
2      A   Yes.
3      Q.  And it's not provided to employers?
4      A   No.
5      Q.  It's not provided --
6      A   Except --
7      Q.  -- to the public?
8      A   I'm sorry.  Except if they filed a Freedom of
9  Information Act request, they could get a copy, a
10  redacted copy.
11      Q.  Yeah.  But I guess my point is absent FOIA
12  request or a request in litigation through discovery,
13  this is a document that's not made public in any way;
14  right?
15      A   That's correct.
16          (Exhibit S is marked for identification.)
17      Q.  And I also just want to mark the complaint as
18  an exhibit.  So have you reviewed this document --
19      A   Yes.
20      Q.  -- the complaint?  Okay.  And in your role as
21  director of enforcement, would you receive copies of
22  complaints?
23      A   Yes.
24      Q.  And those are prepared by the solicitor's
25  office?

73

1    A  Yes.
2    Q  And the director of enforcement or Wage Hour
3  doesn't prepare those?
4    A  That's correct.
5    Q  All right.  So with respect to the complaint,
6  for example, Paragraph 8, Page 3, that identifies what
7  the secretary has alleged the specifics of the minimum
8  wage violations are?
9    A  Yes.
10   Q  You reviewed those?
11   A  Yes.
12   Q  And you addressed those in your reports;
13  correct?
14   A  Yes.
15   Q  All right.  So I would like to start talking
16  about the minimum wage section of your report, which is
17  on Page 4 of Exhibit O.  So the first two sentences
18  under the minimum wage section read, "The narrative
19  report indicates in a summary of violations that the
20  employees were sometimes paid on a cash basis.  In
21  other words, the report finds that payment by cash is a
22  violation of the Act."  So why did you state that the
23  report found that the payment by cash is a violation of
24  the FLSA?
25   A  Two reasons:  One, in the narrative report,

74

1  Exhibit R, if I can refer to it --
2    Q  And you can refer to whatever exhibit.
3    A  Thank you, Tyler.  This does not appear to be
4  the same copy or version of the narrative report that I
5  reviewed.  In the --
6    Q  And -- sorry.  Go ahead.
7    A  In the narrative report that I reviewed,
8  Investigator Masters used this format of Issue 1, Issue
9  2.  And on one of the documents I looked at, I think it
10  was as Issue 1, but nevertheless it was one of the
11  issues, it simply said that the employer paid in cash.
12  Subsequently, in her deposition, she said in response
13  to a question that one of the violations was that they
14  paid employees in cash.
15   Q  But that's not a violation of the FLSA;
16  right?
17   A  That's my opinion.  It is not a violation.
18   Q  Right.  So, like, on Page 11 of this exhibit
19  --
20   MR. WILKINSON:  Bates stamp 11?
21   MR. McLEOD:  No.  No.  The exhibit is, in
22  fact, numbered at the bottom.  It's also numbered at
23  the top because it was filed in court.
24   MR. WILKINSON:  Okay.  It has a Bates stamp
25  at the lower right-hand corner.  That's not the --

75

1    MR. McLEOD:  No.  No.  The Bates stamp number
2  -- this is the only narrative report we have produced.
3  I'm looking at Page 11.  The very last line on that
4  page, it says, the sentence starts --
5    MR. WILKINSON:  Let me see.  And it has Bates
6  stamped 170 in the middle?
7    MR. McLEOD:  It does have Bates stamped 170.
8    MR. WILKINSON:  Thank you for clarifying
9  that.  Go ahead.
10   Q  (By Mr. McLeod)  It reads, the very last
11  starting sentence on that page, "Additionally, the
12  employer claimed that they had no records of the cash
13  payments."  Because that's the issue, right, if you pay
14  in cash, you're required under the FLSA to keep a
15  records of those cash payments; correct?
16   A  Correct.
17   Q  And the complaint does not allege in
18  Paragraph 8 that paying in cash is a violation of the
19  minimum wage; right?
20   A  Correct.
21   Q  So I guess my point, Randy, is that in this
22  paragraph, you're stating that the investigator seems
23  to portray this employer in a negative light for
24  sometimes paying in cash.  Yet, this is an internal
25  document that, unless you can point me otherwise,

76

1  doesn't say that paying cash is a violation of the
2  FLSA.
3    MR. WILKINSON:  Object to the form.
4    Q  And the complaint also does not broadcast
5  that as a public filing.
6    MR. WILKINSON:  Object to form.
7    A  I certainly agree with the last part that the
8  complaint does not allege a payment of cash as a
9  violation of Section 6 or Section 11.  My point is, I
10  think -- has a couple of ingredients:  One is I know I
11  read in a document forwarded to me written by the
12  investigator where, as an issue, it says wages paid in
13  cash or employees paid in cash, period.  It was a
14  stand-alone sentence.
15   Secondly, it's -- it is my opinion in this
16  case based on documents I've reviewed, testimony I've
17  heard that this investigator was not only overly
18  aggressive with this employer and the employees of the
19  restaurant, but that she stepped outside -- clearly
20  outside policy and procedure in not only the conduct of
21  the investigation but her conclusions and findings or
22  findings and conclusions of the investigation.
23   Q  And I definitely want to talk to you about
24  that.
25   MR. WILKINSON:  Excuse me, please.  He wasn't

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 21 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

77

1  through.  Please don't interrupt.
2       MR. McLEOD:  He was done.
3       THE WITNESS:  I'm finished.
4       MR. McLEOD:  I mean, Bill, he finished.
5       MR. WILKINSON:  All right.  I apologize.
6       Q   (By Mr. McLeod)  So, Randy, what I'm talking
7  to you now is this finding of cash is a violation of
8  the FLSA, but you would agree that the narrative,
9  whether it includes it or not, is not a public document
10  that doesn't cast -- that would not cast such a finding
11  in a bad light to anyone other than individuals in the
12  Wage and Hour Division?
13       MR. WILKINSON:  Object to form.
14       A   I would agree, Tyler, with this stipulation
15  that it is statements like that made in an internal
16  document that can influence reviewers and
17  decision-makers, both in the Wage Hour regional office
18  and in the solicitor's office, internal customers so to
19  speak, with respect to getting a picture of this
20  employer, how they treated their employees, how they
21  conducted their business.
22       Q   Okay.  As we sit here now, and I understand
23  you may go back and review other documents, but you
24  can't find in this narrative where the investigator
25  pointed out that payment of cash was, in fact, a

78

1  violation of the FLSA?
2       A   I agree with that.
3       Q   Okay.  Now, what I did just read to you was a
4  reference to not keeping records for cash payments,
5  which is a violation of the FLSA; right?
6       A   It is a record-keeping violation.
7       Q   Right.  And a violation in itself has some
8  negative connotation to it?
9       A   Yes and no.  It really, in my opinion,
10  depends on the venue.  Because the agency struggled for
11  years with whether to take credit for working a
12  violation case when the only violation was non-monetary
13  like record keeping.  Because you can artificially --
14  the agency could artificially raise its percentage of
15  investigations disclosing violations by counting
16  record-keeping violations, but arguably, the congress
17  is not interested in us finding record-keeping
18  violations, nor the administration, but moreover,
19  they're interested in putting us in -- the Wage Hour
20  Division conducting investigations, correcting errors,
21  and putting back wage money in the pockets of the
22  workers who earned the money.
23       Q   Right.  Okay.  Based on your experience in
24  Wage Hour when an employer is paying cash and not
25  keeping any record of cash payments, does that raise

79

1  any concerns for the Wage and Hour Division to look
2  into?
3       MR. WILKINSON:  Object to form.
4       A   Yes.
5       Q   Such as what?
6       A   It facilitates -- it can facilitate
7  noncompliance because an absence of records make it
8  difficult to determine whether the employer has
9  complied with terms of the FLSA or not.
10       Q   Pretty hard to find out if there's no record;
11  right?
12       A   If there's no record.  It's referred to as
13  the underground economy, referred to in different ways,
14  but it certainly deserves and obtains the attention of
15  a Wage Hour investigation.
16       Q   And there's also a suggestion that maybe the
17  employer and the employees are not paying taxes on
18  money paid in cash when there's no record; is that
19  fair?
20       MR. WILKINSON:  Object to form.
21       A   I heard as much in some of the deposition
22  testimony.
23       Q   So I'm going to move on from this cash issue.
24       A   Okay.
25       Q   Moving to the breaks, that's the next

80

1  paragraph under minimum wage on Page 4 of Exhibit O.
2  Can you just explain to me your understanding of what
3  the violation is that the secretary is alleging with
4  respect to short restroom breaks?
5       A   Well, without referring to the complaint --
6       Q   And you can if you want.
7       A   Okay.  Well, maybe I should.  In the
8  complaint in Paragraph 8, engaging in the following
9  practices, the first practice, deducting time from
10  employees for breaks less than 20 minutes.  That is --
11  does that form your question, the basis of your
12  question?
13       Q   Yeah.  I'm just asking you what your
14  understanding is of the secretary's allegation?
15       A   It's against the regulations for the employer
16  to deduct rest or meal breaks of less than roughly  20
17  minutes in duration.  There are some exceptions.  But
18  in general terms, a rest or meal break of less than 20
19  minutes in duration is not deductible.  That time is
20  considered compensable under the FLSA.
21       Q   Right.  So the allegation in this case is
22  that there were clock-in-and-out times for breaks under
23  20 minutes?
24       A   Yes.
25       Q   All right.  So you mentioned in your report,

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 22 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

81

1  in fact, that it's wrong to do such a thing; is that
2  correct?  If it occurs, it is wrong --
3      A   Yes.
4      Q   -- to do that?  I'm not suggesting you're
5  saying it occurred.
6      A   Yes.  Yes.
7      Q   Is it your opinion that that happened in this
8  instance?
9      A   It's my opinion that it did happen in this
10  case.
11      Q   That they were -- so right now I'm talking to
12  you about violations.
13      A   Okay.
14      Q   And I want to talk to you about back wages
15  separately.  So is it your opinion that there were
16  minimum wage violations for deducting pay for short
17  breaks?
18      A   There are potential violations.
19      Q   Why do you say potential?
20      A   Because of the Klinghoffer Rule, some of
21  these employees, by Investigator Masters own
22  methodology, if they had time deducted and you add that
23  alleged deducted -- improperly deducted time back in,
24  then you took that number of hours and divided it into
25  their gross pay, they still received 7.25 an hour or

82

1  more for the hours they truly worked, not the
2  initially-reported hours or paid hours.  But even if
3  you take the alleged improperly deducted time and add
4  it to the hours worked, if it is 40 hours or less,
5  under Klinghoffer, there is a record-keeping violation
6  that there is no monetary violation of Section 6.
7      Q   Because their wages didn't actually fall
8  below minimum wage?
9      A   Exactly.
10      Q   So did you actually run an analysis to
11  determine whether the Klinghoffer Rule, there were no
12  minimum wage violations?
13      A   I took some of her -- some of Investigator
14  Masters' computation sheets.  My recollection is she
15  estimated the employee worked 35 hours, had one hour
16  improperly deducted, so and then she had the gross
17  wages.  I took the gross wages, and in my example,
18  divided it by 36, allegedly the true number of hours
19  they should have been paid for, and it yielded more
20  than 7.25 an hour.
21      Q   So in that example, the employee would have
22  made more than 7.25 an hour?
23      A   Yes.
24      Q   So did you run that example for employees who
25  only earned 7.25 an hour?

83

1      A   No.
2      Q   Let me re-ask that question.  If somebody
3  earns $7.25 an hour, which is minimum wage, and there
4  is a deduction for a short break, that will, in fact --
5  and they don't work above 40, that will, in fact,
6  result in a violation and result in back wage?
7      A   Not necessary.
8      Q   Why?
9      A   Because the investigator testified that she
10  had not and Mr. Lonesky testified that no meal credit,
11  no 3(m) credit, had been given to these --
12      Q   Okay.
13      A   -- if I may finish, had been given to these
14  employees.  If you factor that meal credit in, in
15  addition to the 7.25 an hour cash wage, potentially,
16  they could still not have suffered a minimum wage
17  violation.
18      Q   Right.  And I understand your position that
19  you just said about the meal credit, but my question --
20  you know, putting aside any other variables, but if a
21  $7.25 worker is earning minimum wage and there is a
22  deduction for a short break and they don't work above
23  40 hours, that deduction is a minimum wage violation
24  and there's a resulting back wage violation; right?
25          MR. WILKINSON:  Object to form.

84

1      Q   Absent other variables such as a meal credit
2  or something like that?
3          MR. WILKINSON:  Object to form.
4      A   Yes.
5          MR. WILKINSON:  I don't know where you are on
6  your questioning, but it's time for a lunch break so I
7  would suggest this would be the appropriate time unless
8  you want to continue on.
9          MR. McLEOD:  Bill, can I get through one
10  exhibit and then we'll take a break?
11          MR. WILKINSON:  Sure.
12          (Exhibit T is marked for identification.)
13      Q   (By Mr. McLeod)  I'm handing you what's been
14  marked Exhibit T.  Have you seen the front page of
15  Exhibit T?
16      A   Not to my memory.
17      Q   You at no time have had an opportunity to
18  review this?
19      A   It doesn't look familiar to my, Tyler.
20      Q   Now, it's my understanding you did review
21  some time cards and payroll information in this case?
22      A   Yes.
23      Q   How about Page 2, would you have seen Page 2,
24  payroll journal?
25      A   I have seen this page or pages similar to

21 (Pages 81 to 84)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 23 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

85

1   this.
2       Q    Okay.  And time cards, Pages 3 and 4, would
3   you have seen time cards that were photographed like
4   that?
5       A    Yes.
6       Q    And how about this last page, Page 5?  I'll
7   represent to you that this is the front side of the
8   timecard with Cheryl Masters' additions on it that was
9   produced.  It's Bates stamped 716.
10      A    I would agree that I've seen timecards that
11  have numbers like this on them.
12          MR. WILKINSON:  Counsel, what I think are
13  your third and fourth pages are not numbered.  At least
14  the copies I have are not numbered.
15          MR. McLEOD:  The exhibit is.
16          MR. WILKINSON:  It's Exhibit T, but you were
17  referring to page numbers.
18          MR. McLEOD:  Well, the witness has page
19  numbers on his exhibit.
20          MR. WILKINSON:  So they're not on -- okay.  I
21  just assumed that you gave me a copy of what he has is
22  what I assumed.  In the future, if you do not do that,
23  please tell me, because we all operate under the
24  premise that that's what you're doing.
25      Q    (By Mr. McLeod)  Okay.  So I'm going to walk

86

1   through this just briefly and ask you a question, but I
2   think if I can just point out some things, I think it
3   will go a little quicker, but if you want time to
4   review this first page because you just said you didn't
5   ever review it, let me know.
6       A    All right.
7       Q    But the points are this, to connect the dots,
8   on these pages, so on Page 3, the front of the payroll
9   has 98.08 minus .64 for a total of 97.44.  Do you see
10  that?
11      A    Yes.
12      Q    And on Page 4, that's the back of the same
13  timecard with the same corresponding dates and those
14  are the clock-in, clock-out times for the breaks that
15  are circled with numbers.
16      A    Okay.
17      Q    All right.  And if you add that up, it's 64.
18  Would you agree?
19          MR. WILKINSON:  Object to form.
20      A    So question -- would you take a question?
21      Q    Yeah.
22      A    So on Page 4, frankly, I can't really read
23  the punches, but 13, 10, 13, 13, and 15 purport to
24  represent the number of minutes from the clock out to
25  the clock back in?

87

1       Q    Well, these are the Meers Restaurant
2   timecards with their markings on them.  So I assume
3   that's what that is.
4       A    So I beg your pardon, I thought Investigator
5   Masters had written this.
6       Q    That's Page 5 is her additions.
7       A    Okay.  So these purport on Page 4, these
8   purport to represent the number of minutes the employee
9   clocked out for a smoke break or a short break?
10      Q    Right.  On those specific dates.
11      A    Okay.
12      Q    Right.  This is a timecard from Meers and so
13  that 64 is reflected on the front of the timecard where
14  the time is added.
15      A    Okay.
16      Q    Okay.  So the total is 97.44.  And then
17  Deidra Washington, Page 2 on the payroll --
18          MR. WILKINSON:  Are you referring to Page 5?
19          MR. McLEOD:  I'm not referring to that yet.
20          MR. WILKINSON:  You say you're not?
21          MR. McLEOD:  No.
22          MR. WILKINSON:  I apologize.  Where is the
23  number printed that you just gave?
24          MR. McLEOD:  97.44 is the total made by Meers
25  on Page 3 of the timecard.

88

1           MR. WILKINSON:  Thank you.
2       Q    (By Mr. McLEOD)  And then on Page 2 under
3   Deidra Washington, her hours are reported as 77.44
4   which is 20 less than 97.44.  Would you agree?
5       A    I would agree with the math.
6       Q    And that's all I'm talking about.  I'm just
7   trying to walk through this.
8       A    Okay.
9       Q    Okay.  And Deidra made -- do you know what
10  her pay rate was?
11      A    No.
12      Q    But if you took 77.44, divide that into her
13  pay rate -- pay amount, 56.44, that would give you her
14  pay rate; true?
15      A    Yes.
16      Q    And I'll represent to you that that's $7.25.
17      A    Okay.
18      Q    And that's the minimum wage?
19      A    Okay.
20      Q    And I'm not going to ask you to agree with me
21  that all of this is true.  I just want to ask you a
22  question about it.  Okay.  So on the first page, this
23  is a summary prepared by Cheryl Masters where she
24  identifies actual hours worked on the timecard to be
25  98.81, and that's per her math on Page 5 --

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 24 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

89

1    A    Okay.
2    Q    -- because there were rounding errors.  So
3  she identifies, based on the deductions and the
4  rounding errors, time that was off-the-clock time
5  deducted.  So my question really is this analysis takes
6  the timecards and looks at the actual breaks deducted
7  and the actual addition of the hours worked and
8  compares it to the payroll.  And I guess my question
9  is, did you do a similar analysis to this with respect
10  to those pieces of information?
11       MR. WILKINSON:  Object to form.
12    A    No.  I did an analysis, but it's not -- I
13  have not prepared a written representation of that
14  analysis.
15    Q    Is there anything in this exhibit -- I'm not
16  going to ask you that right now.  I know you haven't
17  reviewed it.
18       MR. WILKINSON:  So is this a good time, then,
19  for the lunch break?
20       MR. McLEOD:  Hold on.  This is a good time to
21  take a break.
22       MR. WILKINSON:  Okay.  We'll see you in about
23  -- back here in about an hour.  You're welcome to leave
24  all your stuff here if you want to.
25       MR. McLEOD:  Would anybody be agreeable to

90

1  having a shorter lunch?  And I only bring it up because
2  if I can get out of here early, I'm going to try and
3  get an earlier flight because there's a storm coming
4  in.
5       MR. WILKINSON:  Well, we're going to do our
6  best to be back here in an hour.
7       MR. McLEOD:  So 45 minutes?
8       MR. WILKINSON:  Yeah.
9       MR. McLEOD:  Okay.  Thank you.
10       (Off the record at 11:55 a.m. and returning
11  at 12:57 p.m.)
12    Q    (By Mr. McLeod)  Randy, before the break, we
13  were talking about breaks actually and deductions for
14  short breaks.  And this is discussed on Page 4 of your
15  report, Exhibit O.
16       MR. WILKINSON:  I'm sorry.  Which exhibit, O?
17  Which exhibit are you referring to?
18       MR. McLEOD:  Yes.
19       MR. WILKINSON:  Thank you.
20    Q    (By Mr. McLeod)  Starting on the bottom of
21  Page 4 onto Page 5, you state, "My interviews revealed
22  smoking breaks were not always deducted even when
23  taken."
24    A    Right.
25    Q    What interviews?

91

1    A    The interviews that I made in November of
2  '16.
3    Q    Who specifically said that?
4    A    Without looking at the interviews or my
5  ROI's, and I'll be glad to do that, Justin Grohn said
6  there was a time in 2012, 2013 that we clocked out for
7  smoke breaks or that was the policy, they were not
8  strict about it, nobody enforced it really; I've been
9  told to go outside for a break to get some fresh air
10  and told not to punch out but we have a few people who
11  were always outside smoking when we needed them.  They
12  stayed outside for a long period of time and the policy
13  was aimed at controlling them.
14       I'm pleased to look at the others, but I
15  think from memory, maybe April Taylor said that the
16  policy was somewhat hit and miss.  Sometimes people
17  clocked out, forgot to clock back -- I'm sorry, clock
18  out, forgot to clock back in.  So in my opinion, it was
19  a policy.  It was not an enforced or a
20  strictly-followed policy.
21    Q    And what are you basing that opinion on?
22    A    My conversations with April Taylor, Justin
23  Grohn, and maybe with -- maybe with Lisa Wiederman.
24    Q    Are you basing that opinion on your
25  assessment of timecards or other payroll or payment

92

1  records?
2    A    Tyler, it's almost like trying to prove a
3  negative.  I based it mostly on conversations or
4  interviews with those employees.  I did look at some
5  timecards and I looked at the back of them and there
6  were no out-and-back-in punches, so that seemed to
7  support their statement that the policy wasn't always
8  followed strictly.
9    Q    Okay.  But would you agree that as the
10  exhibit we went through, some of the timecards on the
11  back did have clock-out's for breaks?
12    A    Yes.
13    Q    So when you say that deductions from the
14  timecards, this is on Page 5, last sentence of the
15  first paragraph, that deductions from their timecard
16  could not be substantiated, what do you mean by that?
17  What did you do to determine it could not be
18  substantiated?
19    A    I think I had two things in mind.  One is the
20  conversations with employees who said that it was
21  either a short-lived policy or it was an on-and-off
22  policy; and secondly that it appeared to me that the
23  investigator had applied that policy across the board
24  to employees without regard whether they were smokers
25  or nonsmokers.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 25 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

93

1    Q   Okay.  So your understanding that -- are you
2 saying that only smokers were clocked out for breaks?
3    A   My understanding from the interviews and
4 conversations with the Marantos was that the policy was
5 solely aimed at controlling smokers.  But when I looked
6 -- and that seemed to be supported in what was said.
7 Without regard to whether it was strictly followed,
8 adhered to, enforced, and so forth, that the policy
9 itself regarded short smoking breaks.
10       When I looked at the back wage computations,
11 it appeared to me that the investigator had applied
12 that allegation of improper deductions across the board
13 to employees without regard or I saw no notation on the
14 computation sheet that would differentiate the smokers
15 from the nonsmokers.
16    Q   Okay.  Let's talk about the rounding errors.
17 In your report, second paragraph, Page 5, you reference
18 that you examined only a few timecards.  So can you let
19 me know how many timecards and what time period you
20 looked at?
21    A   I looked at the timecards that were provided
22 to me by Mr. Wilkinson as having come from the
23 plaintiff.  I don't know the dates that they
24 represented, but I probably looked at maybe -- maybe
25 ten or a dozen of them.

94

1    Q   Okay.  And there were some tallying errors
2 that were on those?
3    A   I don't think I initially recognized the
4 tallying errors when I first examined the documents,
5 but after hearing the -- after hearing Mrs. Maranto's
6 deposition, it made more sense to me what was being
7 referred to, that is, whether an hour was being broken
8 into 60 parts or 100 parts.  In her testimony,
9 Mrs. Maranto seemed to accept the premise that she, and
10 possibly others, had not been real clear on whether it
11 was military time or non-military time and could have
12 made some tallying errors.
13    Q   Well, here you say, "I was able to examine"
14 -- I'm reading from the second paragraph.
15    A   Right.
16    Q   "I was able to examine only a few timecards
17 and it appeared some had been tallied or totaled
18 incorrectly."
19    A   Yes.
20    Q   So you witnessed that on some of the
21 timecards?
22    A   Yes.
23    Q   Okay.  And then you make a reference to the
24 tallying varied depending on the person and there were
25 three different people performing that function.  Who

95

1 were those three people?
2    A   I believe Mrs. Maranto tallied them for a
3 while, Twilla Nieto tallied for a while, and I believe
4 Lisa Wiederman tallied from a while.
5    Q   Why are you saying you believe?  Do you know?
6    A   From deposition testimony or from my
7 conversation with Mrs. Maranto.  When I -- it was one
8 of those two sources.
9    Q   And then you say, "Yet this violation is
10 asserted across the board."  Why is it inappropriate to
11 assert incorrect math on timecards across the board to
12 employees?
13    A   For a couple reasons:  One, the most
14 prominent is the same timecards that are at issue do
15 not show bona fide rest and meal breaks taken,
16 primarily meal breaks.  The food was free.  My 40 years
17 of experience with this is that in the restaurant
18 industry, if you give a financially-challenged employee
19 free food, they will eat that food and they will --
20 because with the food comes time to eat the food and
21 that that will typically be 20 minutes or more.  So the
22 fact that the timecards so illegal -- purported illegal
23 deductions, and I would agree if it's for a rest break
24 of less than 20 minutes, it should not have been
25 deducted, but the same timecard --

96

1    Q   Well, we're talking about the rounding
2 errors.
3    A   Okay.  I'm saying, Tyler, my point is my
4 examination of these timecards, I'm examining them for
5 more than one reason.  I'm examining them for the smoke
6 break deductions and I'm also looking cognizant of
7 whether or not they reflect a meal break deduction.
8    Q   So I understand that, but when you're trying
9 to determine whether someone has sustained a loss of
10 wages and you see tallying errors that result in a loss
11 of wages, and let's say you're going to go ahead and
12 consider meal time for meals as well, but at first you
13 have to see what the result is with the tallying errors
14 and how that may have resulted in underpayment; right?
15    A   Yes.
16    Q   Okay.  So I guess my question is -- and I'm
17 asking my question based on the way you wrote this.
18 Why is it inappropriate to apply tallying errors found
19 on timecards across the board?
20    A   If you were just narrowly noting the improper
21 amount of time deducted, I would not take issue with
22 what you're describing as what was done.  But that's
23 not the whole picture in my opinion.
24    Q   Because you're referring to the meal time and
25 credit?

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 26 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

97

1    A   I'm referring to the meal time and I'm
2  referring to the fact that I believe Mrs. Maranto told
3  me in conversation that of the three people who
4  tallied, and I don't remember which one, but it seemed
5  like she said one of them understood how to do it.  So
6  in my mind, the one that understood how the time clock
7  worked might well not have made tallying errors.
8    Q   And so how would you know whether -- so, for
9  example, how would you know how often they did the
10  tallying in the past and the other two did the tallying
11  and what the errors would total up to?  How would you
12  determine that?
13    A   I would have to probe deeper.  I would have
14  had to ask whether -- what she seemed to be saying was
15  Person A handled it for this -- almost exclusively for
16  this period of time and then someone else took it and
17  then someone else took it.  She didn't seem to be
18  describing a situation where Tuesday Twilla did it,
19  Wednesday Mrs. Maranto did it, Thursday Lisa did it.
20  She seemed to say this person did it for a period of
21  time then a different person then a different person.
22  That conversation, Tyler, was the first time I had met
23  Mrs. Maranto and I simply did not get down in the weeds
24  with her about, all right, tell me everything about
25  that.

98

1    Q   And are you aware of what Cheryl did with
2  respect to the rounding errors and computing that
3  wages?
4    A   No.
5    Q   Like, generally, do you know how she applied
6  this in her minimum wage and overtime computations?
7    A   I looked at it at one point and I did not
8  understand it.
9    Q   Have you looked at any timecards that
10  predated November 2014?
11    A   I don't know.  I could have.  The universe of
12  timecards that I looked at were those the plaintiff
13  provided to Mr. Wilkinson and then he shared with me.
14  I don't remember the inclusive dates covered by those
15  timecards.
16    Q   Well, I will ask you, if the Wage Hour
17  investigator finds from a sample of timecards of, let's
18  say, one month that there are rounding errors that as a
19  whole result in underpayment of wages and there are no
20  timecards preceding that month, is it unreasonable to
21  apply the fact that there were underpayments
22  historically?
23       MR. WILKINSON:  Object to form.
24    A   In general, no.  It's not unreasonable as
25  long as the investigator is willing to consider what I

99

1  would call exculpatory information or contradictory
2  information that might surface as well.
3    Q   And are you referring to the discussions you
4  had with Mrs. Maranto about who did the tallying and
5  when?
6    A   Yes.  That, Tyler, and also this whole idea
7  about -- well, I'll put it to you this way as an
8  answer, I strongly disagreed with Mr. Lonesky and
9  Investigator Masters when, in their testimony when
10  asked about meal breaks, legitimate meal breaks and
11  food credit, they answered that the employer had not
12  claimed it, had not asserted it, and consequently, it
13  wasn't considered.  And that is not consistent with the
14  agency policy.
15    Q   And you're saying that their testimony
16  supports what you just -- how you just characterized
17  it?
18    A   Their testimony led me to believe that they
19  did not consider it because the employer, nor counsel
20  at that time, claimed it or asserted it or pointed it
21  out as a deficiency.  They seemed to be saying we're
22  going to go by the timecards alone because no one has
23  protested that.  It is the agency's policy that if an
24  employer provides food or lodging to an employee, they
25  get credit for it whether they know to assert it or

100

1  not.  The investigator knows they're entitled to it.
2    Q   And is that a written policy or where is that
3  policy?
4    A   It would be in the Field Operations Handbook.
5    Q   Do you know the citation for the Field
6  Operations Handbook?
7    A   No, I don't.
8    Q   Okay.  Well, let's talk about the meal
9  credit.  You do reference that on Page 5 of your
10  report.  Can you explain what a bona fide meal break
11  is, which is the term you used?
12    A   A bona fide meal break is, among other
13  things, a break that is at least 20 minutes in duration
14  and in which the employee is completely relieved of
15  duty.  It does not turn on the consumption of food.  It
16  has nothing to do with that really.  So the two primary
17  factors are it's got to be 20 minutes -- consecutive
18  minutes long or nearly so.
19       There are cases and certainly I allowed
20  practices where the employer could show that the meal
21  break was less than 20 minutes but it was a -- they
22  were completely relieved of duty.  This was a situation
23  where the employee was working in a remote area and the
24  employer catered the food, the washing basins, the
25  toilets, everything, catered them into the field, and

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 27 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

101

1  in one instance, I remember the employee took as little
2  as 11 minutes to eat.  And I allowed it because there
3  was a case in California, outside of this circuit I'll
4  grant you, but a case in California where the Court had
5  found that that constituted noncompensable time.
6      Q   Okay.  Do you know the name of that case?
7      A   No, I don't.
8      Q   Do you know when it was decided?
9      A   I don't recall.
10     Q   Where are you getting the 20-minute amount
11  from?
12     A   Interpretive Bulletin 785.
13     Q   Do you know what the regulations state?
14     A   Regulation Part 785.
15     Q   Do you know what the regulation is on this
16  issue?
17     A   What it says?
18     Q   No.  What it is, what the CFR number is?
19     A   Well, 29 CFR Part 785-point-something.
20     Q   Okay.  .19, does that sound right?
21     A   It could be.  I would have to look to be
22  honest.
23         (Exhibit U is marked for identification.)
24     Q   I'm handing you what's been marked as Exhibit
25  U.  Do you know what that is?

102

1      A   It's a Wage and Hour Division fact sheet that
2  regards hours worked under the Fair Labor Standards
3  Act.
4      Q   And do you see at the bottom of the first
5  page there where it says rest and meal periods?
6      A   Yes, sir.
7      Q   And the third sentence from the bottom reads,
8  "Bona fide meal periods, typically 30 minutes or more,
9  generally need not be compensated as work time.
10  Employee must be completely relieved from duty for the
11  purpose of eating regular meals.  The employee is not
12  relieved if he/she is required to perform any duties,
13  whether active or inactive, while eating."  Did I read
14  that right?
15     A   Yes.
16     Q   So is it fair to say that is the policy with
17  respect to meal periods for the Wage and Hour Division?
18     A   That is the announced policy of the Wage Hour
19  Division.  Bona fide meal periods, typically 30 minutes
20  or more.  I can tell you internally that if it's 20
21  minutes, which is the rest break, usually 20 minutes or
22  less minimum, that in the Southwest Region, they would
23  be able to count that as noncompensent time.
24     Q   Okay.  So it's more of a practice in the
25  Southwest?

103

1      A   It's a practice based on case law and on
2  conversations with the solicitor's office.
3      Q   Is there anything in writing or written
4  guidance or policy of any kind at says that?
5      A   If there were, it would probably be an e-mail
6  that I sent out.  It could rise to the level of a
7  regional numbered memo.
8      Q   Are you saying --
9      A   I might have --
10     Q   Sorry.
11     A   I might have issued a regional numbered memo
12  on that subject.  But this is a great example, in my
13  opinion, Tyler, of the difference between what the
14  agency would like to see employers follow and what's
15  enforceable.
16     Q   Okay.  What evidence did you have for this
17  case that the employees were completely relieved from
18  duty for the purpose of eating meals?
19     A   I did not develop any information, any
20  evidence on that yet.
21     Q   Okay.  If I could point your attention to
22  Exhibit Q, Page 5.  The numbers are at the top.  Middle
23  of the page where it says, "I just grab a bite as I go,
24  maybe take five minutes or so to eat something."
25     A   Yes.

104

1      Q   Does that meet the criteria for a meal
2  credit?
3      A   Was your question --
4      Q   For a meal period?
5      A   Thank you.  No.  That would not be deductible
6  or noncompensable time.
7      Q   Okay.  And the same on Page 8, Brian
8  Hausheer?
9      A   Okay.
10     Q   It's the last paragraph at the bottom, it
11  starts, "Meal breaks occur when we're not busy.
12  Usually, I don't stop working but take short breaks and
13  I don't clock out."  Same question, would that meet the
14  criteria --
15     A   That would not justify a bona fide meal
16  break.
17     Q   And April Taylor, Page 10, third paragraph,
18  "I get a five-minute break here and there, but no 20 or
19  30 minutes for a meal break.  I do grab something to
20  eat during my shift, but I don't have to pay anything
21  for it."  Does that qualify for the period?
22     A   That would not qualify as a bona fide meal
23  break.
24     Q   What sort of analysis have you done to
25  determine whether credit for bona fide meal breaks

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 28 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

105

would impact any underpayments computed by the Wage and
Hour Division?
    A   Just general consideration as to whether the
investigator seemed to consider it and believing that
she didn't and knowing that free food typically will
drive a meal break.  No analysis beyond that.
    Q   Okay.  And what evidence do you have that the
investigators, in this instance, did not consider?
    A   Her deposition testimony.
    Q   Okay.  Anything else?
    A   Mr. Lonesky's deposition testimony.
    Q   Okay.  Anything else?
    A   Her narrative report.
    Q   And where in the narrative report does it
state that she did not consider meal --
    A   It's the absence of a statement that it was
considered that I -- that would influence me.
    Q   And is it your opinion that there should have
been consideration of a food credit?
    A   Yes.
    Q   Okay.  And could you explain how that credit
works and why it should have been considered?
    A   Under Section 3(m) of the act, an employer is
entitled to wage credit for food and lodging provided
to the employee at no cost to the employee.  The value

106

of which or the -- yes, the value of which is tied to
the employer's cost of providing that food.
          In restaurants, it was our typical position
at a standard restaurant that the employer could take
half the menu price as their cost of the food.  So if
the employee ate a $6 -- ate an item that was listed as
$6 on the menu, our rule of thumb was that the employer
could take $3 meal credit for providing that meal at no
cost to the employee.
    Q   Now, is that policy written in any form
somewhere?
    A   I want to say yes, but if you're -- at least
in e-mail or in notes of enforcement-related calls that
I conducted, and frankly, my predecessors or people in
a similar position would have conducted because -- I
say that because when I began with Wage Hour in 1975,
that was the accepted practice and guidance whether it
-- where it's codified and whether it was precisely
codified, I'm not sure.  It could even be a blurb about
it in the Field Operations Handbook.
    Q   Well, I mean, I would prefer -- are you
guessing or are you saying that there is one?
    A   Well, I'm more than guessing there is.  I'm
assuming there is, but it is such a non-controversial
matter that I don't know whether it's just an accepted

107

practice or whether it is published guidance.  I don't
know.
    Q   And when you're saying an accepted practice,
you're talking about how the cost is determined that
you just described?
    A   Yes.  I'm specifically describing the way the
cost is determined, not whether they get credit or not.
    Q   And so can you give me an example of a case
or two where that was applied that way, the cost
determination?
    A   The name of a case?
    Q   Yeah.
    A   No.
    Q   So how about if an employer is going to be
able to take a meal credit, what is required of the
employer?
    A   I don't know that anything is required of the
employer under the Fair Labor Standards Act other than
the ability to attach a value to it.
    Q   How about records of actual meals taken?
    A   Certainly recommended.  I would tell an
employer this is what you need to do to stay out of
trouble, but as far as pointing them to a written
requirement, I'm not familiar with one.
    Q   And so why should the Wage and Hour -- why

108

should Wage and Hour have taken into account a meal
credit in this case?
    A   Because it is our policy to do so.
    Q   Well, what evidence, I guess is what I'm
trying to understand, that supports it?
    A   To me, it's like don't -- don't sit in the
bathtub of water and throw an electric fan in it.  I
can't tell -- we've never said to an investigator,
Tyler, do not lie to an employer.  If they say why not,
show me that, Randy, show me where it says I can't lie
to an employer, I can't do it.  But I can tell them
that it is not Wage Hour's policy to lie or to mislead
or to threaten an employer and that if they do it,
they're taking a huge risk of getting in trouble for
it.
          But if -- I couldn't, if challenged, I don't
know that I can -- well, I'll answer this way.  I set
the policy.  For those 20 years, I established the
enforcement policy.  Right, wrong, or indifferent, I
did it.  And I can tell you that I established a policy
that said if they're giving food and you're thinking
about charging minimal wage violations, you're obliged
to grant them or factor into your investigation
consideration and thought process that they're entitled
to food credit.

27 (Pages 105 to 108)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 29 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

109

1      Because my experience, Tyler, is if the
2  investigator doesn't do that, they're going to spend
3  more time, they're going to calculate back wages,
4  they're going to hold a final conference, and they're
5  either going to college back wages that were not due or
6  they're going to send the case to Mr. Speer or one of
7  his assistants, they're going to expend resources,
8  they're going to do all this stuff if they don't listen
9  -- because then if they can't settle it and they call
10  and say, Randy, we want to send you this case and
11  here's what it's predicated on, minimum wage
12  violations, it's a restaurant, the first thing out of
13  our mouth -- or one of the first things is did you
14  allow a food credit?  No, they didn't claim it.  They
15  don't have to claim it.  That case is not suitable for
16  further handling.  They're not going to ask the
17  solicitor's office to jack around with a case like
18  that.
19      Q   And should there be some evidence that food
20  credit is provided?
21      A   In my opinion, in the statute in 3(m) and in
22  the handbook and in the regulations that further
23  explain 3(m) credit, it explains food credit.
24          MR. WILKINSON:  Tyler, could you give me just
25  a moment, please, for a brief recess?

110

1      (Off the record at 1:34 p.m. and returning at
2  1:38 p.m.)
3      Q   (By Mr. McLeod)  Randy, you also on Page 5 --
4  I'm covering a lot of ground on Page 5, Exhibit O, your
5  report.  You state that you concluded that Roland
6  Cunningham is exempt from minimum wage and overtime
7  requirements under the FLSA?
8      A   Yes.
9      Q   And why is that?
10      A   Well, I think I really agreed with the
11  investigator's first impression of Roland Cunningham
12  because they certainly treated him, by their own
13  description, they treated him as the manager.  They
14  treated him the appointment letter.  They said they
15  give him the publications.
16      I hope for the investigator's sake, frankly,
17  that they asked him for permission to interview
18  employees thinking he was a manager.  Because if they
19  didn't, they were clearly interviewing employees when
20  Mr. Maranto arrived and then subsequently Mrs. Maranto.
21  So if they did not think Roland was a manager, they
22  were very far outside agency policies -- agency policy
23  with regard to interviewing employees who were at work
24  on the clock without permission from the employer.
25      They -- Cheryl describes him as a manager in

111

1  her narrative report, Cheryl Masters the investigator.
2  His title is -- I heard kitchen manager, I heard shift
3  manager or restaurant manager.  So from my conversation
4  with him, from the way the investigators interacted
5  with him, from his -- my understanding of his duties
6  and his pay, he appears to qualify for either an
7  executive exemption or a combination executive
8  administrative exemption.
9      Q   Okay.  What are the requirements for an
10  executive exemption?
11      A   Executive exemption is supervise two or more
12  employees, ability to hire and fire or recommend hiring
13  and firing and those recommendations be given weight,
14  setting schedules, assigning duties.
15      Q   How about the salary basis?
16      A   Salary basis didn't go up.  It's still at
17  455.
18      Q   No.  I'm sorry.  With respect to Roland?
19      A   With respect to Roland, it's 455.  I know he
20  gets some of his compensation in the form of housing
21  and maybe meals, for lack of a better description.
22  It sounded to me that he would meet the $455 a week salary
23  requirement.
24      Q   Well, are you familiar with how he was paid?
25      A   I heard him describe it in his deposition

112

1  testimony.  It sounded like a combination of salary and
2  housing.
3      Q   And are you aware he was paid by the hour?
4      A   It seemed like he said something to me the
5  first time I talked to him about being paid by the
6  hour.  But then it seems like subsequent to that, I
7  heard beyond the interview in his sworn testimony that
8  he was paid a salary.
9      Q   So just so we're clear, the period of time
10  we're talking about is the January 2012 to January
11  2015.  During that period of time, is it your
12  understanding he was paid a salary?
13      A   Yes.
14      Q   So for example on --
15      A   Or at least for a large period of that time.
16      Q   Did you look at his timecards?
17      A   I don't know if his timecards were any that I
18  looked at or not.
19      (Exhibit F-1 is handed to the witness.)
20      Q   So, for example, here's Exhibit F-1 that's
21  been previously marked.  So I wasn't going to use it as
22  an exhibit for this purpose, but the first page is
23  Roland Cunningham's timecard and he's being paid hourly
24  pursuant to the timecard.  Would you agree pursuant to
25  this example?

28 (Pages 109 to 112)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 30 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

---

113

1    A   No.
2    Q   Why?
3    A   What I'm seeing in Exhibit F-1 is a record of
4    his hours.  I don't see his method of compensation.
5    Q   Did you review any payroll information with
6    what he was paid each week?
7    A   Not that I recall.
8    Q   And if that payroll information showed that
9    his hours paid -- or the amounts paid to him fluctuated
10   from pay period to pay period, would that indicate
11   anything to you?
12   A   It could.
13   Q   Like what?
14   A   If his pay -- if his pay fluctuated below
15   $455 a week, it would indicate to me that in those
16   weeks he wouldn't qualify for an exemption.
17   Q   Can you retroactively apply an exemption?
18   A   Yes.
19   Q   And why is that?
20   A   Well, my thought, Tyler, is in an
21   investigation, that's what's going on.  They're looking
22   at, arguably, the last two years of time and they're
23   retroactively determining who's exempt and who's not
24   exempt.
25   Q   Now, just because someone is titled a

---

114

1    manager, might have duties that meet an exemption test,
2    they can still be paid by the hour by an employer;
3    right?
4    A   Right.
5    Q   That's the employer's choice?
6    A   Employer's choice?
7    Q   Yeah.
8    A   Yes.
9    Q   And if an employer pays an employee an hourly
10   rate, that's considered a regular rate, right, for
11   purposes of overtime?
12   A   Could be.
13   Q   Can you give me -- why do you say could be?
14   A   Because the regular rate can include, by
15   regulation, more than just their hourly rate.
16   Q   Let's talk about Roland Cunningham.  You
17   mentioned his compensation was a salary and food and
18   lodging?
19   A   That's my understanding.
20   Q   Okay.  And how do you know -- do you know
21   whether Mr. Cunningham was paying rent for his lodging?
22   A   Tyler, I -- I was somewhat confused by the
23   questions and answers.  At one point, it seemed like he
24   was paying rent -- reduced rent, and other times it
25   sounded to me as if the housing was being provided to

---

115

1    him and the Marantos were taking credit, so to speak,
2    for an agreed amount of rent without money changing
3    hands.
4    Q   So do you know for a certainty whether he was
5    paying rent and what amount?
6    A   I do not.
7    Q   And do you know for certainty what credit he
8    was getting, if any, for meals?
9    A   To my knowledge, no one at the restaurant was
10   given meal credit with regard to the Wage Hour
11   investigation.
12   Q   And I'm not asking with respect -- you have
13   determined that he is exempt and should be
14   retroactively exempt.  Well, let me restate that.
15       You have determined that he was exempt during
16   the subject period of time based on what he was earning
17   and including credit for housing and meals.  So I'm
18   asking what was the amount that he was receiving
19   compensation for food?
20   A   For?
21   Q   Food.
22   A   I haven't attached an amount to it.
23   Q   Okay.  So do you know what his salary was?
24   A   No.  My recollection was his answer to a
25   question posed by Karen Bobela was he was on salary and

---

116

1    he got this much either in two weeks or semi-monthly
2    and it was sufficient to meet the 455-a-week test.
3    Q   Okay.  Are housing or meals included in the
4    455 salary requirement?
5    A   For the exemption?
6    Q   Yeah.
7    A   Regulatorily, no.  In practice, I've seen --
8    well, in practice, we would not further handle a case
9    -- in other words, we would not pursue back wages in a
10   case where the employer was paying $400 a week and
11   giving them a place to live that was worth say $200 a
12   week.  So I'm saying technically they've got to be paid
13   $455 a week in salary exclusive of any other
14   compensation.
15       But in practice, we would -- if encountering
16   that, we would explain that to the employer, we would
17   ask them to pay back wages.  If they did not pay back
18   wages, after agreeing to raise the employee to 455 a
19   week plus free rent, we would not, as the Wage Hour
20   Division, pursue the back wages alleged to be due that
21   employee.  We certainly would not refer that case to
22   the regional solicitor or attempt to do so.
23   Q   Now, this finding of Roland Cunningham being
24   exempt was not included in your first January report;
25   right?

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 31 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

117

1   A   I'm uncertain.  I thought I addressed Roland
2   Cunningham in that report.  I may have clarified it --
3   I may have clarified it by speaking directly to his
4   exempt status.  But to my knowledge, the initial expert
5   witness report addressed Roland Cunningham.  And I
6   would --
7       Q   Well --
8       A   -- add this, Tyler, if I may, the January
9   report did not factor in -- could not factor in the DOL
10  deposition testimony.
11      Q   Right.
12      A   And in that, I heard some things that would
13  influence me with regard to Roland Cunningham.
14      Q   In your investigation with regard to whether
15  Mr. Cunningham was exempt, did you question -- did you
16  personally question Mr. Roland Cunningham about that
17  and the Marantos about it?
18      A   About what?
19      Q   His salary and what the situation was with
20  his housing and food and stuff?
21      A   I don't think I questioned him.  I think I
22  got that information listening to his deposition and
23  then to Investigator Masters' deposition.
24      Q   And you did not review the payroll
25  information or timecard with respect to Roland

118

1   Cunningham to make that determination?
2       A   No.  My examination of the timecards and
3   payroll records was a general review of them to see
4   what they showed.  I never focused on a particular
5   employee to follow their records from one work week or
6   one pay period to the next.
7       Q   You know, back to the meal breaks, in your
8   report, it says, "Considering meal breaks of over 20
9   minutes" -- never mind.  I'm not going back to that.
10  Let me move on.
11          Staying on Page 5, Randy, the third paragraph
12  concerns the topic of volunteers, second full
13  paragraph.  "It is alleged that some compensable hours
14  worked were performed by volunteers who were paid no
15  wages."  Do you see where I read that?
16      A   Yes.  I'm sorry, Tyler.  Yes, I do.
17      Q   So I want to ask you some questions about
18  that.
19      A   Okay.
20      Q   Now, I assume, and so I want to ask, that you
21  are referring to Page 6 of the narrative, so if you
22  want to refer to Exhibit R, please, Page 5 and it's
23  Issue 4.
24      A   Okay.
25      Q   Do you see that?

119

1       A   I do.
2       Q   Is this what you're referring to in this
3   section of your report?
4       A   Yes.  I am referring to bussers.
5       Q   Okay.  So you state that, "The assertion that
6   no wages were paid to these volunteers ignores evidence
7   in the file that the individuals receive tips."
8       A   Yes.
9       Q   What evidence are you referring to?
10      A   My recollection of what I saw in the file
11  indicated that bussers receive tips from servers whose
12  tables were bussed by these bussers but that is that
13  the server, at some point, possibly at the end of the
14  shift or at some point, gave some money -- shared some
15  tip money with the busser.
16      Q   Okay.  And so why should that have been
17  factored in when the employer was not paying wages?
18      A   Well, if I can back it up one step, Tyler?
19      Q   Of course.
20      A   Thank you for indulging me here.  It is
21  unsettled in my mind whether these bussers -- whether
22  there existed an employer/employee relationship between
23  Mrs. Maranto, who Investigator Masters said is
24  singularly the employer in this case --
25      Q   I don't mean to interrupt you, but that's not

120

1   what our complaint says.
2       A   It's not what your complaint says, but it's
3   what your investigator said in deposition testimony.
4   Mr. Speer testified that he would follow her lead on
5   that.  Mr. Lonesky testified that, as late as the last
6   week of February 2017, he and Michael were still
7   debating as to who met the definition of employer in
8   this case.
9       Q   But what does this have to do with anything
10  when this case has already gone to the solicitor's
11  office, has been analyzed and filed by the solicitor's
12  office?
13      A   Well, Tyler, it only -- only this, and please
14  don't take offense.
15      Q   I won't take offense.  I'm asking you
16  questions that might be taken offense.
17      A   What it shows to me is that your client has
18  not given you a full picture of how this investigation
19  was conducted and the conclusions that were reached.
20  Because I understand that the legal analysis resulted
21  in two named defendants, Margaret Maranto and the
22  corporation.  But when Cheryl Masters in sworn
23  testimony was asked that question who is the employer,
24  she said Margaret Maranto.  Mr. Lonesky subsequently
25  said that he and Mr. Speer were still debating that.

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 32 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

121

1   Mr. Speer answered when asked who the employer was that
2   Ms. Masters determined it was Mrs. Maranto, would you
3   agree with that, and he said he would follow the
4   investigator's position on it.
5        So I think from my experience, it is
6   important for the lawyer to know what the investigator
7   is going to -- has testified to with respect to
8   defendants named in the lawsuit.
9        Q   Well, why is that important when the judge or
10  jury is the one deciding who the defendants are?
11       A   Well, ultimately they will, but to me, I
12  certainly would not have asked Margaret or John
13  Rainwater or Lydia to name somebody as a defendant and
14  say, well, I don't have any -- our investigator says
15  they're not an employer, but I --
16       Q   Do you believe that John Rainwater or Lydia
17  or Margaret would actually name a defendant just
18  because somebody at Wage Hour said so without looking
19  at the evidence?
20       A   I would hope not.
21       Q   In your experience, do you believe --
22       A   My experience is --
23       Q   -- they would --
24       A   -- they would never do that.  But my
25  experience has also taught me that I got summoned to

122

1   the courthouse in Dallas for a trial that was underway,
2   and I was summoned over there because the investigator,
3   Tommy Joe Stephanose, was arguing with the solicitor's
4   trial attorney, her own attorney so to speak.  And I
5   was summoned over there to get her out -- off the
6   witness stand, out in the hallway, and give her an
7   attitude adjustment.
8        So my point, Tyler, is that the trial
9   attorney, Karen in this case, may think she knows what
10  her witness, Investigator Masters, is going to say, has
11  concluded, her positions, but that is not consistent
12  with what Investigator Masters testified to in her
13  deposition.
14       Q   But let me ask you this, and we're off the
15  topic from my original question.
16       A   Okay.
17       Q   But, you know, why is it -- I mean, do you
18  have an opinion as to whether or not there is any
19  evidence to support whether that Margaret Maranto is an
20  employer under 3(d)?
21       MR. WILKINSON:  Here we go.
22       A   Do I have any evidence?
23       Q   Do you have an opinion?
24       A   I do have an opinion.
25       Q   What is your opinion?

123

1        A   My opinion is Margaret Maranto is -- that
2   Cheryl Masters has it right, that Margaret Maranto is
3   the employer in this case.
4        Q   Okay.
5        A   And, Tyler, let me say this --
6        MR. WILKINSON:  You answered his question at
7   this point.  I think you've answered it.
8        A   I would just say -- you might say, Randy --
9        MR. McLEOD:  Bill, you've interrupted me, but
10  that's not appropriate to try and stop your own
11  witness's testimony.
12       A   You might say, Randy, what's it to you?
13  You're an old retired guy, you know, let it go, move
14  on.  What it is to me is I love the Wage Hour Division,
15  frankly, and it bothers me to no small end for the
16  division to be represented by the solicitor's office
17  to be represented by the solicitor's office and have an
18  investigator say something like that in deposition
19  testimony.  I think it reflects poorly on the Wage Hour
20  Division.  And my motivation is -- in this case is no
21  different than my motivation when I was director of
22  enforcement, and that is to uphold the integrity and
23  the professionalism of the Wage Hour Division.  I think
24  this case has harmed it.  I think it has the potential
25  to harm it more.  And that's -- that is truly my

124

1   motivation to be involved.
2        Q   (By Mr. McLeod)  Okay.  So let's get back to
3   this volunteers issue.
4        A   Okay.
5        Q   You state that it's unsettled whether or not
6   these workers were employees.  Is that what I'm
7   understanding?
8        A   Yes.
9        Q   And why is that?
10       A   Because if Margaret Maranto, as the employer,
11  did not suffer or permit them to work, then there is no
12  employer/employer (sic) relationship between her and
13  one of these bussers, one of these children of an adult
14  employee.
15       Q   Well, if somebody is bussing a table, aren't
16  they being suffered and permitted to work at the
17  restaurant?
18       A   They're -- someone is suffering and
19  permitting it, but is that someone the employer?  If
20  Margaret Maranto can testify that she didn't know about
21  it, didn't condone it, didn't acquiesce to it, didn't
22  approve it, and knew nothing about it, then I don't
23  think you have evidence that she was the employer.  But
24  let me move on.
25       Q   You're saying that all employers need to

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 33 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

125

1    actually know what violations are taking place in a
2    restaurant?
3         MR. WILKINSON:  Object to form.
4         A    No.  I'm saying, Tyler, there has to be an
5    employer/employee relationship.
6         Q    Well, who is -- let's say that individuals
7    were performing bussing services.
8         A    Okay.
9         Q    Who's the employer?
10        A    I'm not sure the -- I'm not sure they have an
11   employer.  I'm not sure -- if April Taylor tells
12   Dakota, her child, here, help me bus this table.
13   Dakota has come in, has eaten, has played with
14   cardboard boxes, has, you know, run out in the country
15   roads until they're bored, and they come in and they
16   want to help mama bus the table and mama says, okay,
17   help me here, wipe this down and so forth, what I'm
18   saying, Tyler, if Margaret Maranto's already gone home,
19   if she's back in the kitchen, if she has no knowledge
20   of that, then Dakota Taylor is not an employee of
21   anybody, potentially, other than his mother.
22        Q    Okay.  So that story you just told, where are
23   you getting that from?  From what evidence?
24        A    From April -- from a conversation with April
25   Taylor.

126

1         Q    Okay.  Have you considered any other evidence
2    about that particular situation?
3         A    Yes.
4         Q    What?
5         A    That in reality, if this happened
6    extensively, it would be difficult for me to believe
7    that at some point on the spectrum Margaret Maranto
8    didn't become aware of this.  If she became aware of
9    it, as the employer, she has a duty to either stop it
10   or pay for it.
11        Q    Now, in the narrative, it is stated that
12   that's exactly what happened, that she was actually
13   requesting these individuals and scheduling them.  Did
14   you take that into account in forming your opinion?
15        A    I did.  And I also took into account that
16   Mrs. Maranto told me that she thinks it went on --
17   potentially went on with youngsters that she never knew
18   about and that it could have gone on for a period of
19   time before she learned of it.  So my point is borne
20   out and the opinion is that I don't think that the
21   totality of time that this may have gone on with these
22   youngsters there was an employee/employer relationship.
23        One Other point, and that is, even if there
24   is an employer/employee relationship, if those servers
25   gave those bussers tips and those tips amount to $30 a

127

1    month, then Mrs. Maranto is entitled to pay them 2.13
2    an hour, not 7.25.
3         Q    So that's what I wanted to talk to you about
4    at the very beginning of all this.  You're not allowed
5    to get credit for tips where the employer is not paying
6    wages; isn't that true?
7         A    Prospectively, that's true.
8         (Exhibit V is marked for identification.)
9         Q    I'm handing you what's been marked Exhibit V.
10   Page 3 under the minimum wage problems, second bullet
11   point, "Where employee receives tips only and is paid
12   no cash wage, the full minimum wage is owed."  Did I
13   read that correctly?
14        A    You did.
15        Q    And tipped employees are considered minimum
16   wage employees?
17        A    Yes, they are.
18        Q    So the full minimum wage is owed?
19        A    Yes.
20        Q    Is that inconsistent with what you just
21   described?
22        A    Yes.  That statement on this publication is
23   inconsistent with what I described.
24        Q    So your position is contrary to the fact
25   sheet?

128

1         MR. WILKINSON:  Object to form.
2         A    My position is based on what has happened in
3    this region, the practice followed in this region to
4    settle cases and to resolve litigation cases over the
5    last four years.
6         Q    Okay.  So you also on Page 5 talk about the
7    tip credit.  It's the last full paragraph on the page
8    before the overtime section.
9         A    Starts, "Finally"?
10        Q    Right.  So -- you know what, Randy, before I
11   get to that, I forgot to show you one other exhibit.
12        A    Okay.
13        (Exhibit W is marked for identification.)
14        Q    Okay.  I'm handing you what's been marked
15   Exhibit W.  Would you agree this is a copy of the Field
16   Operations Handbook?
17        A    I would.
18        Q    And on Page 2, parenthetical one, "Wage Hour
19   Division will not allow an employer to claim a tip
20   credit on a retroactive basis where the employer has
21   not met the requirements for taking a tip credit.  For
22   example, an employer who pay no wages -- i.e. employees
23   receive only tips -- will be required to pay the full
24   minimum wage and not be able to claim a tip credit."
25   Did I read that correctly?

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 34 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

129

1   A   You did.
2   Q   And that's the policy in the FOH?
3   A   Yes.
4   Q   And the FOH is something that would have had
5   input, you know, from the Enforcement Policy Advisory
6   Committee; correct?
7   A   Yes, it would.
8   Q   Okay.  So I would like to move on to your
9   discussion about the tip credit where you say you found
10   no evidence that employees failed to receive tips
11   sufficient to bring them up to full minimum wage.  Did
12   you find any evidence that they did receive minimum
13   wage?
14   A   Just -- yes.
15   Q   What is that?
16   A   The conversations that I had with the three
17   or four tipped employees that I talked with and I found
18   evidence in the back wage transcription and computation
19   sheets of Investigator Masters.
20   Q   Okay.  Now, as I understand it from your
21   summary here, the employer was not, in fact, taking
22   steps to determine if the employees were earning
23   minimum wage other than the accountant's method of
24   using 12 percent of sales?
25   MR. WILKINSON:  Object to form.

130

1   A   The employer seemed to be following the CPA's
2   advice that tip credit -- tips could be equated with, I
3   think, something like 12 percent of sales.  Something
4   that the CPA apparently brought over from Internal
5   Revenue Code.
6   Q   All right.  So was the employer taking any
7   steps to check whether or not each -- that the servers
8   were earning minimum wage?
9   MR. WILKINSON:  You mean, other than what
10   he's already testified to, to going to the CPA?  Other
11   than that or are you talking about something else?
12   Q   So I think my question's completely
13   different.  So I think before I asked about amounts,
14   and I'm wondering if there's any facts that you're
15   aware of that the employer was taking steps to check
16   whether individuals were making minimum wage?
17   MR. WILKINSON:  Counsel, I'm going to ask
18   you, are you asking him in addition to what he's
19   already testified said or do you want him to repeat
20   that again?
21   MR. McLEOD:  I don't think he said anything
22   in response to that type of question.
23   MR. WILKINSON:  He said he went to the CPA
24   and the CPA told him stuff from the IRS.  You just said
25   that.  And you can ask him about that.  I don't care.

131

1   You can ask him about that all day, but your question
2   is somewhat confusing, therefore, I object to the form
3   of the question because he's just given you --
4   Q   (By Mr. McLeod)  Can you answer my question?
5   A   The employer seemed to be knowledgeable -- in
6   my conversation with Mr. and Mrs. Maranto, they seemed
7   to be knowledgeable of approximately how much employees
8   -- tipped employees received in tips.
9   Q   And did they keep records of that, of what
10   employees received in tips?
11   A   Not to my knowledge.
12   Q   Do you have -- what evidence have you
13   considered that the CPA, in fact, gave the advice with
14   respect to using the 12 percent of sales?
15   A   The deposition testimony of, I believe,
16   Mr. Maranto.
17   Q   Okay.  Anything else?
18   A   Only that I have heard similar guidance being
19   given to restaurants during my career.  Again, it
20   seemed to be something that was IRS approved so to
21   speak.
22   Q   If I can refer you, again, to Fact Sheet 15,
23   which is Exhibit V?
24   A   V?
25   Q   Yeah.  Second page, second full paragraph

132

1   reads, "Employers electing to use the tip credit
2   provision must be able to show the tipped employees
3   received at least the minimum wage when direct or cash
4   wages and the tip credit amount are combined."
5   A   Yes.
6   Q   Did I read that right?
7   A   Yes.
8   Q   And other than relying on the 12 percent
9   sales method, as you mentioned, there's no evidence
10   they did anything else; right?
11   A   There's evidence that they talked with
12   employees about tips so --
13   Q   What evidence?
14   A   My discussions -- my conversations with
15   Mr. and Mrs. Maranto.  And then in my conversations, my
16   interviews with the employees, I asked them pointedly
17   if they received enough tips to bring them up to at
18   least 7.25 an hour.  I don't know that I reduced that
19   to writing, but I did talk with them about it.
20   Q   But there's a difference between whether or
21   not an employee says they got 7.25 an hour and whether
22   or not the employer did something to make sure the
23   employer knew that they got 7.25 an hour; right?
24   MR. WILKINSON:  Object to form.
25   A   Yes.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 35 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

133

1    Q   By the way, have you ever worked in a
2  restaurant?  I meant to ask you that.
3    A   Have I ever worked in one?
4    Q   Yeah.
5    A   No.
6    Q   You escaped that in your younger years?
7    A   Yeah.  Someway, somehow.
8    Q   Okay.  Regarding overtime -- Randy, just to
9  clarify one thing on the 12 percent issue, you do
10  reference this in your report, that's an IRS function
11  taking 12 percent of sales.  That really doesn't have
12  anything to do with whether minimum wage was, in fact,
13  earned; is that fair?
14    A   Yes.
15    Q   So in the overtime section, I'm still on Page
16  5 -- this has been a long page -- it says, "Based on my
17  conversations with employees and testimony in the
18  depositions, it appears the employer did not always pay
19  time-and-one-half for overtime hours worked."
20    A   Yes.
21    Q   So would you agree there's been an overtime
22  violation?
23    A   Yes.
24    Q   And can you explain what the violation is
25  that you're referring to here?

134

1    A   From Mrs. Maranto's deposition, I gathered
2  that she acquiesced to requests from her employees to
3  allow them to work overtime, and the quid pro quo was
4  that if she allowed them to work overtime, they offered
5  to do so at straight time, at a straight time rate, if
6  they could be paid in cash.  So I heard a description
7  of that practice having occurred for, at some point,
8  during the investigation period.
9    Q   Okay.  And what is your understanding of how
10  Wage Hour arrived at -- or what Wage Hour's allegation
11  is or the secretary's allegation with respect to the
12  overtime violations?
13    A   Well, I would have to -- I would probably
14  have to look at the complaint, but I believe the
15  secretary's allegation with regard to violations of the
16  overtime provisions are that there was some
17  uncompensated time that, when added to the heretofore
18  counted hours or record of hours, would put the
19  employee at an overtime posture, and that that
20  uncompensated time, if any of it were overtime, then
21  it, having not been paid at time-and-a-half, the half
22  time is due.
23         Secondly, and I don't know, Tyler, if this is
24  in the complaint specifically or in the narrative, this
25  idea that employees were paid for some or all their

135

1  overtime hours in cash at straight time.  What I just
2  described as being articulated by Mrs. Maranto in her
3  deposition, I think -- I'll be glad to look, but I
4  think those are the two things that drive the
5  secretary's allegation about violations in Section 7.
6    Q   And rather than going through some exhibits,
7  I'd just like to ask you some questions real quick to
8  see if I understand what you're referring to here on
9  Page 5.
10    A   Okay.
11    Q   So as I understand what occurred in prior
12  depositions is that -- including Mrs. Maranto's, is
13  that Mrs. Maranto explains that she communicated hours
14  worked to the CPA who ran payroll.  Is that your
15  understanding?
16    A   Yes.
17    Q   And that those hours worked did not always --
18  excuse me, those hours reported to the CPA were not
19  always the same that appeared on timecards.  Is that
20  your understanding?
21         MR. WILKINSON:  Object to form.
22    A   Yes.
23    Q   Now, for purposes of the Fair Labor Standards
24  Act, are employers relieved from paying time-and-a-half
25  just because the employees agree?

136

1    A   No.
2    Q   And why is that?
3    A   Supreme Court case Brooklyn Savings Bank vs.
4  O'Neal, the Court held that an employee cannot waive
5  their statutory right to overtime, that the half time
6  penalty for overtime hours is imposed onto the employer
7  and it cannot be waived by the employee who actually
8  performed the overtime hours.
9         MR. WILKINSON:  Whenever it's convenient, I
10  think an afternoon break would be helpful.
11         MR. McLEOD:  Okay.  Let's finish overtime.
12  This will be quick.
13         MR. WILKINSON:  Yes, sir.  At your
14  convenience.
15    Q   (By Mr. McLeod)  The last sentence on the
16  overtime section on Page 6 of your report, it says,
17  "Lastly, due to the Klinghoffer Rule, any unpaid
18  straight time hours may have caused no monetary
19  violation at all."  And why did you write that there?
20    A   Because the topic is overtime and the point I
21  was trying to make is that regarding the investigator's
22  allegation that there were unreported or uncompensated
23  hours worked -- let's, for example, say that these
24  short breaks of less than 20 minutes of duration, those
25  were deducted, they should not have been deducted.  She

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 36 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

137

1   seems to add those back in as overtime hours.  My point
2   is that if the employee had not worked 40 hours or
3   nearly 40 hours, then the uncompensated time, when
4   added in, might not constitute an overtime hour at all.
5   It might constitute an hour at 40 or below 40.  So the
6   overtime provision of the law, the overtime penalty so
7   to speak, would not kick in.
8           Investigator Masters seemed to capture most,
9   if not all of that uncompensated time, as overtime.
10  And my point is it's not -- it could be overtime, but
11  it's not necessarily overtime.  And if it's not
12  overtime, then according to the Klinghoffer Rule that
13  I've already beat you up with --
14      Q   Right.
15      A   -- there's no monetary violation.  It's just
16  a record-keeping violation.
17      Q   And do you know for a certainty whether the
18  Klinghoffer Rule caused no monetary violations at all?
19      A   In this case?
20      Q   Yeah.
21      A   I believe, Tyler, the Klinghoffer Rule has
22  applicability to some of these employees and that it
23  was not considered by the investigator.
24      Q   Did you run an analysis to determine whether
25  wages unpaid -- alleged unpaid wages were negated by

138

1   that Klinghoffer Rule?
2       A   Could I or did I?
3       Q   Did you?
4       A   No, I did not.
5       Q   You also state regarding overtime that the
6   two hours of off-the-clock time is unsubstantiated.
7   And why do you say that?
8       A   Because it is counterintuitive to me, Tyler,
9   for the investigator to conclude during the slow season
10  -- which I would interpret as fewer customers, less
11  busy, less demanding -- that they had one hour
12  off-the-clock time -- allegedly off-the-clock time, but
13  during the busy season, March to October, when there's
14  customers to wait on, where there's tips to be made,
15  that somehow during these busy -- the busy season,
16  these busy days, opportunity to make those tips, that
17  they're going to take more short breaks than they do
18  during the slow time.  That is counterintuitive to me.
19  So I describe it as unsubstantiated because it just
20  -- it doesn't pass the reasonableness test to me.
21          MR. McLEOD:  We can take a short break.  We
22  can pick up there.
23          (Off the record at 2:31 p.m. and returning at
24  2:39 p.m.)
25      Q   (By Mr. McLeod)  All right.  Randy, if I

139

1   could direct your attention to Page 5 of the narrative,
2   which is Exhibit R, and we were just talking before the
3   break about this two hours of off-the-clock time that
4   you stated appears to be unsubstantiated in your
5   report.  We were just discussing that.  Is that in
6   reference to this chart on Page 5?
7       A   Yes.
8       Q   Okay.  So there's slow off-the-clock and busy
9   off-the-clock and you're referring to 2, which is the
10  busy period?
11      A   Yes.
12      Q   And do you know how Wage Hour arrived at the
13  numbers in this chart?
14      A   I don't know specifically.  I believe it
15  represented a combination of the improper deductions
16  for short breaks and speaks to the errors made in
17  rounding.
18      Q   Right.  But do you know how the numbers were
19  derived?
20      A   No.
21          (Exhibits 1A and 1B are handed to the
22  witness.)
23      Q   And I'm going to hand you what defense
24  counsel has marked as Exhibit 1 A in a prior deposition
25  and also what was marked as Exhibit 1B in a prior

140

1   deposition.  Have you had an opportunity to review
2   these exhibits?
3       A   They look familiar from the time in Oklahoma
4   City.  I believe I came to understand 1A.  I can't say
5   the same about 1B.
6       Q   Okay.  And what -- do you have an opinion
7   whether computations on Exhibit 1A are reasonable?
8       A   If they're what, Tyler?
9       Q   Reasonable.
10      A   Readable?
11      Q   Reasonable.
12      A   I don't have an opinion because I'm not privy
13  to the information that the investigator used to come
14  up with this.
15      Q   Okay.  And I guess I would ask you the same
16  question about Exhibit 1B?
17      A   I think my answer would be the same except
18  that 1B I don't understand as well as I do 1A.
19      Q   Okay.  The next section on Page 6 of your
20  report talks about record keeping and the first part of
21  that says, "There are clearly record-keeping
22  violations."  Could you explain what you're referring
23  to there specifically?
24      A   Specifically, I'm referring to the fact that
25  the employer could not produce, when requested, the

35 (Pages 137 to 140)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 37 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

141

1    time and payroll records for the two-year period of
2    time or three-year period of time covered by the
3    investigation as the regulations require them to do.
4        Q   Okay.  What records, specifically, were they
5    not keeping other than payroll and -- I think you said
6    payroll and --
7        A   Time and payroll.
8        Q   Time and payroll?
9        A   Time and payroll records.  It's not this
10   particular case.  It reminds me of cases that I had in
11   the past when I was with the division.  It's not so
12   much that records were never created, it's that they
13   were not preserved the three years.
14       Q   Right.  So the timecards, for example, they
15   were discarded?
16       A   Timecards themselves do not have to be
17   maintained for three years.  Timecards -- a stack of
18   timecards can be summarized on one document, be
19   discarded, and the summary document retained and
20   that would suffice.  But the employer is required under
21   the regulations to be able to provide time and --
22   accurate time and payroll records going back a two-year
23   or sometimes three-year period of time.
24       Q   And would you agree that the payroll records
25   don't always reflect accurate time worked?

142

1        A   In general or in this case?
2        Q   In this case.
3        A   Based on the testimony from Mrs. Maranto, I
4    would agree with that.
5        Q   So the payroll records do not always
6    accurately reflect time worked?
7            MR. WILKINSON:  Object to form.
8        A   True.  And that would be a record-keeping
9    violation.
10       Q   Okay.  Now, you stated here that certain
11   records were destroyed by the former CPA?
12       A   I believe by the widow of the former CPA.
13       Q   And what records, specifically, are you
14   referencing that were destroyed?
15       A   It's my understanding that the CPA was in
16   possession of time and payroll records of this employer
17   for the period of time preceding the CPA's death.
18       Q   So we're talking about payroll records?
19       A   My understanding, it's time and payroll.
20       Q   And where are you getting that understanding
21   from?
22       A   My understanding was that Mrs. Maranto, or
23   whoever was tallying the time records, was not always
24   furnishing the raw timecards, I'm going to call them,
25   to the CPA but rather was phoning in weekly hours,

143

1    possibly daily hours, but at least weekly hours and pay
2    period hours to the CPA, and it was the CPA's office
3    that was creating the summary time record for the
4    employees at Meers Restaurant.
5        Q   Okay.  And are there any records that would
6    establish whether the time reported to the CPA was
7    accurate?
8        A   As we sit here today?
9        Q   Yeah.
10       A   Yes.
11       Q   What was that?
12       A   I would say records kept -- created and kept
13   after the Wage Hour investigation.
14       Q   Okay.  But from January 2012 to January 2015?
15       A   I'm not exactly clear from memory when the
16   CPA passed away.  But it's my understanding that the
17   CPA had the sole time and payroll records for the
18   restaurant up until the time -- covering the
19   investigation period up until the time of his death.
20   At that point, a new CPA entered the picture and that
21   that CPA, Mr. Smith I think you said, could possibly
22   have those records.
23       Q   But I guess what I'm trying to understand is
24   what you are saying the deceased CPA had in terms of
25   records.  And you're telling me that he had time

144

1    records.  What do you mean by time records?
2            MR. WILKINSON:  Object to form.
3        A   It's my understanding that the CPA had hours
4    -- had a report of the hours worked phoned into them at
5    minimum.
6        Q   Okay.
7        A   It could have been the timecards were
8    sometimes -- Mr. Maranto or Mrs. Maranto, one, in their
9    deposition talked about taking material, potentially
10   records, to the former CPAs.  I'm -- so I got a little
11   bit confused whether they were sometimes taking the
12   timecards to the CPA or whether they were phoning.  The
13   more common practice in my understanding was they
14   phoned in the time from the timecards the CPA, kept
15   those timecards for a brief period of time, and then
16   they were destroyed.
17       Q   Okay.  So you're basing your understanding of
18   how records were kept prior to the CPA passing away on
19   accounts made in depositions?
20       A   Yes.
21       Q   Did you talk to anyone that worked with Danny
22   Delciello, the CPA?
23       A   No.
24       Q   And under the Fair Labor Standards Act, whose
25   obligation is it to keep the records, payroll records?

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 38 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

145

1    A    The covered employer.
2    Q    Okay.  I would like to talk to you about
3 child labor violations and you discussed that on Page 6
4 of your report.  Okay.  And you state that, according
5 to the complaint, Meers violated the child labor
6 provisions in two ways.  And if I refer you to the
7 complaint on Paragraph 12, there's more than two
8 allegations; is that fair?
9    A    Yes.  But several of them, Tyler, in my
10 opinion, regard the same general violation, that's a
11 Regulation 3 time and age standard.  So I grouped those
12 into non-hazardous order child labor violations and
13 hazardous order violations.
14    Q    All right.  If I can direct your attention to
15 Page 9 of the narrative, I just want to go through and
16 ask questions about each violation as described in
17 here.  So on the bottom of Page 9 for blacked-out
18 things, I'll just use the word minor.  I want to read
19 these and ask you questions.  So the first one at the
20 bottom of Page 9, Exhibit R, "Minor date of birth,
21 blank, Wage Hour investigator verified date of birth
22 with the minor's parent and school district.  Minor
23 worked as a volunteer busser from October 7th, 2012, at
24 age 13 through October 20th, 2012.  She worked more
25 than three hours on school days, more than 18 hours on

146

1 school weeks, worked more than eight hours on school
2 days, and worked past 7 p.m. from Labor Day to June
3 1st."
4    A    Yes.
5    Q    What is your opinion about that allegation?
6    A    The only unsettled issue with me is whether
7 this, quote, "volunteer busser," was an in an
8 employer/employee relationship with Margaret Maranto.
9    Q    Do you have any information about whether
10 individuals or an individual at age 13 worked the hours
11 and days alleged?
12    A    Do I have an opinion about it?
13    Q    Do you have any information?
14    A    No.
15    Q    The next one references, "From October 21st,
16 2012, to October 21st, 2014, at Page 14 and 15, minor
17 worked more than three hours on school days, more than
18 18 hours on school weeks, worked more than eight hours
19 on non-school days, worked past 7 p.m. from Labor Day
20 to June 1st."  Do you have an opinion about whether
21 this violation -- whether there is a violation as
22 alleged?
23    A    If this minor was an employee of
24 Mrs. Maranto, this would represent a Reg. 3 violation.
25    Q    And do you have information as to whether or

147

1 not an individual at age 14 and 15 worked these dates
2 and time?
3    A    Other than this report, no.
4    Q    The next issue on Page 10 refers to an
5 individual age 16 and 17 operating a meat slicer.  Do
6 you have an opinion whether that allegation occurred?
7    A    With regard to the meat slicer?
8    Q    Yeah.
9    A    No.  Other than whether an employment
10 relationship existed.
11    Q    And how about with respect to a dough mixer?
12    A    The dough mixer, I'm unsure of because in
13 conversations with Mr. and Mrs. Maranto that had been
14 photographed by the investigators when they entered the
15 establishment had not worked during the period -- was
16 in a nonworking condition during the period covered by
17 the investigation.
18    Q    Okay.  Other than that testimony you're
19 referencing, do you have any other evidence pertaining
20 to the allegations with the dough mixer?
21    A    No.
22    Q    Did you ever check the dough mixer
23 personally?
24    A    No.
25    Q    The next one, I'm going to ask you the same

148

1 question and I won't read it.  Have you read it?
2    A    Yes.
3    Q    Do you have an opinion whether this alleged
4 violation occurred?
5    A    It seems to have occurred if there was an
6 employer/employee relationship with regard to the
7 volunteer busser.
8    Q    And the last one says, "From approximately
9 May 12th, 2012, through September 6th, 2014, at ages 10
10 to 12, minor worked more than three hours on school
11 days, more than 18 hours on school weeks, worked past 7
12 p.m. from Labor Day to June 1st."  Do you have an
13 opinion whether that alleged violation occurred?
14    A    Nothing other than information stated here
15 and whether there was an employer/employee
16 relationship.
17    Q    On the last page of your report --
18       MR. WILKINSON:  That would be the current
19 report, right, Exhibit O?
20       MR. McLEOD:  That's correct.
21    A    Page 8?
22    Q    (By Mr. McLeod)  Yes.  You state that the
23 investigator did not give proper wage credit for the
24 discretionary bonus of $.45 per hour above the minimum
25 wage.

37 (Pages 145 to 148)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 39 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

149

1    A    Okay.
2    Q    What's the discretionary bonus?
3    A    A discretionary bonus is a bonus that cannot
4  be anticipated by the employee, but rather, it's given
5  at the sole discretion of the employer.
6    Q    Okay.  How does Wage and Hour determine
7  whether a bonus is discretionary?
8    A    Typically, by investigating to see whether
9  there's anything in writing that wherein the employer
10 commits to the bonus, whether the bonus was based on
11 productivity or attendance, and whether there is
12 evidence of the bonus being guaranteed, so to speak, to
13 the employee or promised to the employee.
14   Q    Why is the $.45 in this instance -- and just
15 to be clear, as I understand it, you're referring to
16 the fact that they paid $2.38 instead of $2.15 for
17 servers?
18   A    I think 2.58, Tyler.
19   Q    I'm sorry, 2.58.
20   A    As opposed to 2.13.
21   Q    Right.  So the difference is the $.45?
22   A    Yes.
23   Q    Why is that a discretionary bonus?
24   A    Specifically, Tyler, what brought that $.45
25 into the picture as far as me considering it was some

150

1  previous testimony from Mr. Speer having to do with the
2  definition of a discretionary bonus, deposition
3  testimony not given by him in this case but in another
4  case under his jurisdiction.
5    Q    Okay.  What about that testimony?
6    A    I only read it once, but it seemed to -- he
7  seemed to describe and define a discretionary bonus in
8  a way that this $.45 would meet that definition.
9    Q    But, I guess, I'm wondering what is your
10 opinion, not Mr. Speer's opinion, but your opinion on
11 why this $.45 differential is a discretionary bonus?
12   A    My opinion in this case is just influenced by
13 the unusual or unique circumstance of having a
14 foundation in that prior deposition testimony.
15   Q    Well, I mean, as a matter -- as a matter of
16 Wage Hour policy and the regulations, is it a
17 discretionary bonus?
18   A    I have not viewed it -- an amount like that
19 as a discretionary bonus in the past, but I have never
20 been presented with these particular circumstances
21 before.
22   Q    Just circumstances where the district
23 director gave testimony that you believe would support
24 it being a discretionary bonus?
25   A    Yes.

151

1    Q    Okay.  So is incentive pay a discretionary
2  bonus?
3    A    Typically not.
4    Q    Okay.  And if someone -- if an employer pays
5  an hourly rate for years at a time, would they be able
6  to allege that a portion of that is a discretionary
7  bonus?
8        MR. WILKINSON:  Object to form.
9    A    Can you help me out a little with the
10 question?  Are you talking about an employer who pay as
11 hourly rate in excess of 7.25 an hour?
12   Q    So for example, I believe the testimony in
13 this case indicates that 2.58 was paid for years, like,
14 maybe decades; right?
15   A    I have -- I'm unsure how long they had been
16 paying the 2.58.  I would say this, Tyler, I asked the
17 Marantos out of curiosity why they were paying 2.58
18 when the law only required 2.13, and they told me it
19 was just something they, at their discretion, decided
20 to do.  It had nothing to do with bringing -- it had
21 nothing to do with the insufficiency of tips received
22 by the tipped employees.  It was just something they
23 decided to do.
24       (Exhibit X is marked for identification.)
25   Q    I'm handing you what's marked Exhibit X.  So

152

1  starting on Page 121, Line 3, Question:  "But then it
2  says, quote, 'Recently when we learned this advice was
3  wrong, we decided to continue paying this amount even
4  if we weren't required to do so as a bonus.'"
5        Answer:  "Not a bonus, no.  It's just an
6  incentive."
7        Questions:  "Okay.  So the difference between
8  2.13 and 2.58 is not being paid as a bonus to your
9  employees?"
10       Mr. Wilkinson objects to form.
11       Answer:  "No."
12       Question:  "Is that --"
13       Answer:  "I'm sorry.  No."
14       Question:  "Okay.  So you're saying it's not
15 a bonus.  You said it's an incentive.  What do you mean
16 by that?"
17       Answer:  "We just pay a little more by the
18 hour, the waitresses."
19       MR. WILKINSON:  Do you have a question?
20   Q    Going to Page 122, Line 6, Question:  "You
21 knew from the beginning once you started paying 2.58 a
22 long time ago an hour for your tipped employees --"
23       "Right."
24       Question:  "You knew you were required to pay
25 them 2.13 --"

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

153

1      "Right"
2      Question:  "-- but you chose to pay a higher
3  hourly rate on your tipped staff?"
4      Objection to form.
5      Answer:  "Right."
6      So someone who -- an employer such as Meers,
7  by this description where they kept a rate at 2.58 as
8  incentive, does that meet discretionary bonus criteria
9  as described by Mrs. Maranto?
10     A   Under these circumstances, it could.
11     Q   How could it?
12     A   Because Margaret Maranto, with all due
13 respect, is not qualified to answer a nuance question
14 like is this an incentive, is this a bonus.  I heard
15 the woman in her deposition testimony admit to alleged
16 violations that her own records indicate she did not
17 commit.
18     Q   Like what?
19     A   She said that she, at one point, did not pay
20 anybody time-and-a-half for hours over 40 and I had
21 found in the payroll records that I did look at when I
22 did the math, it appeared to be that some hours had
23 been paid at time-and-a-half.  I had at least two
24 employees that I talked to back in November say, well,
25 sometimes I get straight time but sometimes I've been

154

1  paid time-and-a-half.  Mrs. Maranto, in my opinion,
2  just -- just for whatever reason, stress, whatever,
3  came to the point in her deposition that I think was
4  simply agreeing to whatever Ms. Bobela seemed to be
5  asking her without regard to whether or not it was
6  really true or accurate.
7      Q   Well, they've been paying 2.58 for a long
8  time; right?
9      A   Like I say, I don't know how long they had
10 been doing that.
11     Q   So I guess, Randy, I'm trying to understand
12 what is it about paying the rate of 2.58 that results
13 as a discretionary bonus specifically?  What's the
14 reason?
15     MR. WILKINSON:  Object to form.  It's been
16 asked and answered.  He's told you now two or three
17 times.
18     Q   What's the answer?
19     A   It's predicated on --
20     Q   Mr. Speer's testimony?
21     A   -- Mr. Speer's testimony.
22     Q   What did he say that made it discretionary in
23 this instance?
24     A   As I said, Tyler, I read it one time, but it
25 seemed to define -- for Wage Hour purposes, seemed to

155

1  define a discretionary bonus as an amount paid in
2  excess of what the regulations require be paid and
3  that, his opinion as stated in that jurisdiction, brings
4  into the picture in this particular case a question or
5  a consideration as to whether that extra $.45 an hour
6  is a discretionary bonus.  Or if it's not a
7  discretionary bonus, my reading of the narrative report
8  did not seem -- did not find that the investigator
9  weighed that question or consideration at all.
10     Q   Had the investigator, to your knowledge, been
11 privy to that testimony that you're referring to?
12     A   To my knowledge?  No.  Not to my knowledge.
13 You're speaking of whether the investigator was privy
14 to Mr. Speer's testimony?
15     Q   Well, you just said the investigator was not
16 -- did not consider prior testimony that Mr. Speer
17 gave.  And my question is, do you have reason to know
18 that she was aware of it?
19     A   I may have misstated that.  I'm not saying
20 that she -- whether -- I'm not saying that she failed
21 to give consideration to Mr. Speer's testimony.  I'm
22 saying that in her narrative, there was no specific
23 language that indicated she had considered whether the
24 $.45 was a discretionary bonus.
25     Q   Even though, by your own account, just as a

156

1  matter of regulatory policy, it's not a discretionary
2  bonus?
3      MR. WILKINSON:  Object to form.  He didn't
4  say that.  Don't argue with him about that.  He didn't
5  say it was not.  It was.  It was discretionary bonus.
6      Q   Can you answer my question?
7      A   Would you repeat the question?
8      MR. McLEOD:  Can you read back my question,
9  please?
10     (The previous question was read back.)
11     A   I haven't looked at the regs to see if they
12 address these specific circumstances where you have a
13 district director in charge of his jurisdiction who
14 defines a discretionary bonus in the way that Mr. Speer
15 did.
16     MR. WILKINSON:  All right.  What else can we
17 help you with?
18     Q   (By Mr. McLeod)  All right.  Randy, I would
19 like to talk to you about the section in your report
20 starting on Page 2 about conduct of the investigation.
21     A   Page 2?
22     Q   Yeah.  So regarding the period of the
23 investigation, in the last sentence, you note that FOH
24 Chapter 51 could be used as an exhibit.  And what
25 purpose would that serve?

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

---

157

```
 1        A   It would give -- I think it would increase
 2   the viability, the evidence above my testimony as to
 3   what Chapter 51 said if that section of FOH could be
 4   introduced into evidence.
 5        Q   And what does Chapter 51 say about the period
 6   of investigation?
 7        A   Chapter 51 says that the period to be
 8   investigated is the two-year period prior to the
 9   initiation of the investigation when the employer has
10   no prior history.  My review of the case diary sheet
11   indicated that weeks before Investigator Masters went
12   out to the establishment, she did her research and she
13   noted on the diary sheet that this investigator had no
14   prior history.  Mr. Maranto subsequently testified in
15   his deposition that he had never been investigated
16   before, been out there since the early to mid 80's.
17        So Chapter 51 goes ahead to say that if
18   evidence during the investigation is developed that
19   would reflect willful violations by the employer, that
20   the investigator and the district office manager are
21   required to get approval from the regional office and
22   approval from the regional solicitor before they can
23   extend the investigation back the third year even in
24   the face of the investigation disclosing evidence of
25   willful violations.
```

---

158

```
 1        Ms. Masters testified that she made -- she
 2   made the decision to go back three years before she
 3   ever held the initial conference, before she ever set
 4   foot in the establishment.
 5        Q   Other than Ms. Masters' testimony, what
 6   information do you have or know regarding the
 7   decision-making process within Wage and Hour to apply a
 8   three-year period as part of their investigation?
 9        A   In this particular case?
10        Q   Yeah.
11        A   There is a notation that the day before, I
12   guess it would be November 19th, that there was a call
13   between, it appeared, to be the investigator,
14   Mr. Speer, and Mr. Lonesky where they talked about an
15   action plan, something about an action plan.  The next
16   day, they roll out on the investigation.  So I don't
17   know.  To answer your question, I don't have any
18   knowledge what was discussed in that conference call.
19   Whether the three-year statute, three-year
20   investigation period was discussed or not.  I just know
21   that they applied it, that it was contrary to FOH
22   policy and procedure.
23        Q   And you say it's contrary to FOH policy and
24   procedure, but I guess I'm not sure I'm understanding
25   what evidence you're basing that upon?
```

---

159

```
 1        A   I'm basing it on the fact that Ms. Masters'
 2   own report indicated this employer had no prior
 3   investigation history.  The handbook makes it clear
 4   when that's the case, when this is the first
 5   investigation of the employer, the investigation period
 6   is to be two years.
 7        Q   Now, if evidence is gathered that indicates
 8   potential willful violations, three years can apply for
 9   an investigation period?
10        A   Assuming the regional office and the regional
11   solicitor approve it, it can be extended back the third
12   year.
13        Q   And do you know whether that was done in this
14   instance?
15        A   I know if it's done, it's to be documented in
16   the file and the unredacted portion of the file gave me
17   evidence that that had been done.
18        Q   So do you know whether it had been done?
19        A   No.
20        Q   And why is this significant?  Why is this
21   issue of the investigation period significant to your
22   opinion?
23        A   It's meaningful to me, Tyler, because it's
24   indicative of an investigator who did not follow the
25   rules.  And that offends me personally as a career
```

---

160

```
 1   employee of the Wage Hour Division that she would act
 2   outside the scope of her authority to extend an
 3   investigation three years.  From all appearances, she
 4   did it unilaterally, arbitrarily.  She based it on
 5   complaint information.
 6        Q   And why -- I guess my question is your --
 7        MR. WILKINSON:  Excuse me, Counsel, I don't
 8   think he was through.  Excuse me.
 9        Q   What is the evidence you have to support
10   that?  It's only complaint information.
11        A   That --
12        MR. WILKINSON:  Are you going to permit him
13   to answer his question?  He was answering.
14        A   That when she went into the establishment on
15   November 20th, she stated that the investigation was
16   covering a three-year period of time.  She had no basis
17   -- no procedural policy basis to decide that and
18   announce that.
19        Q   How do you know that?
20        A   Because she says they had no prior history.
21        Q   So your opinion is that unless there's prior
22   history, there's no other circumstances?
23        A   It's not only my opinion, Tyler, it is the
24   agency's policy.  And if the agency begins to
25   willy-nilly go I'm going to investigate you two years,
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 42 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

161

1  well, you, I don't like the looks of you, I'm going to
2  go back three years, then the agency's reputation is
3  going to take a serious hit.
4      Q  Now, the investigation period -- the purpose
5  -- the time periods that you're discussing, two years
6  and three years, that is in relation to the statute of
7  limitations?
8      A  Yes.
9      Q  Okay.  And a three-year period may apply if
10  there's evidence of willfulness; right?
11     A  Under the circumstances I've previously
12  described, yes.
13     Q  Well, and I'm just talking in general.
14     A  Yes.
15     Q  Okay.  So whether or not violations are
16  willful is a matter of evidence.  Would you agree?
17     A  Yes.
18     Q  And willfulness has been alleged in the
19  complaint in this case; right?
20     A  Yes.
21     Q  And so I guess I'm trying to understand that
22  because this is a question that will be presented to
23  the judge or jury in this case how the defendants are
24  somehow prejudiced if somehow the wrong period was
25  applied?  How are they disadvantaged?

162

1      MR. WILKINSON:  Object to the form.  Asked
2  and answered.
3      A  Arguably, Tyler, the back wages alleged to be
4  due are one-third too high right off the bat.
5      Q  But as we talked about earlier, Randy, that
6  Wage Hour could have wanted to apply a two-year period,
7  and the solicitor's office, in pursuing a complaint and
8  alleging willfulness, can go back three years in
9  litigation?
10     MR. WILKINSON:  Object to form.
11     A  From the point of the filing.
12     Q  Right.
13     A  But that question suggests this level of
14  efficacy that I never experienced.  The investigation
15  closes out -- the file has to be reviewed at the
16  district office, has to be reviewed at the regional
17  office.  If it's referred, months go by, sometimes a
18  year goes by, before the case is analyzed and ready to
19  be filed.  So arguably, what's happening once
20  Investigator Masters says to Mrs. Maranto, you're not
21  doing this right, this is what you need to do and
22  Mrs. Maranto says, okay, I need to do that, then what
23  we're trading with the two-year and three-year statute
24  is the clock ticks.  We're trading a week of agreed
25  compliance with -- we're gaining a week of agreed

163

1  compliance and we're dropping of an alleged week of
2  violations.  So that when a year goes by and the
3  solicitor's office files and decides, you know, we're
4  going back three years, then they're going to capture a
5  period of time of compliance.
6      But to me, the bigger issue, and to me in a
7  jury trial, the issue is going to be fruit of the
8  poisoned tree.  If these employers had the rights
9  abridged, had their employees threatened, had an
10  investigator assert arbitrarily a three-year statute
11  when no evidence -- she didn't have any evidence to
12  support that, when the solicitor's office hadn't
13  approved it, the regional's office hadn't approved it,
14  the totality of the situation, I think, will be weighed
15  by a jury, not the technicality of whether the
16  solicitor's office could have said, well, now that
17  we're looking at it, we see evidence of willful
18  violations, we're going to file for a three-year
19  period.  I think these other things are important and
20  they certainly -- as I've said, they certainly ought to
21  be important to Wage and Hour whether they have a rogue
22  investigator who -- I mean, I'm having flashbacks to
23  Gate Guard Services here that Michael's familiar with
24  where it doesn't really matter in that case to the
25  judge so much what the employer did as much as what the

164

1  Department of Labor investigator did.
2      Q  Okay.  So are you aware of when the statute
3  of limitations begins to run after the filing of the
4  complaint?
5      A  The filing of the complaint freezes the
6  period of time addressed in the lawsuit.
7      Q  Okay.  So it goes back three years from the
8  date of filing?
9      A  Yes.  That's my understanding.
10     Q  And let's talk about the 72-hour letter.
11     A  Okay.
12     Q  How was the 72-hour letter used in this case?
13     A  I think at some point earlier in the
14  investigation after records had been requested and the
15  investigator decided they weren't being produced
16  quickly enough, she utilized a 72-hour letter.
17     Q  Okay.
18     A  Completely inappropriately, but nevertheless.
19     Q  Do you know if whether Meers complied with
20  the letter, the 72-hour letter?
21     A  I think counsel was involved about that time
22  and I'm not sure.
23     (Exhibit C is handed to the witness.)
24     Q  Okay.  And I'm handing you what's been marked
25  previously as Exhibit C.  I cannot find copies.

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 43 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

165

```
1        MR. WILKINSON:  Do you not having copies for
2   us?
3        MR. McLEOD:  Well, I just explained I've been
4   trying to find it.  I cannot find copies.
5        (Brief discussion off the record.)
6        (Exhibit Y is marked for identification.)
7        Q   (By Mr. McLeod)  I'm handing you what's been
8   marked as Exhibit Y.  Can you identify Exhibit Y,
9   please?
10       MR. WILKINSON:  Wait.  I don't have a --
11  would you wait until my assistant returns, please?
12       Q   Can you identify Exhibit Y?
13       MR. WILKINSON:  We're going to wait until my
14  legal assistant returns.
15       MR. McLEOD:  He can identify it.
16       MR. WILKINSON:  He can't do anything until I
17  tell him he can.  We're trying to accommodate you by
18  getting a copy, so we're going to wait until she gets
19  back.
20       MR. McLEOD:  That's accommodating you.  I
21  have a simple question for him.
22       THE WITNESS:  Would you repeat the question?
23       Q   (By Mr. McLeod)  Can you identify Exhibit Y,
24  please?
25       A   Exhibit Y is two different Dallas regional --
```

166

```
1   Dallas regional numbered memos and a sample 72-hour
2   letter.
3        Q   And I'll represent to you this was provided
4   to us through discovery from the defendants.  Is this
5   information something you provided to them?
6        A   Yes.
7        Q   Okay.  Is there anything in here that
8   indicates that the 72-hour letter marked as Exhibit C
9   was issued inappropriately?
10       A   Anything contained in this document?
11       Q   Yeah.
12       A   No.
13       Q   And in your report, you mentioned that policy
14  requires approval of the 72-hour letter by the regional
15  office and the regional solicitor's office?
16       A   Yes.
17       Q   Do you know whether that approval occurred
18  here before this was issued?
19       A   Indications from the file indicate it did not
20  occur.
21       Q   When you say indications from the file, what
22  are you referring to?
23       A   I'm referring to the requirement that the
24  file carry a notation that that approval was requested
25  and received.
```

167

```
1        Q   Do you know whether that approval was
2   requested and received?
3        A   Nothing beyond looking at the documents
4   supplied by DOL.
5        Q   And Exhibit C, the actual 72-hour letter,
6   that was delivered to the Meers attorney; right?
7        A   It appears so.
8        Q   Okay.  And what is the purpose of having the
9   solicitor's office look at a 72-hour letter and letting
10  them know about it in advance?
11       A   Because it could obligate or attempt to
12  obligate the solicitor's office to support the
13  enforcement of an administrative subpoena.
14       Q   Was a subpoena issued in this case?
15       A   I don't know.
16       Q   Do you know whether defendants complied with
17  this 72-hour letter?
18       A   I assume they did.
19       Q   And what is the significance of pointing out
20  your comment about the 72-hour letter in your report?
21       A   Well, first -- first of all, there's no
22  indication that the office received the requisite
23  approval -- the district office received the requisite
24  approval from the regional office and the regional
25  solicitor.  Notably, this letter, when I got a copy, I
```

168

```
1   noticed it was signed by a bargaining unit employee.
2   That's -- that is absolutely prohibited not only in
3   this region but in this country for a bargaining unit
4   employee to sign a managerial letter to an employer,
5   much less to an attorney.
6        Mr. Lonesky, in his testimony, said he wasn't
7   available to sign it.  If he doesn't know now, I would
8   think through this process he will learn that's
9   irrelevant.  A bargaining unit employee never is
10  allowed to sign a managerial letter like this.
11       Q   Okay.  So how does this prejudice or
12  disadvantage the employer?
13       A   To me, Tyler, it is indicative of this
14  pattern of abusive behavior by this investigator --
15  lead investigator toward this small employer.  It is a
16  continuation of two investigators -- two journey level
17  investigators, not one, not a two-year period of time,
18  three year period of time.  She simply occasion after
19  occasion after occasion operated, vis-a-vis, this
20  employer, outside of the policy and procedures of the
21  agency.
22       Q   Okay.  Let's talk about your point on Page 3
23  of your report, Exhibit O, about two investigators.
24       A   Yes.
25       Q   Is there any written policy about how many
```

42 (Pages 165 to 168)

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

169

1  investigators could be assigned to a case?
2      A   If there is, it's contained in a regional
3  numbered memo. I'm not sure there is. It's something
4  we've talked about continuously with the managers
5  because it puts at risk the entire grade structure that
6  took the agency 50-plus years to get the journey level
7  from a GS-11 to a GS-12.  That was done in the late
8  70's and early 80's, and it was all predicated on
9  investigators being able to enforce any of the laws
10 entrusted to the Wage Hour Division and to make those
11 investigations individually, not in a team with a
12 partner as a group, but to make them individually.  So
13 I have investigated investigators who teamed up and
14 when we found them doing it, they were disciplined.
15 One was separated from the Wage Hour Division because
16 it is not to be done.
17     In this case, the testimony was that it was
18 done for safety purposes and that is questionable in my
19 mind.
20     Q   Why?
21     A   Because Investigator Masters said she had
22 gone to this establishment to eat.  I don't go eat at
23 establishments where I'm concerned about my safety.
24 Investigator Arnold testified that she had been to the
25 establishment as many as five times and never felt any

170

1  danger.
2      Q   Well, now, isn't there a difference between
3  going with your spouse or your family or with friends
4  to eat at a restaurant that is in a remote location and
5  showing up as an investigator to ask questions that
6  could result in liability?
7      A   To me, the safer scenario is to show up with
8  a badge and credentials and under the authority of the
9  Secretary of Labor.  I would feel safer in that
10 scenario than I would if I were a female in the
11 accompany of my spouse or my children.
12     Q   Okay.  Ultimately, whose decision is it on
13 who to send out for an investigation?
14     A   It's the district office manager, either the
15 assistant district director or the district director.
16 Their decision is then subject to review by the
17 regional office.
18     Q   And there are instances where more than one
19 investigator goes out to investigations such as
20 agriculture -- certain agricultural investigations;
21 correct?
22     A   Certainly.
23     Q   And for child labor investigations?
24     A   There are situations under child labor
25 agriculture, there are certain task force

171

1  investigations that are just -- they are so
2  distinguishable, in my opinion, from the first
3  investigation of a small employer that they're not
4  really comparative.
5      Q   And this is a child labor case; right?
6      A   Yes.  Child labor where this would happen is
7  child labor in agriculture where when the investigator
8  goes in the north end of the field, the minors run out
9  the south end.  So we use multiple investigators to
10 block off those exists.  In this situation, the
11 allegation, I suspect, was these youngsters working
12 with their mother or the alleged hazardous occupation
13 which has nothing to do with people running out of the
14 establishment.
15     So this type of child labor allegation
16 investigation would never, in my opinion, justify two
17 GS-12 investigators going into an establishment where
18 you're going to find four or five, maybe six employees.
19     Q   Okay.  You identified three employees -- let
20 me ask you this, do you know of any business
21 interruptions that occurred as a result of two
22 individuals being assigned to the investigation?
23     A   Yes.
24     Q   Could you explain that?
25     A   There was at least one employee, Lisa

172

1  Wiederman, who asked to not be interviewed because she
2  had customers and it would affect her tips.  The agency
3  policy is that that request would have been honored.
4  She would not have been asked to leave her work station
5  and sit for an interview when it was going to cost her
6  money.  Lisa indicated to me that that's exactly what
7  happened to her over her protestations.  So it did
8  interrupt the business practice by having two
9  investigators there.
10     But moreover, it was the intimidation factor
11 of displaying their badges continually through the
12 visit, which we have repeatedly told investigators not
13 to do, and some of the statements and threats made to
14 those employees.  So it was the environment that was
15 created and bolstered by the presence of two people.
16 It was overwhelming and threatening to the employees
17 who I talked to anyway and to the operation of the
18 business.
19     Q   Okay.  And what were the threats?
20     A   One employee indicated that at the beginning
21 of the interview Investigator Masters said if you lie
22 to me when I ask you these questions, you'll be charged
23 with perjury.  Another one said if you don't tell me
24 the truth, you can go to jail.  Mr. Cunningham said
25 that he indicated to them in some form or fashion that

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 45 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v.  Margaret Maranto, et al.

173

1    his wife was seriously ill, had serious health
2    condition, and the response was, well, then you want to
3    be sure and answer my questions correctly because you
4    can't really afford to lose your job, can you, some
5    words to that effect, which he took as an absolute
6    threat of his employment at that restaurant.
7        Q    And you're conveying this to me based on your
8    discussions with these individuals?
9        A    Yes.  And with the recounting of what was
10   told to the Marantos by these employees in real time.
11       Q    Okay.  And you got that from the Marantos,
12   their explanation of it?
13       A    From the Marantos, yes.
14       Q    Okay.  You also state that the investigators
15   began interviews before the Marantos were contacted and
16   abridged rights under the Small Business Regulatory
17   Enforcement Fairness Act?
18       A    Yes.
19       Q    What are you referring to there?
20       A    Well, that's an act that -- of years standing
21   that employers of fewer than 50 employees are
22   considered to be covered or protected under SBREFA.  I
23   was the SBREFA coordinator for the Southwest Region.  I
24   went to the meetings, met with the congressional
25   representatives who had constituents who were small

174

1    employers.  It could be a huge hassle if we mistreated
2    or treated unfairly a small business.
3        So one of the things we made sure that the
4    investigators knew to do was to give the employer the
5    Handy Reference Guide that in the back provided their
6    SBREFA notice that they had the ability to contact the
7    SBREFA ombudsman and say the government, you know, is
8    mistreating me or making unfair demands of me.
9        Q    Now, I mean, you indicate -- well, why is it
10   that the Marantos had to be contacted?
11       A    Because Investigator Masters said
12   Mrs. Maranto's the employer.
13       Q    So you say here that, "It is important to
14   note that Investigator Masters determined that
15   Mr. Cunningham was not a manager."
16       A    Investigator Masters has it both ways in my
17   opinion.
18       Q    Well, in the narrative she says he's a
19   manager; right?
20       A    She says he's a manager and then she says
21   he's nonexempt.
22       Q    But those are two completely different
23   things; right?  Somebody can be a manager and paid
24   hourly?
25       A    They could be a manager paid hourly, but I

175

1    think within the context of the FLSA, a manager
2    typically is an exempt manager at least so far as a
3    manager who is an appropriate person to ask for
4    permission to interview employees and to provide the
5    Handy Reference Guide to.
6        Q    Do you know what the definition of manager is
7    under the Small Business Regulatory Enforcement
8    Fairness Act?
9        A    No.
10       Q    Is there one?
11       A    I'm not sure.
12       Q    Do you know how to determine who a manager is
13   under Title 7?
14       A    No.
15       Q    And under the FLSA, somebody could have
16   managerial duties and be bestowed with supervisory
17   authority and be paid hourly?
18       A    They could.
19       Q    And on Page 5 here, you state -- third full
20   paragraph --
21           MR. WILKINSON:  Third full paragraph?
22           MR. McLEOD:  Yeah.
23           MR. WILKINSON:  It is alleged?
24           MR. McLEOD:  The next one.
25           MR. WILKINSON:  Thank you.

176

1        Q    (By Mr. McLeod)  After the FLSA cite, it
2    says, "I think the investigators probably thought the
3    same thing when they first encountered him during the
4    investigation and that's why they furnished him with a
5    copy of the appointment letter.  Certainly the
6    testimony of both Marantos would indicated
7    Mr. Cunningham was either the kitchen manager or the
8    restaurant manager during certain shifts."  So he was a
9    manager?
10       A    (Nodding).
11       Q    Would you agree?
12       A    Yes.
13       Q    Okay.
14           MR. WILKINSON:  I knew we would get an
15   agreement.  I knew it.
16       Q    And this gets into the issue of the
17   appointment letter.  So on Page 5, you acknowledge that
18   they gave him, Mr. Cunningham, the appointment letter?
19       A    Mr. Cunningham, I believe, said they gave it
20   to him.  I mean, I wouldn't know but for -- well, I'm
21   not sure he said they gave it to him.  I believe both
22   investigators indicated they gave it to him.
23           (Exhibit A is handed to the witness.)
24       Q    Okay.  I'm handing you a copy that's
25   previously marked Exhibit A.  Okay.  So I just looked

Case 5:15-cv-01378-D  Document 73-1  Filed 05/04/17  Page 46 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v.  Margaret Maranto, et al.

177

1  at your first report, and it indicates that the Handy
2  Reference Guide -- you'll have to excuse me for a
3  second. I'm trying to square what's being said in both
4  reports.
5      MR. WILKINSON:  Just take your time. That's
6  all right. You know, times goes by when you're having
7  fun.
8      Q   So on Page 4 of your --
9      A   Supplemental?
10     Q   Yeah. Your supplemental report, Exhibit O,
11 the second paragraph says "Mr. and Mrs. Maranto
12 testified they were not provided with a copy of the
13 appointment letter or any publication during the
14 initial visit."
15     A   Yes.
16     Q   Okay. I guess, in your initial report, you
17 make mention of the Handy Reference Guide not being
18 provided to the employer?
19     A   Yes.
20     Q   Is that part of your opinion that the Handy
21 Reference Guide was not provided?
22     A   Yes.
23     Q   And what are you premising that on?
24     A   That when I spoke with the Marantos, they
25 indicated that at the end of the day, November 20th,

178

1  2014, the first day the investigators were there, that
2  they didn't have anything in the way of correspondence
3  or written publications from the investigators.
4      Q   Okay. And Exhibit A, would you agree that it
5  indicates in handwriting on the first page that it was
6  provided to Roland Cunningham?
7      A   That's the notation.
8      Q   Right. And there's an enclosure section on
9  the second page that the Handy Reference Guide was
10 provided?
11     A   Yes. And, Tyler, what I'm saying is the
12 Marantos indicated that they never received it. I'm
13 not taking issue with whether or not the appointment
14 letter and/or the Handy Reference Guide was furnished
15 to Mr. Cunningham.
16     Q   Okay. So Mr. Cunningham did receive the
17 Handy Reference Guide?
18     A   I don't know that -- I don't know whether he
19 did or not. This only indicates -- to me in my
20 opinion, this would indicate that the investigators are
21 noting that this letter was given to Mr. Cunningham on
22 11/27/2014 when they walked into the establishment.
23     Q   Okay. And do you know whether Mr. Cunningham
24 actually received the attachments?
25     A   I don't know that for a fact.

179

1      Q   Okay. And is it common for employers to
2  engage legal counsel during your investigation?
3      A   Is it normal?
4      Q   Yeah. Common is what I said. Or typical?
5      A   Well, it really depends on the employer. A
6  corporate employer with a hundred or more employees, it
7  would be common. A small employer like this, it is
8  common only if there is a particular reason -- if
9  there's a specific motivation to that employer because
10 of the -- because of the cost involved.
11     MR. WILKINSON:  But it is not common for them
12 to retain the world's best lawyer.
13     MR. McLEOD:  I move to strike that.
14     MR. WILKINSON:  All right. I agree. Strike
15 that. Probably wouldn't agree to that anyway.
16     A   I'd also note, Tyler -- you didn't ask, but I
17 can't help myself, the letter that they purportedly
18 gave to Mr. Cunningham says that they want to
19 investigate a two-year period of time. It's in the
20 third paragraph down, for a two-year period of time.
21     Q   (By Mr. McLeod)  Okay. On the last paragraph
22 Page 3, you take issue with interviews taken after the
23 lawsuit and you state, "This tells me that significant
24 attempts were made by Wage Hour and the DOL attorney to
25 justify decisions made months prior by the

180

1  investigator." What is it that gives you -- that
2  supports your conclusion that efforts are being made to
3  justify decisions made prior by the investigator?
4      A   Well, first, it's certainly normal in the
5  roll-up to litigation to go get additional statements
6  and do witness evaluations. So I'm not taking issue
7  with that. What I'm taking issue with is Investigator
8  Masters extrapolates the allegation about uncompensated
9  time across the board to the employees. Then she -- a
10 year after the litigation's filed, she goes out to,
11 arguably, interview some of those very employees to get
12 detailed information that I suggest she should have
13 gotten prior to her averaging and her extrapolations
14 and her estimates.
15     Q   Do you know what those conversations and
16 statements contained?
17     A   No.
18     Q   And you reviewed our privilege log and those
19 statements were identified in the privilege log; right?
20     A   They're identified as a B Exhibit obtained on
21 a certain date.
22     Q   Right. It includes the date that they were
23 taken?
24     A   Yes. That's why I know that some of them,
25 many of them, nine of them or something, were taken in

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 47 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

181

the fall of 2016.

Q   Right.  So all you know is the dates they were taken and that's it and how many people were interviewed?

A   Yes.

Q   So on top of Page 4, you mention that in prior instances where you've seen misconduct by investigators, they were subject to discipline?

A   Yes.

Q   How many times has that occurred?

A   I'm sorry?

Q   Approximately how many times has that occurred?

A   Ten to 15.

Q   Okay.  So what are --

A   Where I made the internal investigation.

Q   Okay.  And what's the discipline?

A   Well --

Q   So for example, let's say somebody -- so two investigators go out to a restaurant and you're saying it's inappropriate to say that you have to give a statement under penalty of perjury or what the other complaints were recounted in your report by the three employees you referenced, what would the discipline be?

A   Suspension, potential proposed separation.

182

Q   And have you encountered those things in the past, those types of --

A   Yes.

Q   And how did you know about them?

A   Various ways, typically from either the victim, either the employer or the employee.  I've been given leads by the FBI.  I've been given a lead by the Texas Ranger.  I've been given leads by various departmental IG's, special agents.  I've been given leads by congressional representatives.  So it comes in various forms.

Q   But you're notified; right?

A   Not always.  I could identify it based on my routine periodic reviews of case files.  In the venue of accountability reviews, each district office, like Mr. Speers', is reviewed by the regional office once every three years.  In that review, I pull 60 investigation case files, and sometimes I develop leads from my review of those case files.

Q   Okay.  So in this instance, you have explained some comments that employees made based on the November 20th arrival of two investigators at the restaurant and your discussions with the Marantos about that.

A   And my discussions with the employees about

183

that.

Q   And I think it was three employees that you reference in your report that complained about it, the Marantos, that they were not provided or they claimed to not have received the Handy Reference Guide that -- and I guess my question is how is Wage and Hour supposed to have known about that occurring?

MR. WILKINSON:  Object to form.

A   Well, I guess my answer would be once they receive my expert witness report in January, they were on notice, at least by then, if not before.

Q   Okay.  Do you know of any facts where the employer or the employer's attorney that was retained after November 20th made any complaints to Wage and Hour with respect to conduct on the November 20th initial arrival at the restaurant, information that was provided, the 72-hour letter, or the three-year period?

A   I never communicated, Tyler, with the first two attorneys.  I think I said earlier I was not familiar with either of their names, which was somewhat of an indication to me they might not have developed expertise with regard to policies and procedures at the Wage Hour Division.  But since I never talked to them, I heard it for the first time when I talked to Mr. Maranto in July of 2016.  I wrote him the letter.

184

He called me and in that phone conversation, he recounted some of this to me.  I began to ask him who were these investigators.  I said earlier I had a standing concern about Investigator Masters, but he told me it was a woman from Oklahoma City or then he said two ladies from Oklahoma City.  Cheryl Masters is not from Oklahoma City, so I stepped back and thought, well, maybe my suspicions or concerns are unfounded, but then ultimately, I found out who the investigators were and he simply -- I guess he thought they were from Oklahoma City instead of from Lawton.

Q   But you don't know whether any communication about these complaints you raised in your report about investigation and the investigators were communicated to Wage and Hour management?

A   I do not know.  When Mr. Maranto recounted those to me, he said words to that effect, "Is that right?  Can they really treat us like that, treat my employees like that?"

Q   And why is it that -- let's say all these allegations you make in your report are true.  Why does that absolve an employer who has committed violations?

A   It doesn't, Tyler.  What it means to me -- and, you know, I'm singing the same verse over and over.  But what it means to me is that if these

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

185

allegations are true, and I certainly understand Wage
Hour not looking into them now, I clearly understand
that given the litigation.  But if they're true or even
if they're made at this point, then my experience with
Wage Hour was if we had reason to believe they were
true, we would engage that employer and give them some
relief.  We would focus on getting them into compliance
and we would focus on negotiating some equitable
resolution to the investigation/litigation.  Equitable
within the context of the mistreatment, if you will, or
the departure from policy and procedure that they had
suffered from.

        We would be looking -- simply put, we will
not be looking to go to a jury trial in circumstances
like this.  That would be the very last thing I would
want to do on top of the experience this region had in
the Gate Guard Services case and with the incoming
administration.  I don't have to be politically
correct, I can just say that.  In the face of this
administration, if I were the Wage Hour Division, I
would not want this case heard by a jury, reported by
the media.
        **Q   Well, so the violations in this matter, the**
**allegations, I'll say that, you don't have to agree**
**with them, but the allegations are that there were**

186

**inappropriate deductions for short breaks and tallying**
**errors on timecards as shown by timecards and that**
**overtime was not paid at time-and-a-half as shown by**
**the comparison of timecards to the payroll information**
**which was corroborated by witness statements as**
**described by Cheryl Masters in her narrative.  Now,**
**even if there is misconduct involved as the way you**
**have described, what bearing does that have on**
**violations that are supported by evidence?**
        MR. WILKINSON: Object to form.  Asked and
answered.  We've gone all through this before.
        A   With regard to the violations that are a
matter of record, it has none except that, in my
opinion, the investigation should have covered a
two-year period of time.  If I were still on that side
of the table, I would say we're going to use a two-year
period of time, not three.
        **Q   What would happen if Margaret who is the**
**regional Wage and Hour counsel disagreed with you and**
**she was going to do three in a complaint?**
        A   I would appeal to her.  I would appeal to
Jim.  I would lay prostate -- prostrate in front of
their doorway.
        **Q   But they would make the decision?**
        A   They would clearly make the decision, but

187

their -- I would make sure our national office knew of
my requests/suggestion, my concerns, and I would think
the political people in Wage Hour would have a
conversation with the political in the solicitor's
office and Margaret and Jim would, as always, be
reasonable people.  How's that?
        **Q   Sounds gratuitous for the record I suppose.**
        A   It's just honest opinion.
        **Q   All right.  Randy, I want to talk to you**
**about Cheryl Masters and you've made some comments**
**about her and you were present in her deposition;**
**correct?**
        MR. WILKINSON:  Before you launch out on
that, let's take a quick afternoon break.
        (Off the record at 4:14 p.m. and returning at
4:20 p.m.)
        **Q   (By Mr. McLeod) So, Randy, I wanted to talk**
**to you about Cheryl Masters.  What do you know about**
**the situation that was discussed in her deposition with**
**respect to her and Leroy Poor?**
        A   Either Mr. Poor and/or one of his assistants
told me back -- I don't remember the year, Tyler --
back when she transferred from the Midwest Region,
Illinois I think, to the Longview field office or field
station, that Mr. Poor felt like she represented to him

188

and misled him about her intention.  In a district
director -- I don't mean to -- I'm not -- I was not a
district director, but I think I can safely say any
district director wants their field staff to be
in that field office when they're not at an
establishment.  So his expectation was that she said
she wanted to staff the Longview, Texas, office.  He
thought she was going to live there.  Next thing he
knew, she was indicating they were buying property
Shreveport.  He felt misled strongly enough and
credibility was stretched so thin that he moved to
retract his agreement, renege on his agreement that she
transferred.  So I was told that the was concerns about
her honesty, her veracity.
        Subsequent to that, I would begin to hear
concerns about her behavior, her conduct with regard
to, vis-a-vis, employers, that she was overly
aggressive, harsh, demanding, that sort of thing.
There came a point in time -- the other thing I would
say is I began to notice that when I went into the
district office to provide training, she would not be
present.  And I remember at least once specifically
asking where is she because some of the training are
the very topics that we talked about.  That's how we
delivered the training to the investigative staff,

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

189

among other ways.  And it concerned me because I
thought she was one of the very people that needed to
hear it.
        So ultimately coming to point, I decided to
open a case on her and make an internal investigation
of her performance -- conduct and performance when she
was in Longview?
        Q   When was that?
        A   I don't remember.  I equate it with I
finished a similar investigation of an investigator in
New Mexico and I finished that one.  It was done in
conjunction with the Office of Inspector General.  That
investigator, we were going to discipline.  She
transferred outside the region.  I don't know if it was
per agreement or not.
        Q   I'm sorry, Randy.  I don't mean to interrupt
you, but are you talking about Cheryl or someone else?
        A   No.  Another investigator.
        Q   Okay.
        A   But it brought Cheryl back to my mind and I
planned to open a case on her.  I never got to that
point.  I don't know if it was other duties, other
demands on my time, but I never opened that case on her
before she left Longview.
        Q   Did you ever tell anybody that you were going

190

to open a case on her?
        A   I would have told either Cynthia Watson -- I
don't think I told Betty Campbell.  If I mentioned it
to anyone, it would have been Cynthia.  I'm not certain
that I mentioned it to her, because sometimes I would
start them on my own string on my own authority without
ever mentioning to her, so I'm not sure I did.
        Q   What was your degree of knowledge regarding
her performance as an investigator?
        A   Things that I was picking up from her
supervising assistant director employer complaints
about being, kind of, run over, rough shot, demanding,
pushy, overly aggressive, unfair, just things like
that.
        Q   Who was telling you this?
        A   I'm pretty sure it was one or more assistant
district directors in the Dallas office.  Someone who
supervised her or who knew about what the office
supervisor was hearing from the employers in the
Longview area.
        Q   Do you know what their names are?
        A   At that time, I do not.
        Q   Okay.  When was this training that you were
talking about that you specifically noticed she was not
there?

191

        A   I don't remember the date.  I tried to get to
each district office at least every couple of years in
person when they had their annual meeting, planning
meeting to deliver some training.
        Q   And this instance in your comments you're
making -- the instance with Mr. Poor and these comments
you have made are not included in your reports.  How
come?
        A   Partially, out of a sense of wanting to be
fair, but when she mentioned in her deposition
testimony that Mr. Poor considered her to be a
dishonest -- to have dealt dishonestly with him, words
to that effect, it -- frankly at that point, I had
already written my initial report and I hadn't put it
in there and I was uncomfortable putting it into the
supplemental which was just a clarification.
        Q   Okay.  So other than some comments from ADD's
in Dallas about her temperament with employers, what
else did you know about her, if anything, about her
performance?
        A   Performance was, as far as I knew, was good
as measured by a number of investigations completed,
back wages recovered, things like that.  But that's not
inconsistent with an investigator who is not following
policy and procedure with regard to their interaction

192

with employers.
        Q   Okay.  And are you aware that Leroy Poor gave
her a good job cash award in 2013?
        A   No.  But I would tell you this, Mr. Poor is a
bottom line supervisor.  If you produce cases, Mr. Poor
is going to reward you accordingly.
        Q   And are you aware she got the regional
administrator's award?
        A   Which would have been at the recommendation
of Mr. Poor.
        Q   That was in 2012?
        A   I'm sorry.  It would be at the recommendation
of either Glenda Smith or Michael.
        Q   Who makes the decision of who's going to get
those awards?
        A   Well, they have to be nominated by their
district director and the regional administrator makes
the final decision.
        Q   And does the regional administrator consult
with you about that?
        A   Would the regional administrator --
        Q   Have consulted with you about the issuance of
that award?
        A   Sometimes she did, sometimes she didn't.  She
certainly didn't have any obligation to.

48 (Pages 189 to 192)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 50 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

193

Q   Did she with respect to Cheryl in her award?
It would have been Cynthia; right?
A   2012?
Q   Yes.
A   It would have been Cynthia.  We had
employees, Tyler, who were rated exemplary or
outstanding who, maybe within 12 months, I ran an
internal case on and we suspended.  I mean, they're not
totally different.
Q   My question, though, is did you -- did
Cynthia consult with you about -- in 2012 about who was
going to get the regional administrator's award?
MR. WILKINSON:  Object to form.  Asked and
answered.
A   I don't remember her talking to me about
Cheryl.  Sometimes she talked to me about people who
had been nominated.  Other times, you know, she didn't.
Q   Okay.  Other than what you've articulated
about Ms. Masters, any other concerns that you have
regarding her conduct in this investigation or her job
performance in general?
A   She mentioned in her deposition testimony
that all her investigation material was not enclosed in
the investigation case file.  And we've harped on that
forever that whatever the investigator develops in the

194

investigation goes in the case file.  We have found
investigators who would withhold exculpatory
information and they would put it in a drop file, dummy
file, stick it in their bottom drawer.  But they would
withhold it and we have repeatedly preached to them do
not do that because we have to turn over to the
defense, if it comes to that in discovery, everything
and we repeatedly find them sticking that information
somewhere else other than the case file.  And she
testified that she had done as much.
Q   With respect to what?
A   To material she developed.  The question was,
I think, from Mr. Wilkinson:  Is everything you
developed in your investigation, all the documents, all
the material, everything you developed in the case file
and she said no.
Q   Are you aware of something specific she
withheld?
A   She didn't address specifics.
Q   So I want to talk about liquidated damages.
A   Okay.
Q   Can you explain what an employer must show to
establish a good faith defense to liquidated damages?
A   In general terms, they have to show they have
relied on professional advice.  Typically, we say to

195

employers that if they are relying on information from
a Wage Hour investigator, previous investigation, or
from an attorney, that that will form a good faith
defense.  In reality, if they have consulted or talked
with and been guided by a Wage Hour consultant who has
previous experience with Wage Hour or a CPA, we accept
that as a good faith defense.
Q   Okay.  And here as I understand it, your
opinion is that they have established a good faith
defense?
A   Yes.
Q   And why is that?
A   Because they appear to have relied clearly on
guidance and information given to them by the deceased
CPA.
Q   And you -- I'm sorry.
A   I'm through.
Q   Can you tell me specifically what advice they
were given that they relied upon?
A   The 12 percent of sales as a representative
amount of tips received by employees.  I know Joe
testified that, based on guidance from the CPA, he had
determined to run the business, back when he was active
in it, nobody worked more than 38 hours a week, we
don't hire anybody under 18.  I'm assuming that

196

information also came over to him from the CPA.
Q   And you're assuming that?
A   I am assuming that.  I have never spoken with
the CPA.
Q   Now, Mr. Maranto also testified that the CPA
told him that you had to pay time-and-a-half for
overtime?
A   Yes.
Q   So not paying time-and-a-half is contrary to
the advice given by the CPA; right?
A   Yes.
MR. WILKINSON:  Object to the form.
(Exhibit Z is marked for identification.)
Q   I'm going to do it.  I'm going to mark
Exhibit Z.  I'm handing you what's been marked Exhibit
Z.  I would like to turn your attention to Page 246,
the question on Line. 2:  "Okay.  But you did hide your
cash overtime for straight time pay wages from your new
accountants; right?"
Answer:  "Yes."
"Why?"
Answer:  "I am not -- I wasn't familiar with
Don Smith.  I don't know.  I don't know Don Smith that
well."
So is hiding cash overtime from your CPA,

Case 5:15-cv-01378-D  Document 73-1  Filed 05/04/17  Page 51 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

197

1   does that meet the good faith test?
2       A   Well, this is the -- Don Smith is the new
3   CPA.  My understanding was it was Danny, the former
4   CPA, who gave them advice on FLSA compliance.
5       Q   Okay.  But did the CPA -- again, the CPA told
6   them to pay time-and-a-half; right?  The deceased CPA?
7       A   I don't -- I don't recall hearing that
8   question asked and answered with regard to the deceased
9   CPA.
10      Q   All right.  With respect to this, what I just
11  read and the Smith law firm, I will represent to you,
12  was running their payroll during this period of time
13  during 2014 through January 15th, 2015, and beyond.
14      A   Okay.
15      Q   So her testimony about hiding cash overtime
16  from the CPA, that does not meet the good faith test;
17  is that accurate?
18          MR. WILKINSON:  Object to form.
19      A   My answer, Tyler, would be Mrs. Maranto, from
20  her deposition testimony, did not follow the
21  instructions that her husband gave her about nobody
22  works more than 38 hours a week, we don't hire anybody
23  under 18.  I'm more familiar from the deposition
24  testimony with what he told her instructionally than
25  what Mr. Smith did or didn't tell her.

198

1           But the accountant -- previous accountant
2   had, my understanding was, he had the conversation
3   about how to comply with the law with Mr. Maranto and
4   probably Mrs. Maranto.  Mr. Maranto got it.  Years of
5   experience, he got it.  He incorporated it.  I think it
6   is indicative of the fact -- that leads to the fact
7   that they were never investigated since 1983 or '84,
8   whenever they began operation.  They were never -- they
9   never had a private suit filed against them.  I think
10  they were in compliance.  It is when he steps away from
11  the operation and she takes it that I'm unclear whether
12  she was following anybody's advice, her husband and the
13  CPA's, or whether she, frankly, just lost her way and
14  didn't do -- didn't follow some of the instructions she
15  had been given.
16      Q   Regarding back wages, do you have an opinion
17  as to what unpaid overtime compensation, if any, should
18  be in this case?
19      A   No.
20      Q   Do you have an opinion as to what unpaid
21  minimum wage -- excuse me, unpaid overtime compensation
22  should be?
23      A   No.
24      Q   And so just regarding the computation of back
25  wages, so if Wage Hours does an investigation and they

199

1   find, for example, that employees are not being paid a
2   minimum wage of $7.25 as it shows up on timecards and
3   the payroll records and the paychecks and the stubs on
4   the face of the records, Wage Hour would find a minimum
5   wage violation; is that fair?
6       A   Yes.
7       Q   And they would asked the employer to pay
8   whatever back wages were computed based on the face of
9   the records?
10      A   Yes.
11      Q   And same with overtime, if the payroll
12  information just shows on the face of the records that
13  time-and-a-half was not paid but all hours worked over
14  40 were paid at the straight regular rate rather than
15  the time-and-a-half premium, Wage Hour would find an
16  overtime violation and could compute the back wages
17  based on the information on those records?
18          MR. WILKINSON:  Object to form.
19      A   Yes.
20      Q   So when there are no records, what does Wage
21  Hour do to determine back wage computations?
22      A   Simply put, they try to reconstruct them as
23  accurately as possible under the theory of a case
24  called Mountain Clements Property.
25      Q   And it's called reconstruction; is that

200

1   correct?  Is that what Wage Hour calls when there's no
2   records computing back wages?
3       A   Yes.
4       Q   Are there any Wage Hour written policies or
5   guidelines on how to do the reconstruction?
6       A   If there are, they are probably in the
7   handbook, but I'm not certain there are because each
8   case is really fact specific.  The reconstruction has
9   to be based on something, and that something or some
10  things can vary from case to case.
11      Q   Okay.  So what does the case law say about
12  Department of Labor's burden in proving computation of
13  back wages in a reconstruction case?
14      A   Well, Tyler, again, forming the foundation
15  and answer to that question is Wage Hour has to conduct
16  a legitimate investigation, one that has adhered to
17  policy and procedure, to get to the point of your
18  question -- of the question you're asking.
19      Q   Let's say that they do that, what does the
20  case law say?
21          MR. WILKINSON:  Excuse me.  He wasn't
22  through.  You interrupted him.  Excuse me.
23      A   So my answer is different in this case, in
24  these circumstances, than it is in the normal course of
25  business.

50 (Pages 197 to 200)

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 52 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

201

Q    My question is what does the case law say about the Department of Labor's burden in proving reconstruction?

MR. WILKINSON:  Object to form.

A    Well, the department has the burden to be reasonable because -- in essence, the case law is the employer's not to benefit from the absence of records that they were required to keep.  By the same token, neither is the employer to be punished for their lack of adherence to the record-keeping violation.  So it's the sweet spot.  The correct position is that Wage Hour will do its due diligence -- in absence of the time or payroll records or a portion of them, that they will do their due diligence and they will try to fairly and equitably reconstruct those.  And at that point, they're still open to input of additional evidence and, frankly, to negotiation.

Q    So am I understanding that that's your -- that is your understanding of what the case law says?

A    Yes.

Q    And how about what the case law says with respect to what the employer must establish to challenge any reconstruction back wage computation?

MR. WILKINSON:  Object to form.  Counsel, you know, you're asking all legal conclusions and he's not

202

testifying as a lawyer.  He's not a lawyer.

MR. McLEOD:  He's given opinions on a lot of legal topics here.

MR. WILKINSON:  But asking him questions about legal points like this -- I mean, go ahead.  It's your deposition, you can do what you want to do.

MR. McLEOD:  Your objection is on the record.

THE WITNESS:  Can you repeat the question?

Q    (By Mr. McLeod)  What is your understanding of what case law says with respect to what the employer -- the standard for the employer to challenge a reconstruction by the Department of Labor?

MR. WILKINSON:  Object to form.

A    I think the case law is similar evidence.  By that, I mean if the department says we've interviewed 11 people, we have taken the average number of hours they say they worked a week, 43, and so we have concluded that employees are due three hours of overtime a week.  If the employer comes forward and says, well, I've got four employees that say they never worked over 40, case law is that that has to be reconciled by what one judge in the Southern District of Texas calls mature counsel.  They, in essence, have to work that out, those differences, each one advocating for their client to come to a reasonable

203

negotiated resolution.

Q    What case are you referring to?

A    Well, I mean, Tyler, I've been in Judge Hinojosa's court in the Southern District where he said they owe X and they said, no, we don't.  And he said I want this off my docket, so both parties go back in that room and you can come out when you've negotiated a resolution to this case.  Have a nice afternoon.  And that's exactly what we did.

My conclusion was that Judge Henojosa is more familiar with the case law than I am, and for him to tell the government and the defendant to go do that, he was basing it on something other than a whim and it worked.  That's exactly what we did.  When ordered to reach an agreement, the parties reached an agreement.

I can't tell you, as a non-attorney, exactly what the case law is with regard to the facts you've asked me about.

Q    But then how can you give an opinion as to whether or not the good faith defense has been met?

MR. WILKINSON:  Object to form.

A    My opinion is based on 40 years of experience and observation.

MR. WILKINSON:  Counsel, I don't want to interrupt you, but under the Federal Rules, you know,

204

your time is very close, and of course, I have a few questions, so you have to allow some time there for me to do cross-examination.

MR. McLEOD:  Well, Bill, I understand that.  And, you know, this is why I wanted to start at 8:00 and, you know, you weren't agreeable to that.

MR. WILKINSON:  Well, we compromised on that.  Don't you recall?

MR. McLEOD:  By a half hour.  You wanted 10 a.m.

MR. WILKINSON:  Well, we compromised.

MR. McLEOD:  And then you took an hour lunch when we asked for 45 minutes.

MR. WILKINSON:  That doesn't move us all forward.  I'm just -- in a respectful way, I'm just reminding you that there are time limits involved here.

Q    (By Mr. McLeod)  Okay.  Well, I'll ask you regarding what you know of Cheryl Masters' back wage computations.  I believe you've made comments about her off-the-clock time as expressed in the narrative that you didn't agree to that?

A    Right.

Q    Is there anything else that she has done in her computations that you believe is unreasonable?

A    I've mentioned, Tyler, the failure to allow

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 53 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

205

1  tip credit to bussers who met the definition of
2  employees.  With regard to comps, she didn't allow the
3  good faith defense.  She -- Wage and Hour, in my
4  opinion, Tyler, is attempting to have it both ways in
5  the sense that they are saying willful violations are
6  present in this case, we're going with the three-year
7  statute, but yet, willful violations are to result in
8  civil monetary penalties being assessed against the
9  employer for wilful violations.  And that was not done
10 in this case.
11       So the impression I'm getting is that the
12 investigator says this is willful, I'm going back three
13 years, but when the case arrives at the manager's desk
14 and/or the regional office desk and/or the regional
15 solicitor's desk, someone in management made a
16 conscious decision that we're not assessing CMP's for
17 willful violations.
18       So you've got an unqualified, in my opinion,
19 investigator stepping outside Chapter 51 instructions,
20 going after the third year based on willful, but all of
21 a sudden, the same violations evaporate as far as being
22 deemed willful when it comes to the manager's desk and
23 their review of the circumstances that she found in the
24 investigation.
25       Q   Okay.  And I believe we also discussed the

206

1  meal credit that you believe should have been
2  considered?
3          MR. WILKINSON:  Object to form.
4       A   I'm sorry.
5       Q   Is there other things?
6       A   Meal credit -- meal credit, meal and rest
7  breaks, failure to apply Klinghoffer, and I believe
8  that's it as far as the back wage computation
9  methodology.
10      Q   And the one thing that we didn't finish
11 discussing is, in your initial report, you state an
12 opinion that Meers, the corporation, should not be
13 liable here.  And why is that?
14      A   I'm just spinning primarily off the
15 investigator's conclusion that the single employer in
16 this case is Margaret Maranto.
17      Q   Any other reason?
18      A   Well, I haven't spent the time to delve into
19 this, but I'm not sure who the corporate officials are,
20 but if Joe Maranto is a corporate official, he clearly
21 gave instruction that instructions, that if followed,
22 would have continued the business to be in compliance.
23      Q   So do you know who the shareholders, board of
24 directors, members, and officers are for Meers Store
25 and Restaurant, Inc.?

207

1       A   No.
2          MR. McLEOD:  Bill, in light of the time, I
3  will --
4          MR. WILKINSON:  We'll take a brief recess.
5  We'll do our cross-examination in a real quick way.
6          MR. McLEOD:  I didn't finish my sentence for
7  the record, but I will conclude.
8          (Off the record at 4:54 p.m. and returning at
9  4:59 p.m.)
10         CROSS-EXAMINATION
11 BY MR. WILKINSON:
12      Q   Randy, you've been very patient and I'll try
13 to limit this to a very few number of questions.  But
14 you have been questioned since 9:30 this morning by
15 counsel for the Department of Labor; is that correct?
16      A   Yes.
17      Q   I'm going to ask you just a few questions
18 about some of the same things he asked you about.
19 Okay?
20      A   Okay.
21      Q   Now, let's go -- first of all, let's turn to
22 the subject of the amount of back wages that are
23 claimed in this case by the Department of Labor.  Do
24 you know what I'm talking about?
25      A   Yes.

208

1       Q   Now, do you have an opinion with regard to
2  those back wages?
3       A   Yes.
4       Q   Would you tell us what your opinions are
5  about that, please?
6       A   Well, in my opinion, the back wage amounts
7  computed under the investigation are they're wrong in
8  the sense that she did not follow policy and procedure
9  in making those computations.
10      Q   She who?
11      A   Investigator Masters.
12      Q   All right.  Go ahead, sir.
13      A   Investigator Arnold indicated she had looked
14 at the computations, I think, but that Investigator
15 Masters actually computed them.  So they are wrong.
16 They're woefully high.  I was asked if I knew how much
17 is due.  I haven't, frankly, made the effort to
18 determine because the facts that she presents are so
19 far outside the guidance in the Field Operations
20 Handbook that they seemed to me to be a waste of time
21 or at least premature to try to figure out what the
22 true back wages might be.
23      Q   All right.  So your conclusion is -- about
24 the back wages is that they're invalid and excessive?
25      A   Yes.

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

209

Q   Now, you were asked by opposing counsel some questions about Margaret.  And let me -- let me ask you this question, do you have an opinion as to whether responsibility for any violations in this case, do you have an opinion as to who should -- on whose shoulders that responsibility should rest?

A   Yes.

Q   Who?

A   Clearly on Margaret Maranto.

Q   And what -- tell us what causes you to believe that Margaret Maranto is responsible for the violations, if any?

A   Because based on the deposition testimony, she decided or -- her actions did not follow the instructions and guidance that she had been given by Joe Maranto.  She acted outside the authority he had given her and the instructions he had given her and certainly beyond the scope of the authority he had given her when he was absent from the establishment due to a serious health condition.

Q   And do you have an opinion as to whether or not -- back at that time before any of this came up, do you have an opinion as to whether Joe Maranto knew what Margaret was doing on the day-to-day operations of the business?

210

MR. McLEOD:  Objection.  Form, foundation.

A   His testimony was he believed -- he had no reason not to believe she was following the instructions and guidance he had given her about how to stay in compliance with the Fair Labor Standards Act.

Q   And do you have an opinion with regard to -- between the three -- between the corporation and Joe Maranto or Margaret Maranto, do you have an opinion as to which one of those persons should be held for violations if, in fact, there are violations?

MR. McLEOD:  Objection.  Form, foundation.

A   Solely Margaret Maranto.  I agree with the investigator insofar as that conclusion.

Q   Now, just from a matter of your practice over all those years with the Department of Labor, I'm going to ask you a question about what would normally be the case or what would customarily be the case.  Do you understand that's what I'm going to ask you about now?

A   Yes.

Q   Assuming for purposes of this question that the Department of Labor believed that there was a case that should be filed -- a court case that should be filed against a corporation and against a husband and wife who were owners of the corporation -- do you understand my question so far?

211

A   Yes.

Q   Tell us what has your experience been over these years, would the Department of Labor normally sue all three of these entities and people?

MR. McLEOD:  Objection.  Form, foundation.

Q   So is it unusual in this case, based on your experience, that Joe Maranto was not named as a defendant in this case?

A   Extremely unusual.

Q   And your opinion, as I understand it, is the reason Joe Maranto was not named a defendant in this case was because Margaret Maranto was taking all of these actions without any authority and without his knowledge.  Do you agree?

MR. McLEOD:  Objection.  Form.

A   That's correct.

MR. WILKINSON:  That's all.  We'll read and sign.

MR. McLEOD:  I have a follow-up and you raised some new things, let's go really quick.

REDIRECT EXAMINATION

BY MR. McLEOD:

Q   Randy, you said the back wages are wrong because Cheryl was not following policy and procedures

212

in computing them.  What policies and procedures are you referring to?

MR. WILKINSON:  Object to form.  It's all been asked and answered.  I mean, with all due respect to you, you spent approximately an hour doing that just shortly before.

A   She didn't follow policy and procedure with regard to the investigation period.

Q   Well, let me shorten this then, are you referring to things you've already discussed in your report and that we've talked about today?

A   Most, if not all of the things we discussed, the tip credit, the meal credit, the bona fide rest meal periods that I believe given the free food -- I'm repeating myself -- were taken that she did not allow -- she did not subtract as noncompensable time.  She did not follow procedure with respect to the good faith defense.  The calculation of liquidated damages in this case was not adherent to the policy of the agency.

Q   Okay.  Why is it that Joe's lack of knowledge of what -- alleged lack of knowledge of what Margaret Maranto was doing relieved the corporation of liability?

A   As I said earlier in response to your question, I don't know the exact corporate make-up, the

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 5:15-cv-01378-D   Document 73-1   Filed 05/04/17   Page 55 of 57
RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

213

1   officers, the shareholders and so forth.  I guess I'm
2   somewhat assuming in my answer that the officers
3   probably include Joe and Margaret Maranto.  So if Joe
4   is an officer of the corporation and he said follow
5   these policies as I have for 50 years and have never
6   had a problem with the Wage Hour Division, if problems
7   indeed occurred and he's physically not at the
8   establishment, he's not engaged in the operation of the
9   hiring and firing and payroll and timecards, then it
10  only leaves Margaret who, in her testimony, said she
11  felt sympathy, empathy, compassion for the employees
12  and acquiesced to their request.
13       Q   But the employees work at Meers Restaurant,
14  so Meers is a proper defendant; correct?
15       MR. WILKINSON:  Object to form.
16       Q   Or the employer?
17       MR. WILKINSON:  Object to form.
18       A   Not based on the circumstances as I know them
19  even as presented in the investigation case file.
20       Q   In your 40 years with the Wage and Hour
21  Division, have you ever had a corporate employer that
22  was not deemed to be an employer?
23       MR. WILKINSON:  Object to form.
24       A   Yes.
25       Q   And only another individual was?

214

1        MR. WILKINSON:  Object to form.
2        A   Yes.
3        Q   Which case?
4        A   I don't remember.  It was a security guard
5   case out of Waco and they came up with counsel, several
6   of them, and they made their argument and the
7   solicitor's office dismissed some of them as
8   defendants.  And I think the corporate entity was one
9   that was dismissed because they had, through a series
10  of circumstances somewhat similar to this, one or two
11  people had emerged as the true employers, hiring and
12  firing, scheduling, assigning duties.  One, I remember,
13  lived out of state, was almost an investor and they
14  made their argument and they were dismissed.
15       Q   Was it a misclassification case?
16       A   It was an overtime case, Tyler, as I recall.
17  I'm going back several years.
18       Q   But in that particular case, do you know why
19  a particular corporate entity was dismissed?
20       MR. WILKINSON:  Object to form.
21       A   Well, as I say, I think the circumstances
22  were such that the corporation was on record as
23  providing guidance and instruction that would have
24  resulted in compliance and the true employer, as
25  defined by FLSA, was one or two of the other named

215

1   defendants and the facts supported that they had really
2   made the decisions that resulted in the alleged
3   violations.
4        Q   Was that a recorded case in the Court, do you
5   know?
6        MR. WILKINSON:  Object to form.
7        A   It never went to court.
8        MR. McLEOD:  No further questions.
9        MR. WILKINSON:  We will read and sign.
10  (The deposition was concluded at 5:11 p.m.)

216

1        Jurat
2
3        I, RANDALL G. O'NEAL, do hereby state under
4   oath that I have read the above and foregoing
5   deposition in its entirety, and that the same is a
6   full, true, and correct transcript of my testimony so
7   given at said time and place, except for the
8   corrections noted.
9
10  _____
    RANDALL G. O'NEAL
11
12       Subscribed and sworn to before me, the
13  undersigned Notary Public in and for the State of
14  Oklahoma, by said witness, on this, the _____ day of
15  _____ 2017.
16
17  _____
    NOTARY PUBLIC
18
19  My Commission Expires: _____
20  JOB FILE 121530
21  Department of Labor, et al vs. Meers Restaurant, et al.
22
23
24
25

54 (Pages 213 to 216)

RANDALL G. O'NEAL - 4/20/2017
Edward C. Hugler, et al.  v. Margaret Maranto, et al.

217

```
                    ERRATA SHEET
            DEPOSITION OF RANDALL G. O'NEAL
          REPORTED BY:  LINDSEY GOODENOW, CSR
      DATE OF DEPOSITION TAKEN:  APRIL 20TH, 2017
                 JOB FILE NO. 121530

PAGE        LINE            IS           SHOULD BE
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
```

218

```
                    CERTIFICATE


        I, LINDSEY GOODENOW, Certified Shorthand
Reporter, do hereby certify that the witness was by me
first duly sworn to testify the truth, the whole truth,
and nothing but the truth, in the case aforesaid, taken in
shorthand and thereafter transcribed; that the same was
taken pursuant to stipulations hereinbefore set out;
and that I am not an attorney nor relative of any of
said parties or otherwise interested in the event of
said action.
        IN WITNESS WHEREOF, I have hereunto set me
hand and seal this April 24th, 2017.




            _____
            Lindsey Goodenow, CSR
            CSR No. 1956
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

```
 1                      CERTIFICATE

 2

 3          I, LINDSEY GOODENOW, Certified Shorthand

 4   Reporter, do hereby certify that the witness was by me
     first duly sworn to testify the truth, the whole truth,
 5   and nothing but the truth, in the case aforesaid, taken in

 6   shorthand and thereafter transcribed; that the same was

 7   taken pursuant to stipulations hereinbefore set out;

 8   and that I am not an attorney nor relative of any of

 9   said parties or otherwise interested in the event of

10   said action.

11          IN WITNESS WHEREOF, I have hereunto set me

12   hand and seal this April 24th, 2017.

13

14

15

16

17

18

19

20   _____

21   Lindsey Goodenow, CSR

22   CSR No. 1956

23

24

25

26
```